No. 13-3634

---

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT**

---

KEVIN P. DIXON, deceased, by and through
LULA M. DIXON, his mother, next best
Friend and Independent Administrator of the
Estate of Kevin P. Dixon,

Plaintiff-Appellant,

v.

COOK COUNTY d/b/a CERMAK HEALTH
SERVICES; KATRINA M. BONAPARTE M.D.;
and NEWORLD ABOIGBE (f/k/a OMEKE,
R.N.),

Defendants-Appellees.

---

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division
No. 09 CV 6976
The Honorable THOMAS M. DURKIN and The Honorable HARRY D.
LEINENWEBER, Judges Presiding

---

**BRIEF OF THE PLAINTIFF-APPELLANT,
KEVIN P. DIXON, by and through next best Friend LULA M. Dixon**

---

ROBERT ROBERTSON
Law Offices of Robert Robertson
Attorney for Plaintiffs-Appellants
20 North Wacker Drive
Suite 3710
Chicago, Illinois 60606
(312) 223-8600

**ORAL ARGUMENT REQUESTED**

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No.: 13-3634

Short Caption:
  Estate of Kevin Dixon, Plaintiff-Appellant v. Cook County d/b/a Cermak
  Health Services, et al. Defendants-Appellees

1.)  The full name of every party that the attorney represents in the case:
  Kevin Dixon by and through Lula Dixon as next best Friend and Independent
  Administrator of the Estate of Kevin P. Dixon

2.)  The names of all law firms whose partners or associates have appeared for
the party in the case (including proceedings in the district court or before an
administrative agency) or are expected to appear for the party in this court:


  Robert Robertson of the Law Offices of Robert Robertson;
  Michael D. Robbins of Michael D. Robbins & Associates;
  Jeffrey Neslund of the Law Offices of Jeffrey Neslund

3.)  If the party or amicus is a corporation:

  i.)  Identify all its parent corporations, if any; and
    N/A

  ii.)  List any publicly held company that owns 10% or more of the party's or
    amicus' stock:
    N/A

_____

Attorney's Signature____/s/ Robert Robertson_____  _____  Date: March
26, 2015_____

Attorney's Name: Robert Robertson

*Counsel of Record* for above listed party pursuant to Circuit Rule 3(d):____Yes

Address:    20 North Wacker Drive, Suite 3710
        Chicago, Illinois 60606

Phone Number:   (312) 223-8600    Fax Number: (312) 781-9123

E-mail Address: robrobertson1@sbcglobal.net

i

No. 13-3634

---

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT**

---

KEVIN P. DIXON, deceased, by and through
LULA M. DIXON, his mother, next best
Friend and Independent Administrator of the
Estate of Kevin P. Dixon,

                                    Plaintiff-Appellant,

            v.

COOK COUNTY d/b/a CERMAK HEALTH
SERVICES; KATRINA M. BONAPARTE M.D.;
and NEWORLD ABOIGBE (f/k/a OMEKE,
R.N.),

                                    Defendants-Appellees.

---

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division
No. 09 CV 6976
The Honorable THOMAS M. DURKIN and The Honorable HARRY D.
LEINENWEBER, Judges Presiding

———————

**BRIEF OF THE
PLAINTIFF-APPELLANT**

———————

# TABLE OF CONTENTS

CIRCUIT RULE 26.1 DISCLOSURE STATEMENT……………………………  v

TABLE OF CONTENTS…………………………………………………………...iii

TABLE OF AUTHORITIES……………………………………………………  v

JURISDICTIONAL STATEMENT………………………………………………… 1

ISSUES PRESENTED FOR REVIEW…………………………………………… 2

STATEMENT OF THE CASE………………………………………………… 3

SUMMARY OF ARGUMENT………………………………………………………16

ARGUMENT…………………………………………………………………………22

    I.    The District Court Erred In Dismissing Plaintiff's First Amended Complaint Pursuant To Rule 12(B)(6) Where The Complaint Alleged That Neither Defendant Medical Providers Bonaparte Or Omeke Offered Plaintiff Any Significant Medical Treatment Even Though Plaintiff Was: 1) In Severe And Persistent Pain; 2) Had Been Diagnosed With A Large Mass In His Chest; 3) Was Bowel And Urinary Incontinent; And 4) Was Unable to Walk…………………………………………………………………………………24

        *A. The District Court Erred In Granting Defendant Bonaparte's Motion To Dismiss Where She Discharged Plaintiff From A Medical Unit Into The General Jail Population Even Though He: A) Was In Severe And Persistent Pain; B) Had A Large Rapidly Growing Mass In His Chest; C) Was Bowel And Urinary Incontinent; And D) Could Not Walk*……………………..25

        *B. The District Court Erred In Granting Defendant Nurse Omeke's Motion To Dismiss Because The Complaint Establishes His Deliberate Indifference In Failing To Provide Medical Treatment After Being Notified Of Plaintiff's Serious Condition*…………………………………………………………………37

        *C. The District Court Erred In Dismissing The Intentional Inflection Of Emotional Distress Count (Count V) Against Defendants Bonaparte And Omeke Where Their Conduct In Refusing Medical Treatment Was Extreme And Outrageous*………………………………………………………………40

II.    The District Court's Grant Of Summary Judgment On Plaintiff's Monell
       Claim Should Be Reversed Where There Is A Genuine Issue Of Material
       Fact As To Whether The Policies Of Defendant Municipality Resulted In
       Harm To A Plaintiff Who Was Inexplicably Denied Adequate Medical Care
       For An Obvious And Serious Medical Condition.............................43

CONCLUSION.........................................................................................55

TABLE OF AUTHORITIES

Cases

*Anderson v. Liberty Lobby,*
    477 U.S. 242 (1986)..................................................................................20

*Arnett v. Webster,*
    658 F.3d 742 (7th Cir. 2011).................................................................35, 49

*Bannister v. Burton,*
    636 F.3d 828 (7th Cir. 2011).........................................................................51

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007)..................................................................................25

*Berry v. Peterman,*
    604 F.3d 435 (7th Cir. 2010)..............................................., 34, 36, 38, 39, 40

*Edwards v. Snyder,*
    478 F.3d 827 (7th Cir. 2007)........................................................................31

*Estelle v. Gamble,*
    429 U.S. 97 (1976)................................................................................30, 32

*Farmer v. Brennan,*
    511 U.S. 825 (1994).............................................................................26, 27

*Fox v. Hayes,*
    600 F.3d 819 (7th Cir. 2010)........................................................................41

*Frake v. City of Chicago,*
    210 F.3d 779 (7th Cir. 2000)........................................................................44

*Gayton v. McCoy,*
    593 F.3d 610 (7th Cir. 2010)...................................................................38, 49

*General Electric Capital Corp. v. Lease Resolution Corp.,*
    128 F.3d 1074 (7th Cir. 1997)......................................................................20

*Gil v. Reed,*
    381 F.3d 649 (7th Cir. 2004)..................................................................34, 40

*Gonzalez v. Feinerman,*
  663 F.3d 311 (7th Cir. 2011)....................................................................33

*Greeno v. Daley,*
  414 F.3d 645 (7th Cir. 2005).......................................................26, 32, 36, 39, 49

*Grieveson v. Anderson,*
  538 F.3d 763 (7th Cir. 2008)................................................................31, 32

*Gutierrez v. Peters,*
  111 F.3d 1364 (7th Cir.1997)................................................................28, 31

*Harris v. City of Auburn,*
  27 F.3d 1284 (7ᵗʰ Cir. 1994).....................................................................20

*Hayes v. Snyder,*
  546 F.3d 516 (7th Cir. 2008)...........................................26, 27, 28, 30, 35, 36

*Johnson v. Doughty,*
  433 F.3d 1001 (7ᵗʰ Cir. 2006)...................................................................32

*Jones v. Simek,*
  193 F.3d 485 (7ᵗʰ Cir. 1999).....................................................................36

*King v. Kramer,*
  680 F.3d 1013 (7ᵗʰ Cir. 2012)...................................................................38

*Kolegas v. Heftel Broadcasting Corp.,*
  154 Ill. 2d 1, 607 N.E.2d 201 (1992)......................................................41, 42

*Krist v. Eli Lilly & Co.,*
  897 F.2d 293 (7ᵗʰ Cir. 1990)....................................................................50

*McGowan v. Hulick,*
  612 F.3d 636 (7ᵗʰ Cir. 2010)....................................................................38

*McGrath v. Fahey,*
  126 Ill. 2d 78, 533 N.E.2d 806 (1988)....................................................40, 41

*Metavant Corp v. Emigrant Savings Bank,*
  19 F.3d 748 (7ᵗʰ Cir. 2010)......................................................................51

*Meyers v. Illinois Central Railroad Co.,*
  629 F.3d 639 (7ᵗʰ Cir. 2010)....................................................................51

*Miller v. Gonzalez,*
    761 F.3d 822 (7th Cir. 2014)………………………………………………20, 21, 45

*Ortiz v. Webster,*
    655 F.3d 731 (7th Cir. 2011)……………………………………………………32

*Patterson v. Xerox Corp.,*
    901 F. Supp. 274 (N.D. Ill. 1995)………………………………………………41

*Pavilon v. Kafery,*
    204 Ill. App. 3d 235, 561 N.E.2d 1245 (Ill. App. 1990)…………………………40, 41

*Phelan v. Cook County,*
    463 F.3d 773 (7th Cir. 2006)……………………………………………………44

*Powe v. City of Chicago,*
    664 F.2d 639 (7th Cir. 1981)……………………………………………………47

*Public Finance Corp. v. Davis,*
    66 Ill. 2d 85, 360 N.E.2d 765 (1976)……………………………………………40

*Ramos v. Lamm,*
    639 F.2d 559 (10th Cir. 1980)……………………………………………………44

*Rice v. Correctional Medical Services,*
    675 F.3d 650 (7th Cir. 2012)……………………………………………33, 38, 49

*Scheuer v. Rhodes,*
    416 U.S. 232 (1974)………………………………………………………………20

*Shepherd v. Dallas County,*
    591 F.3d 445 (5th Cir. 2009)……………………………………………………46

*Sherrod v. Lingle,*
    223 F.3d 605 (7th Cir. 2000)……………………………………………………27

*Smego v. Mitchell,*
    723 F.3d 752 (7th Cir. 2013)……………………………………………33, 35, 38

*Thomas v. Cook County Sheriff's Department,*
    604 F.3d 293 (7th Cir. 2010)……………………………………………………44

*Todaro v. Ward,*
    565 F.2d 48 (2nd Cir. 1977)……………………………………………………44

*Travel All Over the World v. Kingdom of Saudi Arabia,*
  73 F.3d 1423 (7th Cir. 1996)……………………………………………..…...20

*United States v. Parra,*
  402 F.3d 752 (7th Cir. 2005)………………………………………………….51

*Walker v. Benjamin,*
  392 F. 3d 1030 (7th Cir. 2002)………………………………………..27, 36, 37, 38, 49

*Wellman v. Faulkner,*
  715 F.2d 269 (7th Cir. 1983)……………………………………………45, 53

*Williams v. Liefer,*
  491 F.3d 710 (7th Cir. 2007)…………………………………………….32, 40

*Wolf-Lillie v. Sonquist,*
  699 F.2d 864 (7th Cir.1983)……………………………………………….47

*Zemke v. Chicago,*
  100 F.3d 511 (7th Cir. 1996)……………………………………………….20

Statutes And Rules

Fed. R. Civ. Proc. Rule 8………………………………………………….....25, 38

Fed. R. Civ. Proc. Rule 12(b)(6)…………………………………………………passim

REQUEST FOR ORAL ARGUMENT

Plaintiff respectfully requests the opportunity to present oral argument in this matter as this case meets the standard set forth in F.R.A.P. Rule 34(a). This appeal is not frivolous and oral discussion of the facts and the applicable precedent would benefit the Court. Specifically, this appeal is not frivolous as the district court failed to accept all well pled allegations as true and consider all reasonable inferences in favor of the Plaintiff when dismissing counts of their Complaint against certain individual defendants. Further, the district court failed to faithfully apply the summary judgment standard by resolving contested factual issues in favor of the moving party, which deprived Plaintiff of an opportunity to present its *Monell* claim to a trier of fact. This case involves a significant amount of legal and factual issues; none of the legal issues raised herein have been definitively decided by this Court.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343, as Plaintiff's Complaint alleged violations of his civil rights under 42 U.S.C. § 1983. R.49, Ex. 1. The district court had ancillary jurisdiction over Plaintiff's state law intentional infliction of emotional distress claim pursuant to 28 U.S.C. § 1367. On April 26, 2011, the district court dismissed Plaintiff's First Amended Complaint with prejudice as to Defendants Bonaparte and Omeke. R. 70. On October 30, 2013, the district court granted Defendant Cook County's Motion for Summary Judgment on Plaintiff's *Monell* claim and entered judgment that same day. R.173-74. On November 25, 2013, Plaintiff filed a timely Notice of Appeal. R.178. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## ISSUES PRESENTED FOR REVIEW

1. Whether the district court erred in dismissing certain counts of Plaintiff's First Amended Complaint pursuant to Rule 12(b)(6), which alleged:

    a. that defendant physician failed to provide required medical treatment to the Plaintiff-Decedent to treat his pain and serious medical conditions (Count I);

    b. that defendant nurse failed to provide timely medical treatment after being alerted to the serious medical condition of Plaintiff-Decedent by correctional officers (Count II);

    c. that the failure of defendant physician and nurse constituted extreme and outrageous conduct such to support a claim of intentional infliction of emotional distress (Count V)?

2. Whether there was a material issue of fact as to whether practices and policies in providing medical treatment to detainees of Defendant municipality caused harm to Plaintiff that would preclude summary judgment on Plaintiff's *Monell* claim (Count III)?

STATEMENT OF THE CASE

Kevin Dixon was a pre-trial detainee at the Cook County Department of Corrections ("CCDOC") from September 5, 2008, until January 5, 2009. R. 108, ¶20. While a detainee, Mr. Dixon developed tumors in his chest that eventually spread to both his lungs and impinged on his spinal cord. R. 129, ¶6. On March 4, 2009, Mr. Dixon died from lung carcinoma. R. 108, ¶29.

### Discovery of Kevin Dixon's Serious Medical Condition

While a pre-trial detainee, Mr. Dixon began to exhibit symptoms of his illness in October of 2008; these included increasingly severe and persistent pain in his back and abdomen. R. 108, ¶7. A paratracheal mass, or tumor, was initially discovered on a chest x-ray on December 10, 2008, and confirmed on a CT scan on December 11, 2008. R. 130, ¶10. These tests were performed at Cermak Health Services ("Cermak") within the CCDOC. R. 130, ¶10.

On December 15, 2008, Cermak physician assistant (P.A.) Kevin Sims referred Mr. Dixon for an "urgent" pulmonary consultation for this serious medical condition. R. 108, ¶10; R. 129, ¶1. According to former Cermak physician Dr. Pedro Cruz, such an "URGENT" consultation should take place within 24-48 hours. R. 130, ¶11. Mr. Dixon, however, did not have a pulmonary consultation until December 23, 2008. R. 130, ¶10. At the consult with pulmonologist Dr. Braven Shah, Mr. Dixon complained of chest pain for the past two months rotating to his back, lasting hours to days. R. 130, ¶23. Mr. Dixon described this pain in his chest as 10/10 in severity and aggravated by deep breaths. R. 130, ¶23. Dr. Shah reviewed the December 11, 2008

CT scan, ordered a repeat CT scan for January 2, 2009, and scheduled a follow up consultation for January 6, 2009. R. 130, ¶10.

### Dec. 30, 2008-Kevin Dixon admitted to Cermak unable to walk and accused of malingering

On December 29, 2008, Mr. Dixon was transported *via* wheel chair from CCDOC Division 9 to the dispensary because he was having difficulty breathing and experiencing chest pains. R. 130, ¶18. After Mr. Dixon fell out of his bunk with complaints of abdominal pain and an inability to move his legs, Defendant Omeke, an R.N., was called to Division 9 in the morning of December 30, 2008. R. 49-1, ¶50. At 9:44 a.m., Defendant Omeke was specifically notified by a correctional officer that Mr. Dixon was complaining of pain in his stomach, could not use the bathroom, had pain in his legs and could not get up. R. 49-1, ¶50, 72. Based on these symptoms as well as the documented mass in his chest, Defendant Omeke was aware that Mr. Dixon was in need of urgent and immediate medical care. R. 49-1, ¶50, 72. Rather than being transferred to Cermak's Acute Care facility, Mr. Dixon was left on the floor of his cell suffering from bowel and urinary incontinence and paralysis. R. 49-1, ¶¶50, 72. Defendant Omeke simply scheduled him for the "sick call" three days later. R. 49-1, ¶¶50, 72.

Later that day after a shift change, Mr. Dixon was finally admitted to the Cermak Acute Care Facility at 6:00 p.m. R. 49-1, ¶19, 75. Mr. Dixon underwent a CT scan of his abdomen this same day, which, again, confirmed the presence of the large paraspinal and paramediastinal lung tumor in his left chest. R. 129, ¶5. Mr. Dixon

was admitted to Cermak with a diagnosis of bilateral extremity weakness, history of hard stools and history of left paratracheal mass. R. 130, ¶18. Nevertheless, Cermak P.A. Glenn Trammell ordered a psychiatric consultation, suspecting Mr. Dixon was malingering or faking his paralysis. R. 108, ¶15. Mr. Dixon underwent additional CT scans of his spine the morning of December 31, 2008, which described the mass as extending from T4 through T7 of the thoracic spine, with possible extension of the mass into the central spinal canal at T6. R. 129, ¶6.

Mr. Dixon was examined by Defendant Dr. Katrina M. Bonaparte in Cermak on December 31, 2008. R. 129, ¶2. Dr. Bonaparte was in charge of the hospital ward and supervised nurses on the floors where inmates with acute conditions are treated in Cermak. R. 49-1, ¶34. At the time of her examination of Mr. Dixon, Dr. Bonaparte did not have the reports from the multiple imaging studies in the prior three weeks that confirmed this profound and progressive illness. R. 129, ¶2. Due to a backlog in scanning medical records at the CCDOC, the results from the various x-rays, CT scans and the pulmonologist consult from December 23, 2008, were not in the Cermak electronic medical record system called CERNER. R. 129, ¶2, 36. Nor did Dr. Bonaparte have Mr. Dixon's paper medical records from Division 9, which documented months of complaints of rotating pain in his chest and spine. R. 129, ¶4. The only imaging report Dr. Bonaparte saw in the CERNER system on December 31, 2008, was Mr. Dixon's normal x-ray from his admission to the CCDOC in September of 2008. R. 129, ¶4.

Although Dr. Bonaparte was aware Mr. Dixon had a history of a paratracheal

5

mass in his chest and knew CT scans were pending, she testified at her deposition that she does not remember if she made *any effort* to find out the results of the CT scans ordered the previous day. R. 49-1, ¶40, 41; R. 129, ¶7. Despite obvious symptoms of a severe illness and prior CT scans confirming the large mass in his chest, Dr. Bonaparte wrote in her progress notes that Mr. Dixon should undergo a psych consult to rule out malingering. R. 49-1, ¶47. Dr. Bonaparte's progress note also states that she "will see patient Friday," which was three days after the progress note was written on December 31, 2008. R. 49-1, ¶47.

Even though she may have been aware Mr. Dixon already had a pulmonologist consultation on December 23, 2008, Dr. Bonaparte requested another pulmonologist consultation be done on an urgent and "RUSH" basis. R. 130, ¶22, R. 49-1, ¶48. However, the "RUSH" consultation requested by Dr. Bonaparte never took place. R. 49-1, ¶48; R. 129, ¶37. Dr. Bonaparte only prescribed Tylenol and a powerful laxative to treat Mr. Dixon despite his diagnosed tumor. R. 49-1, ¶45. When Dr. Bonaparte prescribed these drugs, Mr. Dixon was bowel and bladder incontinent, paralyzed, and in pain. R. 49-1, ¶45. Dr. Bonaparte also ordered the Cermak nurses to take away Mr. Dixon's wheel chair despite the previous imaging studies describing the progressive mass impinging on his spine and Dixon's statements he could not walk. R. 129, ¶¶9, 10.

On January 1, 2009, nurses in Cermak repeatedly found Mr. Dixon on the floor with stool on himself and verbalizing an inability to walk. R. 129, ¶¶ 11, 12. At 2:30 p.m. on January 1, 2009, a Cermak nurse found Mr. Dixon on the floor with stool on

himself at which time Dixon told security that he could not move from the chest down. R. 129, ¶11. This nurse instructed Mr. Dixon to "avoid malingering behavior and pretending." R. 129, ¶11. The night shift nurse noted at 11:00 p.m. that Mr. Dixon had "open bowel on himself 3x during the shift" and that Mr. Dixon was "unable to walk but can only ambulate with a wheelchair." R. 129, ¶12.

### January 2, 2009- Mr. Dixon discharged from Cermak by Dr. Bonaparte

On the very next day - January 2, 2009 - Mr. Dixon returned to the Fantus Clinic for the follow up CT scan ordered by Dr. Shah on December 23, 2008. R. 129, ¶13. The CT was performed at 9:52 a.m. and described the tumor as "6 x4 cm in the left upper lung lobe which extends to the level of the aortic arch and invades the mediastinum and posterior chest wall. Findings are most indicative of malignant neoplasm." R. 129, ¶13. The January 2, 2009 CT scan also described a 12mm x 9mm nodule in the right upper lobe which is likely metastatic in nature and noted questionable extension of the tumor into the spinal canal. R. 129, ¶20. The CT scan also found Mr. Dixon suffered from emphysema with bullous changes in both lungs. R. 129, ¶13. This CT scan was verified by a radiologist at 3:48 p.m. that same day. R. 129, ¶13.

Less than two hours after the latest CT scan confirmed progression of the disease into both lungs and spinal canal, Dr. Bonaparte discharged Mr. Dixon from Cermak's Acute Care Facility. R. 129, ¶¶14-15. Dr. Bonaparte's discharge order stated that Mr. Dixon's wheelchair should be taken away and "used for transport only." R. 129, ¶14. Dr. Bonaparte discharged Mr. Dixon from Cermak, despite the fact her own

request for an "urgent /rush" pulmonary consult never took place. R. 49-1, ¶43; R. 129, ¶37.

Despite her knowledge that Mr. Dixon had a serious medical condition, was in severe pain and suffered from paralysis, Dr. Bonaparte did not prescribe any medication other than over-the-counter pain medications. R. 49-1, ¶¶43, 45. The last documentation of pain medication received by Mr. Dixon prior to his discharge from Cermak was 600 mg of Motrin on January 2, 2009, at 11:00 a.m. R. 129, ¶18. Dr. Bonaparte does not recall if she examined Mr. Dixon prior to his discharge and there is no medical record of *any* physical examination of Mr. Dixon by *any* caregiver at Cermak prior to his discharge at 12:30 p.m. on January 2, 2009. If Kevin Dixon's serious medical condition as described in the January 2, 2009 CT report was known to the healthcare providers at Cermak, Mr. Dixon would not have been discharged from the Acute Care Unit and had his wheelchair would not have been taken away. R. 129, ¶17.

### *January 5, 2009-Mr. Dixon returns to Cermak paralyzed with stage II pressure ulcers*

On January 5, 2009, Mr. Dixon was transferred back to the Cermak emergency room, suffering from complete paralysis, bowel and bladder incontinence and Stage II pressure sores on his buttock. R. 129, ¶19. Cermak physician Dr. Pedro Cruz documented that Mr. Dixon had severe weakness over both lower extremities with bladder and bowel incontinence since his fall from his bed on December 30, 2008, in CCDOC Division 9. R. 129, ¶20. Mr. Dixon also told Dr. Cruz that he had pain in his

spine for the past three months. R. 129, ¶20. Dr. Cruz diagnosed Mr. Dixon with paraplegia, bowel and bladder incontinence, a large left paramediastinal mass and a stage II sacral pressure sore on his right buttock. R. 129, ¶22. According to Dr. Cruz, Mr. Dixon's sacral pressure sores were the result of impaired mobility from bladder and bowel incontinence or impaired level of consciousness because the patient was not moving around. R. 129, ¶21. Dr. Cruz made the decision to transfer Mr. Dixon to Stroger Hospital for his paralysis. R. 129, ¶22. When Mr. Dixon was finally transferred to Stroger on January 5, 2009, he was gravely ill with lung carcinoma and paralyzed from the waist down due to the metastasized cancer. R. 49-1, ¶¶26-27; R. 108, ¶29.

Mr. Dixon did not receive any pain medication or medical care from the time Dr. Bonaparte discharged him out of Cermak on January 2, 2009, until his return to Cermak on January 5, 2009. R. 129, ¶21. For three days, Mr. Dixon laid paralyzed in Division 10, bowel and bladder incontinent, as stage II pressure sores developed on his buttock. R. 129, ¶19-21. As a result of his terminal condition, Mr. Dixon received a compassionate release from custody. R. 49-1, ¶28. Mr. Dixon died on March 4, 2009, from lung carcinoma. R. 49-1, ¶29.

### Plaintiff's Monell Claim

Plaintiff's retained expert, Dr. Robert Greifinger, has opined that certain deficient policies and procedures at the CCDOC regarding acute care, continuity of care, coordination of care, timeliness of care and the medical record keeping system created barriers to timely and appropriate medical care for Mr. Dixon. According to

9

Dr. Greifinger, these deficient policies and procedures resulted in unnecessary pain and suffering to Mr. Dixon as well as a lack of palliative care. R. 129, ¶31.

On July 11, 2008, the Civil Rights Division of the Department of Justice (DOJ) put Defendant Cook County on notice that a 17-month investigation revealed severe deficiencies in the CCDOC policies and procedures regarding acute care, continuity of care, coordination of care, and the medical record keeping system; these defeciencies created barriers to timely and appropriate medical care to its detainees. R. 129, ¶25. During the DOJ investigation, Dr. Greifinger had primary responsibility for evaluating the medical care provided to inmates at the CCDOC. R. 129, ¶25. Dr. Greifinger's investigation for the DOJ found severe deficiencies in the policies and procedures of CCDOC in providing detainees proper medical care. R. 129, ¶26. Dr. Greifinger, former Chief Medical Officer for the New York State Department of Correctional Services, found the CCDOC's acute care services substantially depart from generally accepted correctional medical care standards. R. 129, ¶26. Dr. Greifinger found that acute care at the CCDOC was so deficient that inmates suffered needlessly because medical staff failed to ensure that inmates met scheduled appointments, failed to monitor acute conditions and failed to timely treat inmates conditions. R. 129, ¶26. Dr. Greifinger's investigation for the DOJ found that the CCDOC was "deficient in ensuring that patients are seen on a regular basis, medications are timely distributed and that inmates are monitored and treated to prevent the progression of an illness." R. 129, ¶27. Dr. Greifinger's investigation identified "grossly inadequate acute care that led to prolonged suffering and

premature deaths of inmates." R. 129, ¶26.

Dr. Greifinger's investigation also found that the CCDOC fails to maintain complete, accurate, readily accessible and systematically organized medical records. R. 129, ¶28. Specifically, Dr. Greifinger's investigation found a three-month backlog of unfiled medical records; a two-month backlog of unfiled emergency room records; and a 3 to 14 month filing backlog of medical records in various divisions within the jail. R. 129, ¶28. Dr. Greifinger's investigation found this insufficient filing system does not facilitate a system for coordinated treatment by multiple providers because inmate records are not accurate, organized or timely filed. R. 129, ¶28. The DOJ investigation concluded with a report that was presented to Cook County Board President Todd Stroger and Cook County Sheriff Thomas Dart on July 11, 2008. R. 129, ¶25.

Dr. Pedro Cruz was a physician at Cermak in 2008 and 2009. R. 129, ¶23. According to Dr. Cruz, there were circumstances when he examined a patient and did not have access to the patient's prior medical records because they had not been scanned into the electronic system utilized by the jail's healthcare providers. R. 129, ¶23. Dr. Cruz also experienced a lack of communication between the Cermak attending physicians and those non-Cermak doctors who did consultations. R. 129, ¶23.

Dr. Avery Hart took over as the Chief Medical Officer of Cermak Health Services in July of 2008, the same month as Dr. Greifinger's findings in the DOJ report were presented to the Cook County Board. R. 129, ¶29. Dr. Hart did not implement any new policies or procedures until the following year in 2009. R. 129,

¶29. Therefore, the same deficient policies and procedures outlined by Dr. Greifinger's investigation in the DOJ report were in place at the time of Mr. Dixon's incarceration. Dr. Hart acknowledged that in 2008 inmate medical records were disorganized and incomplete "to some extent" and there was a backlog in filing certain emergency room records. R. 129, ¶30.

With regards to Mr. Dixon's care, Dr. Greifinger found the same systematic failures that resulted in inadequate continuity and coordination of acute care that were present during his investigation of the CCDOC. R. 129, ¶30, 32. Dr. Greifinger opined that the deficient policies and procedures created barriers to coordination of care and treatment for Kevin Dixon resulting in unnecessary pain, suffering and lack of palliative care. R. 31, ¶31. The policies and practices that created the barriers to timely and appropriate medical care for Mr. Dixon included: (1) a lack of timeliness of care for a known serious medical condition; (2) a lack of communication between the various health care providers resulting in a lack of continuity and coordination of care; and (3) an inadequate and deficient dual medical record keeping system, all of which resulted in unnecessary pain and suffering for Mr. Dixon. R. 129, ¶32.

Specifically, Dr. Greifinger opined there was a complete absence of coordination between Mr. Dixon's caregivers. R. 129, ¶37. There was no communication of critical diagnostic information between caregivers from his housing unit, Cermak and Stroger Hospital. R. 129, ¶37. The lack of communication between caregivers at Cermak, radiologists and the pulmonary consultant resulted in a barrier to the continuity and coordination of care for Mr. Dixon. R. 129, ¶35. These failures subsequently resulted

in unnecessary pain and suffering for Mr. Dixon and the lack of appropriate medical care for his serious medical condition. R. 129, ¶35.

Dr. Greifinger opined that once the mass was identified on December 10, 2008, the serious nature of the condition required *immediate* diagnosis and treatment. R. 129, ¶33. Based on his 25 years of experience in prison/jail healthcare, including managing the medical care at Rikers Island for almost 3 years, Dr. Greifinger opined that the discovery of the mass required immediate attention and not the 13-day delay Mr. Dixon experienced in seeing the pulmonologist. R. 129, ¶33. This 13-day delay resulted in unnecessary pain and suffering and denial of timely palliative care.  R. 129, ¶33.

Dr. Greifinger further opined that the dysfunctional dual paper and electronic medical record system used by Cermak also created a barrier to proper continuity and coordination of care for Mr. Dixon. R. 129, ¶36. For example, Dr. Bonaparte did not have Mr. Dixon's paper file from Division 9 when he was at the Cermak on December 30, 2008; that file reflected months of progressive and deteriorating symptoms. R. 129, ¶¶36, 38. Nor did Dr. Bonaparte have the results of any of the diagnostic studies that showed the progression of the mass in his chest. R. 129, ¶¶36, 38. The lack of communication between caregivers and dysfunctional record system at Cermak also resulted in Mr. Dixon being falsely accused of malingering, despite clear physical symptoms of neurological deficits and progressive deterioration due to the growing mass in his chest. R. 129, ¶36. Mr. Dixon also suffered a substantial compromise in his ability to function, as well as unnecessary pain, suffering, and humiliation, when

13

Dr. Bonaparte ordered that his wheelchair be taken away. R. 129, ¶¶36, 38.

Dr. Greifinger opined that as a result of the deficient policies and practices at the CCDOC, Kevin Dixon never received any substantive medical care or palliative care for his known serious medical condition. R. 129, ¶38. Kevin Dixon suffered needless pain and humiliation, including loss of the ability to ambulate, loss of control of his bowel and bladder, and stage II sacral ulcers after Dr. Bonaparte discharged him from Cermak with nothing more than Tylenol to treat his profound and progressive illness. R. 129, ¶38.

### *The Civil Suit and Proceedings Below*

On November 5, 2009, the Estate of Kevin Dixon brought a four-count Complaint against, as relevant to this appeal, Defendants Cook County d/b/a Cermak Health Services, Katina M Bonaparte, M.D. and R.N. Omeke. R. 1. Plaintiff alleged that Dr. Bonaparte and nurse Omeke's failure to diagnose and/or properly treat Kevin Dixon's serious medical condition constituted deliberate indifference to his serious medical condition, thereby violating his constitutional rights; there was an ancillary intentional infliction of emotional distress claim against these two defendants as well. R. 1. Plaintiff also brought a *Monell* claim against Defendant Cermak Health Services regarding inadequate policies and procedures that resulted in a deliberate indifference to Kevin Dixon's medical condition. R. 1.

On February 8, 2010, Defendants filed a motion to dismiss Plaintiff's Complaint. R. 15. On June 24, 2010, the district court granted Defendant's motion to dismiss without prejudice as to Defendants Bonaparte and Omeke. R.36. On

January 6, 2011, Plaintiff filed a First Amended Complaint containing additional factual allegations against Bonaparte and Omeke. R. 53. On February 4, 2011, Defendants Bonaparte and Omeke filed a motion to dismiss Plaintiff's First Amended Complaint. R. 54. On April 26, 2011, the district court granted Defendants Bonaparte and Omeke's motion to dismiss with prejudice R. 70. On January 4, 2013, Defendant Cook County d/b/a as Cermak Health Services filed a motion for summary judgment on Plaintiff's *Monell* claim. R. 106. On October 30, 2013, the district court granted defendant's motion in its entirety. R. 173. Plaintiff now appeals. R. 178.

## SUMMARY OF THE ARGUMENT

I. Incorrect Granting of Motion to Dismiss Defendants Bonaparte and Omeke.

The district court erred in dismissing Plaintiff's First Amended Complaint on the grounds it failed to establish deliberate indifference on the part of Defendants Bonaparte and Omeke. In so doing, the district court failed to accept all well-pled facts as true and failed to consider all reasonable inferences from those facts in favor of the Plaintiff.

A. Defendant Bonaparte's deliberate indifference was sufficiently pled as the Complaint set forth: 1) the serious medical needs of the Plaintiff-Decedent, including that he was in severe pain, unable to walk, incontinent, and had been diagnosed with a tumor in his chest prior to seeing Dr. Bonaparte; 2) Defendant Bonaparte's role as Plaintiff-Decedent's treating physician and her position as the supervisor of the Acute Care Unit at Cermak; 3) the failure to provide Plaintiff-Decedent with any significant medical treatment for his symptoms; 4) the resulting discharge of Plaintiff-Decedent into a general jail tier for a period of three days when he was still incontinent, unable to walk, and in severe pain; and 5) taking away Plaintiff-Decedent's wheelchair and ordering a psych consult to rule out malingering for a man who had a serious diagnosed medical condition with accompanying pain and other physical symptoms. Many of these would be sufficient standing alone to satisfy the deliberate indifference element; collectively they paint a picture of callous indifference when taken in the best possible light - abject cruelty if looked at otherwise.

B. Defendant Omeke's requisite deliberate indifference was also sufficiently pled as the Complaint set forth the following facts and inferences: 1) Defendant Omeke was notified on December 30, 2008, of the Plaintiff's medical condition while Plaintiff-Decedent was in his cell; 2) Defendant Omeke was working at Cermak, which had an extensive medical history of the Plaintiff including knowledge of the large and growing mass in his chest; 3) Defendant Omeke was told that the Plaintiff was complaining of stomach pain, could not use the bathroom, had leg pain, and could not get up; and 4) Defendant Omeke did not render any medical treatment and just placed Plaintiff on the sick call for three days from then.

C. The conduct of Defendants Bonaparte and Omeke in refusing to treat a patient in such a dire need of basic care constituted extreme and outrageous conduct for purposes of Plaintiff's intentional infliction of emotional distress claim. This is particularly so considering their relative position of authority and the fragile physical state of the Plaintiff-Decedent.

## II. Inappropriate Granting of Summary Judgment on Plaintiff's *Monell* Claim

The district court erroneously granted summary judgment in favor of the Defendant municipality reasoning that no reasonable juror could find that the harm suffered by Plaintiff-Decedent was caused by any deficiencies in the policy and practice of maintaining and giving treating personnel access to medical records. In reaching this sweeping conclusion, the district court failed to consider all of the direct and circumstantial evidence contained in the record, failed to consider all

reasonable inferences in favor of the Plaintiff, and improperly resolved factual issues instead of permitting the trier of fact to do so.

Summary judgment should have been denied where: 1) the readily apparent deficiencies in the record keeping process have been identified by an Official Department of Justice Report; 2) an expert who had primary responsibility for investigating that report opined that the same deficiencies identified in that Report were still present during Mr. Dixon's incarceration, and were the cause of harm to the Plaintiff-Decedent; and 3) the Defendant's Chief Medical Officer admitted that nothing had changed between the release of that report and Plaintiff-Decedent's "treatment."

Even setting aside the official report, an expert's opinion, and the admission that such policies were still in place, the district court failed to consider the clear circumstantial evidence that supported Plaintiff's claim that the deficiencies in the policy and practices of the Defendant's maintenance of medical records resulted in harm to the Plaintiff. Regardless of how it is shaded or spun, it is truly inexplicable that any fully informed medical care provider would have cavalierly discharged him into a general jail population with a tumor in his chest that was pressing on his spine, which was causing severe pain, an inability to walk, and incontinence. It is inexplicable that a fully informed medical professional would have ordered an urgent pulmonary consult when one had occurred the previous week. It is inexplicable that a fully informed medical provider would have ordered removal of a

wheelchair and a psych consult to rule out malingering when the patient is dying from lung cancer and lacks the basic abilities to care for himself.

## APPELLATE STANDARD OF REVIEW

As to Defendants Bonaparte and Omeke, the standard of review applicable for this appeal is *de novo* as the district court granted their Motion to Dismiss pursuant to Rule 12(b)(6). *General Electric Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1080-81 (7th Cir. 1997). In reviewing the sufficiency of a complaint, all of the well-pleaded allegations in the complaint are accepted as true, *Harris v. City of Auburn*, 27 F.3d 1284, 1285 (7th Cir. 1994), and all reasonable inferences are drawn in favor of the plaintiff. *Zemke v. Chicago*, 100 F.3d 511, 513 (7th Cir. 1996). Dismissal of a complaint pursuant to a motion to dismiss is warranted if the plaintiff can prove no set of facts in support of its claims that would entitle it to relief. *Travel All Over the World v. Kingdom of Saudi Arabia*, 73 F.3d 1423, 1429–30 (7th Cir. 1996). A well-pleaded complaint may proceed even if "recovery is very remote and unlikely." *Scheuer v. Rhodes,* 416 U.S. 232 (1974).

As to Defendant Cook County, the standard of review applicable for this appeal is *de novo* as the district court granted Defendant Cook County's Motion for Summary Judgment. *Miller v. Gonzalez*, 761 F.3d 822, 826 (7th Cir. 2014). When considering an appeal from a grant of summary judgment, this Court will review all facts in favor of the non-moving party, in this case Plaintiff. *Id*. This Court will also construe all reasonable inferences in favor of Plaintiff for the same reason. *Anderson v. Liberty Lobby*, 477 U.S. 242, 106 S. Ct. 2505 (1986). Summary judgment is not appropriate if a reasonable jury could return a verdict for the non-moving party. *Id*. at 248.

When reviewing a grant of summary judgment, this Court will not "make credibility determinations, resolve factual disputes and swearing contests, or decide which inferences to draw from the facts." *Miller*, 761 F.3d at 827. This Court "must resist the temptation to decide which party's version of the facts is more likely true" even if the "heftiness of the evidence is on one side," or the credulity of a particular litigant makes the task a difficult one. *Id.*

ARGUMENT

Plaintiff-Decedent needlessly suffered as a pre-trial detainee in the CCDOC because he was not given proper medical care for symptoms of his rapidly progressing lung cancer. This needless suffering included severe and persistent pain without adequate relief, denial of a necessary wheelchair after he could not walk, denial of basic medical care to assist him when he became incontinent and unable to move, the development of open sores and wounds caused by laying in his own waste for days, and housing in a general jail population when he was unable to care for himself and was in dire need of a medical setting. No one, even someone charged with a crime and incarcerated, should have to endure such unnecessary suffering.

Following separate rulings by the district court below, however, every individual medical provider and the institution itself has been cleared of any liability without a true fact-finder hearing evidence and determining who is responsible for this unnecessary suffering. The first ruling at issue dismissed all claims against both the Defendant Doctor, who was responsible for providing care for the Plaintiff-Decedent and who discharged him into a general jail population when he could not care for himself, and the Defendant nurse who initially failed to provide any medical treatment when contacted by correctional officers and alerted to Plaintiff-Decedent's serious pain and symptoms. The second ruling at issue granted summary judgment to the Defendant municipality on Plaintiff's *Monell* claim, finding in large part that although the Plaintiff needlessly suffered for at least three days, the policies of the institution could not be blamed. In each of these

rulings, the district court failed to faithfully apply the appropriate standard when assessing the claim before it. Instead of viewing the pleadings and/or evidence in the light most favorable to the Plaintiff and considering all reasonable inferences therefrom, the district court heightened pleading requirements, inferred facts in favor of the Defendants, and resolved factual issues that should have been addressed by a trier of fact. In the end, the two rulings from the district court absolved both the individual defendants and the institution when responsibility lies in part with all of them.

I. The District Court Erred In Dismissing Plaintiff's First Amended Complaint Pursuant To Rule 12(B)(6) Where The Complaint Alleged That Neither Defendant Medical Providers Bonaparte Or Omeke Offered Plaintiff Any Significant Medical Treatment Even Though Plaintiff Was: 1) In Severe And Persistent Pain; 2) Had Been Diagnosed With A Large Mass In His Chest; 3) Was Bowel And Urinary Incontinent; And 4) Was Unable to Walk.

The district court erred in granting the Motion to Dismiss filed by Defendants

Bonaparte and Omeke pursuant to Federal Rule of Civil Procedure 12(b)(6). In

granting the Defendants' motion, the district court failed to consider all the well-pled

facts contained in that Complaint as well as all reasonable inferences from those facts

in favor of the Plaintiff. Instead of faithfully applying this threshold standard, the

district court created additional and unwarranted pleading requirements for claims

involving medical personnel who treat incarcerated individuals and granted the

motion to dismiss. As a result, the district court found that there was no viable cause

of action against either the doctor, whose care Plaintiff was under, or the nurse who

was expressly informed of the Plaintiff's need for medical attention, even though

neither provided any significant treatment to Plaintiff.  These defendants failed to

provide any medical care even though the Plaintiff-Decedent: 1) presented with severe

and persistent pain for a period of months; 2) had been diagnosed after multiple CT

scans with a large mass in his chest; 3) was bowel and urinary incontinent, and 4) was

unable to walk because of extreme weakness in his lower extremities. The district

court's ruling that the failure to act did not reach the level of deliberate indifference

ignored the unnecessary pain and suffering Plaintiff experienced for a period of days

as he was inexplicably discharged into a jail tier while in this same infirm,

incontinent, and non-ambulatory condition without the use of a wheelchair and only Tylenol for his severe pain.

The district court's ruling regarding these two Defendants is directly inconsistent with the fundamental tenants of the threshold sufficiency of a complaint and the concept of notice pleading. The district court's analytical framework cannot be reconciled with the longstanding requirements established in Federal Rule of Civil Procedure 8(a)(2), which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the ... claim is and the grounds upon which it rests," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007). In a similar vein, the district court also failed to consider all reasonable inferences from the facts contained in the Complaint when ruling on the Defendants' Motion to Dismiss. Collectively, this incorrect analysis led the district court to artificially separate the factual allegations of the Plaintiff's medical condition, the Defendants' action/inaction, and the continued pain and suffering experienced by the Plaintiff, to somehow conclude that the pleadings that set forth these facts failed to plead sufficient allegations of deliberate indifference.

> *A. The District Court Erred In Granting Defendant Bonaparte's Motion To Dismiss Where She Discharged Plaintiff From A Medical Unit Into The General Jail Population Even Though He: A) Was In Severe And Persistent Pain; B) Had A Large Rapidly Growing Mass In His Chest; C) Was Bowel And Urinary Incontinent; And D) Could Not Walk.*

In reaching its ruling regarding Defendant Dr. Bonaparte, the district court incorrectly concluded that the Plaintiff's First Amended Complaint failed to establish

deliberate indifference on the part of Defendant Bonaparte. The facts contained in the First Amended Complaint, however, establish that the Plaintiff had a serious medical condition and was in dire need of basic medical treatment and care – pain management and ambulatory aid in a medical care setting. Instead of providing or facilitating this basic care, Defendant Bonaparte gave the Plaintiff Tylenol and discharged him back into a jail tier even though he was in severe pain, could not walk and was incontinent. Instead of being transferred to Stroger Hospital or even remaining at Cermak Hospital, Mr. Dixon was discharged back into a prison population without a wheelchair, but with an order for a psych consult to rule out malingering. On its face, these facts establish a cause of action against Defendant Bonaparte for her deliberate indifference to Mr. Dixon's need for medical treatment.

Claims involving a defendant's deliberate indifference to an incarcerated Plaintiff's medical care involve a two-part test. *Greeno v. Daley,* 414 F.3d 645, 652 (7th Cir. 2005). The claim of deliberate indifference must first plead a medical condition that is "objectively, sufficiently serious," which is generally one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention. *Farmer v. Brennan,* 511 U.S. 825, 834 (1994); *Hayes v. Snyder,* 546 F.3d 516, 522-26 (7th Cir. 2008). Second, a plaintiff must plead a subjective component that shows that the defendant acted with a sufficiently culpable state of mind. *Farmer,* 511 U.S. at 834. This second factor is satisfied when the defendant knows of and disregards a substantial risk to the plaintiff's health. *Hayes,* 546 F.3d at 522. A plaintiff need not

26

show that he was completely ignored or that the defendant intended the harm that transpired. *Hayes*, 546 F.3d at 524; *Sherrod v. Lingle,* 223 F.3d 605, 611 (7th Cir. 2000); *Walker v. Benjamin*, 392 F. 3d 1030, 1037 (7th Cir. 2002). In fact, a fact-finder may reasonably infer that a defendant knew of a substantial risk from the obviousness of that risk. *Farmer,* 511 U.S. at 842.

Below, the parties agreed and the district court found that the Plaintiff's medical condition met the objective component of this test. Report of Proceedings, April 26, 2011 p. 4. The district court, however, determined that the plaintiff failed to sufficiently plead the subjective portion of the deliberate indifference claim with respect to Defendant Bonaparte. Report of Proceedings, April 26, 2011 pp. 6-7. Dr. Bonaparte's deliberate indifference, however, is apparent when considering the totality of the Plaintiff's obvious medical needs, Defendant Bonaparte's position as supervisor of the Acute Care Unit at Cermak, and the ill-advised and inexplicable decision to discharge a non-ambulatory incontinent man in severe pain into a general jail population as a malingerer.

Here, the district court failed to give proper weight to the detailed factual allegations of the Complaint and the reasonable inferences therefrom prior to dismissing the claim against Defendant Bonaparte. The First Amended Complaint establishes that the Plaintiff began developing symptoms of a serious illness in October 2008 following his incarceration in the Cook County Department of Corrections. R. 49, Ex. 1 ¶9. The symptoms of this illness included serious abdominal and back pain, a large open sore, weakness in his lower extremities, incontinence, and

27

a difficulty in walking. R. 49, Ex. 1 ¶¶10, 11, 13. Mr. Dixon's pain became increasingly severe and persistent and eventually he was unable to walk. R. 49, Ex. 1 ¶¶9, 11.

The First Amended Complaint further establishes Mr. Dixon's obvious and serious medical condition – so obvious that it can be reasonably inferred that Defendant Bonaparte was aware of the risks this condition posed. Plaintiff had received CT scans on December 11th and 12th that revealed a large mass in the left paratracheal region of his chest measuring 5.8 cm x 5.0 cm. R. 49, Ex. 1 ¶15. On December 15, 2008, a Cermak medical provider prepared a Consultation Request Form calling for an "Urgent" pulmonary consultation. R. 49, Ex. 1 ¶16. On December 23, 2008, Mr. Dixon was seen at Fantus Clinic, a division of Cook County's Stroger Hospital, for such a consultation at a time he was in severe pain and discomfort - experiencing pain of 10 on a scale of 1 to 10 that radiated from his back to his chest and lasted for hours or days. R. 49, Ex. 1 ¶17. *Hayes*, 546 F.3d at 524; *Gutierrez v. Peters,* 111 F.3d 1364,1373 (7th Cir.1997) (recognizing that a "serious medical need" exists where the condition features "chronic and substantial pain").

Further, the First Amended Complaint sets forth the circumstances immediately preceding Plaintiff's encounter with Defendant Bonaparte that showed that Plaintiff was in need of immediate medical care. Weeks after the large mass in his chest was discovered, Plaintiff fell from the bunk in his cell and was unable to get up. R. 49, Ex. 1 ¶18. Mr. Dixon became incontinent and remained on the floor of his cell until the next day when he was taken to the Cermak Emergency Room by

stretcher. R. 49, Ex. 1 ¶18. Once admitted, Mr. Dixon received an abdominal CT scan that showed a large left Paraspinal and Paramediastinal Mass consistent with his scans from weeks earlier. R. 49, Ex. 1 ¶19.

The First Amended Complaint also alleges facts that showed Dr. Bonaparte's institutional and personal knowledge of the Plaintiff's serious medical condition and the need for significant and prompt medical attention. The Complaint established that on multiple occasions, Mr. Dixon informed the Defendants, and other medical providers at Cermak Hospital, of his increasingly severe medical condition. R. 49, Ex. 1 ¶¶10, 11. On December 31, 2008, Dr. Bonaparte examined Mr. Dixon. R. 49, Ex. 1 ¶37. Dr. Bonaparte knew that Plaintiff had been diagnosed with a large mass in his chest and that the results of a further CT scan performed earlier that day were pending. R. 49, Ex. 1 ¶37. At the time of his examination, Mr. Dixon was experiencing severe pain, was incontinent, and experiencing lower extremity loss of function. R. 49, Ex. 1 ¶37. Bonaparte knew that earlier that same day while still a patient in Cermak Hospital, Mr. Dixon was examined by a nurse whom he told "I can't walk" and that he had chest pain since October that was made worse with movement. R. 49, Ex. 1 ¶42.

Besides this evidence of an undeniably serious medical condition and accompanying severe symptoms, Plaintiff's Complaint also establishes that Defendant Dr. Bonaparte's position, role and responsibility in caring for Mr. Dixon – she was the supervisor of the hospital ward where Mr. Dixon was taken on multiple occasions. R. 49, Ex. 1 ¶34. In her official capacity, she had access to Mr. Dixon's paper and electronic medical records; these electronic medical records include any medical

29

records for CCDOC detainees who have received treatment at any Cook County Hospital facilities, including Stroger Hospital where Mr. Dixon received all of his medical treatment following October 2008. R. 49, Ex. 1 ¶35. Dr. Bonaparte also had access to x-rays and CT scans performed on Mr. Dixon. R. 49, Ex. 1 ¶36.

Perhaps most importantly, the First Amended Complaint detailed the results of Dr. Bonaparte's failure to provide medical treatment. Mr. Dixon suffered great pain and humiliation as a result of her failure to provide appropriate medical care. R. 49, Ex. 1 ¶12. Mr. Dixon never received any medication other than Tylenol or medical treatment between his discharge back into the CCDOC on January 2, 2009, and when he was transferred to Stroger Hospital three days later (R. 49, Ex. 1 ¶21). This alone is enough to demonstrate Bonaparte's deliberate indifference. *Hayes*, 546 F.3d at 524-25. When Mr. Dixon was received at Stroger Hospital on a stretcher, it was determined that Mr. Dixon was in fact paralyzed from the waist down due to an aggressive form of lung cancer that had metastasized and extended from his lung into the middle of his spine. R. 49, Ex. 1 ¶¶26, 44, 46. So much for the psych consult in order to rule out malingering.

Plaintiff's Complaint elaborated on how Defendant Bonaparte caused Plaintiff unnecessary pain and suffering when she disregarded Plaintiff's basic needs and discharged him into a jail tier in CCDOC Division 10 with only a prescription for Tylenol and without any additional tests. R. 49, Ex. 1 ¶43. *Estelle v. Gamble,* 429 U.S. 97 (1976). Defendant Bonaparte did not keep Plaintiff in Cermak Hospital or immediately send him to Stroger Hospital even though he was bowel and urinary

30

incontinent, paralyzed, and in severe pain. R. 49, Ex. 1 ¶45. Even though Defendant Bonaparte was aware of all of these facts and the multiple scans that showed a large growing mass with a more recent CT scan pending, she chose to order a psych consult for the purposes of ruling out malingering. R. 49, Ex. 1 ¶¶37, 40, 41, 43, 47. Instead or providing immediate palliative care in a proper setting, Defendant Bonaparte discharged the non-ambulatory incontinent Plaintiff into the general jail population – deciding that she would see Plaintiff next in three days. R. 49, Ex. 1 ¶¶35-37; 41, 43, 47.

The actions, and more importantly the inactions, of Defendant Dr. Bonaparte as set forth in First Amended Complaint establish her deliberate indifference to the Plaintiff's serious medical condition. *See Edwards v. Snyder*, 478 F.3d 827, 829-32 (7th Cir. 2007). Dr. Bonaparte unquestionably was aware of the serious symptoms displayed by the Plaintiff, including continuous chest pain since October, a large growing mass in his chest that was established weeks earlier after multiple CT scans, bowel and urinary incontinence, and extreme loss of lower extremity functioning manifesting in an inability to walk at times. R. 49, Ex. 1 ¶¶31-48. Standing alone, a detainee's chronic pain can constitute a separate objectively serious medical condition. *Grieveson v. Anderson,* 538 F.3d 763, 779 (7th Cir. 2008); *Gutierrez v. Peters,* 111 F.3d at 1373.

In response, the only actions taken by Dr. Bonaparte were Tylenol for pain and ordering an urgent pulmonary consult – which had previously been ordered. Instead of taking actions designed to manage his pain and alleviate or ameliorate his

31

symptoms/conditions or facilitate his transfer to Stroger Hospital, Defendant Bonaparte discharged him from Cermak Hospital into the general jail population for three days, without his wheelchair, under the theory he was malingering. Considering these facts and that he was found multiple times on the floor of the hospital in his own waste in the preceding two days, such a "diagnosis" is absurd. Even more salient, Defendant Bonaparte's action in delaying significant pain medication and basic care necessities and discharging the Plaintiff into a non-medical setting is fatally inconsistent with her own opinion ordering an "urgent" consultation with a pulmonologist (*Ortiz v. Webster*, 655 F.3d 731, 734-36 (7th Cir. 2011)), thus establishing her own deliberate indifference.

This choice for an "easier and less efficacious treatment" in light of a serious medical condition further shows her deliberate indifference. *Estelle,* 429 U.S. at 104 & n. 10; *Johnson v. Doughty,* 433 F.3d 1001, 1013 (7th Cir. 2006); *Greeno,* 414 F.3d at 655; *Ortiz*, 655 F.3d at 735-36. Considering the severity of the symptoms and the amount of pain exhibited by Plaintiff, this three-day refusal to provide proper medical treatment supports a claim of deliberate indifference. *Grieveson,* 538 F.3d at 779 (7th Cir. 2008) (reversing summary judgment for defendants where plaintiff did not receive treatment for painful broken nose for nearly two days); *Williams v. Liefer,* 491 F.3d 710, 716 (7th Cir. 2007) (affirming denial of judgment as a matter of law; jury could conclude that the delay in treatment "unnecessarily prolonged and exacerbated" prisoner's pain).

When factoring in the amount of critical daily functions Plaintiff could not

perform - walking and using the bathroom - callously discharging Mr. Dixon into the general jail population is truly appalling and constitutes much more than mere negligence. There is only one reasonable inference from having an individual with an inability to walk due to extreme weakness who is also suffering from urinary and bowel incontinence in a non-medical prison setting – that prisoner will suffer as he lay in his own waste until a time when he receives proper placement and treatment in a medical facility. The reasonable inference of deteriorating physical condition actually manifested itself in the reality of the stage II pressure sores that developed on Mr. Dixon's buttocks during this period of time. R. 129, ¶19-21. This is deliberate indifference. *Rice v. Correctional Medical Services,* 675 F.3d 650, 665 (7th Cir. 2012).

The deliberate indifference of Dr. Bonaparte is further demonstrated by the host of actions that were surely available to her as the Plaintiff's physician and supervisor of the Acute Care Unit at Cermak. First, Dr. Bonaparte could have prescribed pain medication that was stronger than an over the counter pain reliever people take when they have a headache. Plaintiff had been suffering severe and persistent pain for months, reaching 10 on a 10 scale while he was receiving treatment at Cermak Hospital. He was experiencing pain in the chest – an area in where Defendant Bonaparte knew he had a large mass. *Smego v. Mitchell*, 723 F.3d 752, 756-58 (7th Cir. 2013) (physician deliberately indifferent when he persists in an ineffective treatment for a serious condition); *Gonzalez v. Feinerman,* 663 F.3d 311, 314 (7th Cir. 2011).

Defendant Bonaparte could have taken a number of other actions to care for the

Plaintiff. *Berry v. Peterman,* 604 F.3d 435, 441 (7th Cir. 2010) (deliberate indifference could be established by physician's actions in knowingly using less effective medical methods to treat the plaintiff's pain and condition). She could have let him stay in Cermak Hospital instead of discharging him into a normal prison incarceration setting. *Id.* (looking at available alternatives to physician in determining deliberate indifference). She could have allowed Plaintiff to have his wheelchair so that he would not have to continue instead of taking that wheelchair away. Dr. Bonaparte could have provided some type of adult diaper or taken other measures to try and aid Plaintiff in managing his bowel and urinary incontinence, particularly when that condition is coupled with an inability to walk and a jail cell setting. All of these alternatives are ground in common sense, are not unduly burdensome, and most importantly for the purposes here – reasonable inferences from the facts set forth in the Complaint. *See Berry,* 604 F.3d at 441 (summary judgment not warranted because defendant physician rejected obvious alternatives in treatment of the plaintiff); *see also Gil v. Reed*, 381 F.3d 649, 662 (7th Cir. 2004).

In reaching its ruling, the district court placed significant weight on the fact that there were no allegations in the Complaint that Defendant Bonaparte: 1) caused a delay in the transfer of the Plaintiff; 2) had the authority to expedite the transfer; or 3) played a role in Plaintiff missing his previously scheduled January 2, 2009 consult at Fantus Clinic. (6-7). The district court, however, ignored at least three critical facts regarding Defendant Bonaparte's position that directly rebut all of those points. First, Dr. Bonaparte was the doctor who was treating the Plaintiff and obviously was

34

responsible for his care. Second, she was the supervising physician of the Acute Care Unit in which Plaintiff was initially housed during this critical period of time. Third, Defendant Bonaparte's deliberate indifference could be inferred from what paltry medical treatment she provide to Plaintiff – regardless of any allegations concerning her role or authority to send patients to Stroger Hospital. *Smego*, 723 F.3d at 756-58; *Arnett v. Webster,* 658 F.3d 742, 752 (7th Cir. 2011).

Instead of creating additional pleading elements, the district court should have examined the facts contained in the compliant and looked at the reasonable inferences from those facts. This is particularly so where the "[s]ubjective awareness and deliberate indifference normally can be proved only with circumstantial evidence." *Hayes*, 546 F.3d at 524. In this case, the district court's analysis seemed to ferret out ways to explain or excuse certain conduct by Defendant Bonaparte, instead of accepting all the facts as true and viewing all the inferences from those facts in favor of the Plaintiff. *Hayes*, 546 F.3d at 523-24 (noting importance of employing proper standard in assessing deliberate indifference claims).

For instance, instead of requiring affirmative pleadings and proof that Defendant Bonaparte caused the delay in treatment, had authority to expedite the transfer and did not play a role in the missed consultation, the district court should have looked at the fact that Bonaparte was the supervising physician of the Acute Care Unit and reasonably inferred that she had the ability to facilitate reasonable care instead of sending Mr. Dixon back to a prison setting without proper medication and care assistance. *Smego*, 723 F.3d at 756-58 (distinguishing two defendant

doctors in granting summary judgment to doctor who investigated and followed-up to see why plaintiff suffering pain was not receiving adequate medical care while denying summary judgment to doctor who simply deferred to primary physician's denial of medical care). Any claims of a lack of authority ring particularly hollow in light of Defendant Bonaparte's position and this Court's rejection of such a defense when raised by a medical care provider. *See Berry*, 604 F.3d at 443.

The district court's focus on the lack of certain specific allegations also fails to consider that as the Plaintiff's treating physician and the supervisor of the hospital wing, Defendant Bonaparte could not simply sit by and allow her patient to suffer. It is reasonable to infer that a doctor placed in a position of caring for a patient can provide necessary care for that patient - particularly where that condition is both obvious (*Berry,* 604 F.3d at 440-41; *Hayes*, 546 F.3d at 523-24) and has been known to exist for a significant period of time (*Greeno*, 414 F.3d at 654-55; *Jones v. Simek,* 193 F.3d 485 (7th Cir.1999)). Similarly, it is a reasonable inference that the supervisor of the Acute Care Unit could ensure that one of her patients gets treatment in a proper facility. Although failure to provide medical treatment claims may fall by the wayside as a defendant is permitted to rely upon the actions of the primary treating medical professional in the case, Defendant Bonaparte cannot avail herself of this defense of convenience. The proverbial buck must stop with someone; here, that someone is Defendant Bonaparte.

The district court's reliance on *Walker v. Benjamin*, 392 F. 3d 1030 (7th Cir. 2002), is misplaced as that case actually supports the Plaintiff's position. In *Walker*,

this Court reversed the district court's dismissal of the count of Plaintiff's Complaint that alleged a denial of pain medication following a surgery. 392 F.3d at 1039. The Court concluded that the complaint's repeated allegations that the plaintiff was in pain and was denied pain medication following a surgery was sufficient to provide notice pursuant to Federal Rule of Civil Procedure 8. *Id.* These sufficient allegations pale in comparison to the extensive allegations that were contained in the Plaintiff's Complaint here.

As to the deliberate indifference point relied upon by the district court below, the *Walker* case is legally and factually distinguishable. Legally, the case was decided at summary judgment, in large part based on the Plaintiff's failure to include any evidence concerning deliberate indifference in the record. Factually, the injury involved in *Walker* – a puncture to the finger that subsequently became infected – cannot be compared to the serious and invasive condition suffered by the Plaintiff here. Not to deprecate the injury in *Walker*, but the condition of the Plaintiff here was not only obviously serious – a mass in the chest with severe and persistent pain – it was accompanied by incredibly debilitating symptoms that impaired the basic and fundamental life functions of being able to ambulate and use the washroom.  All of these factual allegations are pled in the Complaint and all the inferences argued herein are reasonable; Plaintiff has established deliberate indifference.

> *B. The District Court Erred In Granting Defendant Nurse Omeke's Motion To Dismiss Because The Complaint Establishes His Deliberate Indifference In Failing To Provide Medical Treatment After Being Notified Of Plaintiff's Serious Condition.*

The district court also erred in granting Defendant Omeke's Motion to Dismiss

on the grounds that his conduct did not constitute deliberate indifference. Looking at all the allegations and resulting inferences, the Complaint establishes that the Plaintiff was unquestionably in dire need of medical care on December 30, 2008, when Defendant Omeke was contacted in his professional capacity by correctional officers to provide such treatment and that Defendant Omeke failed to provide any medical treatment. These allegations are sufficient to meet the notice pleading requirements contained in Rule 8 of the Federal Rules of Civil Procedure. Fed. R. Civ. Proc. Rule 8; *Walker*, 293 F.3d at 1041.

As a nurse, Defendant Omeke has a responsibility to provide or obtain medical aid for a detainee with a serious medical condition when that condition is brought to his attention. Even personnel who are not doctors cannot ignore a detainee's need for obvious medical attention. *King v. Kramer,* 680 F.3d 1013, 1018 (7th Cir. 2012); *Rice,* 675 F.3d at 679. Nurses or non-medical personnel cannot deliberately obstruct or delay a patient from receiving necessary treatment. *McGowan v. Hulick,* 612 F.3d 636, 640–41 (7th Cir. 2010). In fact, even non-medical personnel cannot simply stand by and ignore complaints of a serious medical issue by a detainee. *Smego*, 723 F.3d at 756-58; *Berry,* 604 F.3d at 441.

Here, the facts contained in the First Amended Complaint and the reasonable inferences stemming from those facts establish deliberate indifference on the part of Defendant Omeke. *See Gayton v. McCoy*, 593 F.3d 610, 623-24 (7th Cir. 2010). These facts and inferences establish that 1) Defendant Omeke was notified on December 30, 2008, of the Plaintiff's medical condition; 2) Defendant Omeke was working at

Cermak, which had an extensive medical history of the Plaintiff including the knowledge of the large and growing mass in his chest; 3) Defendant Omeke was told that the Plaintiff was complaining of stomach pain, could not use the bathroom, had leg pain, and most importantly, could not get up from the floor of his cell; and 4) despite having this knowledge and being called on in his capacity to render medical treatment, Defendant Omeke did not render any medical treatment. R. 49, Ex. 1 ¶ 50. These factual allegations are sufficient to show deliberate indifference on the part of Defendant Omeke as he was aware of Mr. Dixon's pain and serious medical needs and simply ignored them. *Berry*, 604 F.3d at 443; *Greeno*, at 414 F.3d at 654.

In granting Defendant Omeke's Motion to Dismiss, the district court incorrectly determined: 1) these allegations were only insufficient "general" allegations that the Plaintiff failed to receive medical treatment; 2) the Complaint was fatally defective because the complaint failed to specifically allege that Defendant Omeke ever saw the Plaintiff or played a role in making the sick call decision; and 3) the Complaint was fatally defective because it failed to specifically allege that Defendant Omeke acted as a gatekeeper for other medical personnel.

First, none of these factors are dispositive or fatal to Plaintiff's Complaint. Once again, the district court failed to consider the procedural posture of the case when granting the motion to dismiss. A "general allegation" that the Plaintiff did not receive medical treatment after Defendant Omeke was contacted was appropriate when Plaintiff did not receive any timely medical treatment. Similarly, the district court's concern over having specific allegations that Omeke was responsible for placement on

sick call or to act as a gatekeeper are both readily and reasonably inferable from the fact that the correctional officer on duty contacted Omeke in his official capacity to notify him of Plaintiff's need for medical attention and that as a result he was placed on the sick call, albeit with a three-day delay. Furthermore, even without this reasonable inference, Defendant Omeke's complete failure to provide or secure medical attention in a timely fashion constitutes deliberate indifference. *Berry*, 604 F.3d at 443; *Williams*, 491 F.3d at 715-16; *Gil*, 381 F.3d at 662.

> *C. The District Court Erred In Dismissing The Intentional Infliction Of Emotional Distress Count (Count V) Against Defendants Bonaparte And Omeke Where Their Conduct In Refusing Medical Treatment Was Extreme And Outrageous.*

The trial's court also erred in granting the Motion to Dismiss the Plaintiff's Intentional Infliction of Emotional Distress ("IIED") claim (Count V) concerning Defendants Bonaparte and Omeke on the grounds that their conduct as detailed in Complaint was not extreme and outrageous.

In order to satisfy the elements of IIED, the conduct of the defendants must be extreme and outrageous; the defendants must intend that their conduct inflicts severe emotional distress, or know that there is a high probability that their conduct would do so, and the conduct must cause severe emotional distress. *McGrath v. Fahey*, 126 Ill. 2d 78, 86, 533 N.E.2d 806, 809 (1988). The determination of whether conduct is extreme or outrageous is based on all the facts and circumstances of a particular case. *McGrath*, 126 Ill. 2d at 86.

In reaching its decision, the district court failed to consider: 1) Defendants' position of power relative to the Plaintiff (*Pavilon v. Kafery*, 204 Ill. App. 3d 235,

245-46, 561 N.E.2d 1245 (Ill. App. 1990)), and 2) Defendants' awareness of a plaintiff's susceptibility to emotional distress. *Public Finance Corp. v. Davis*, 66 Ill. 2d 85, 94, 360 N.E.2d 765 (1976); *Pavilon*, 204 Ill. App. 3d at 246. First, the district court failed to consider that both defendants had a particular position of power over the Plaintiff – he was completely dependent upon them for basic medical care that he desperately needed. In assessing IIED claims, courts will frequently look at the relationship between the parties and analyze whether a defendant abused a position of authority in committing the conduct in question. *Fox v. Hayes*, 600 F. 3d 819, 842 (7th Cir. 2010). "The extreme and outrageous character of a defendant's conduct may arise, not so much from what he says or does, but from the defendant's improper use of a position of power which gives him the ability to adversely affect the plaintiff's interest." *Kolegas v. Heftel Broadcasting Corp.*, 154 Ill. 2d 1, 22, 607 N.E.2d 201 (1992). In fact, the more power or control a defendant has over a plaintiff, the more likely that defendant's conduct will be deemed outrageous. *McGrath*, 126 Ill. 2d at 86-87.

Furthermore, the district court failed to consider the Plaintiff's fragile condition at the time the Defendant's actions were taken. *Patterson v. Xerox Corp.*, 901 F. Supp. 274, 278-79 (N.D. Ill. 1995). The Plaintiff was unable to walk, incontinent, and in severe persistent pain; certainly a reasonable inference is that he was susceptible to emotional distress. It is well established that a defendant's knowledge "that the plaintiff is peculiarly susceptible to emotional distress, by reason of come physical or mental peculiarity" (*McGrath*, 126 Ill. 2d at 89-90), is

41

also quite relevant in determining whether conduct was extreme or outrageous. In fact, even mere rude behavior, which is generally not sufficient to satisfy the conduct element, will be deemed to have done so where the defendant knows that the plaintiff is susceptible to emotional distress. *Kolegas*, 154 Ill. 2d at 21.

Defendants' conduct as set forth *supra* is extreme and outrageous on a number of levels. It is extreme and outrageous to deny pain medicine and medical treatment to a Plaintiff who is in dire need of both. It is also extreme and outrageous to take away a wheelchair from a man who has an inability to walk and is bowel and urinary incontinent. It is also extreme and outrageous, to discharge a vulnerable, physically disabled, and incontinent individual into the general prison population of the CCDOC.

II. The District Court's Grant Of Summary Judgment On Plaintiff's *Monell* Claim Should Be Reversed Where There Is A Genuine Issue Of Material Fact As To Whether The Policies Of Defendant Municipality Resulted In Harm To A Plaintiff Who Was Inexplicably Denied Adequate Medical Care For An Obvious And Serious Medical Condition.

The district court erroneously granted summary judgment in favor of the Defendant municipality reasoning that no reasonable juror could find that the harm suffered by Plaintiff-Decedent was caused by any deficiencies in its policy and practices of maintaining the medical records of detainees. R. 173 p. 22. The district court, however, failed to consider that there was considerable direct and circumstantial evidence that created a genuine issue of fact regarding whether Defendant's policies and practices resulted in harm to the Plaintiff-Decedent. This evidence came in a variety of forms including, an official DOJ Report on the exact same policy and practices at issue here at the same institution; an expert opinion from the professional who was the primary investigator of that report who specifically opined regarding Mr. Dixon's situation; testimony from a physician who was employed at the institution concerning specific lapses and deficiencies in the identified policies and procedures; and a frank admission from the Chief Medical Officer of Defendant who admitted that no policies identified in the DOJ report had changed from the issuance of that report until after Plaintiff-Decedent's "treatment" in this case. Perhaps most telling, the district court failed to appreciate how the facts of this very case circumstantially show the very causation the court found lacking – how Mr. Dixon unnecessarily suffered for three days as he lay incontinent in his own waste with open pressure ulcers while dying from terminal cancer was

treated as a malingerer and denied basic medical treatment even though the tumor in his chest had been diagnosed over three weeks earlier.

A municipality may liable for damages if an unconstitutional act is caused by: "(1) an official policy adopted and promulgated by its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority." *Thomas v. Cook County Sheriff's Department*, 604 F.3d 293, 303 (7th Cir. 2010). An unconstitutional municipal policy "may take the form of an implicit policy or a gap in expressed policies. *Id.*; *Phelan v. Cook County*, 463 F.3d 773, 790 (7th Cir. 2006) ("in situations where rules or regulations are required to remedy a potentially dangerous practice, the County's failure to make a policy is also actionable").

To demonstrate that the County is liable for a harmful custom or practice, the plaintiff must show that County policymakers were deliberately indifferent as to known or obvious consequences of the policy. *Frake v. City of Chicago*, 210 F.3d 779, 782 (7th Cir. 2000). It is well established that as a practical matter, deliberate indifference can be evidenced by repeated examples of negligent acts that disclose a pattern of conduct by the prison medical staff or it can be demonstrated by proving there are such systemic and gross deficiencies in staffing, facilities, equipment, or procedures that the inmate population is effectively denied access to adequate medical care. *Wellman v. Faulkner*, 715 F.2d 269, 272 (7th Cir. 1983), *citing Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980); *Todaro v. Ward*, 565 F.2d 48 (2nd Cir. 1977).

In reaching its sweeping conclusion, the district court violated several of the cardinal rules for making a valid summary judgment determination, as it: 1) failed to consider all of the direct and circumstantial evidence contained in the record; 2) failed to consider all reasonable inferences in favor of the Plaintiff and, in certain instances, made inferences that favored the Defendant; and 3) conclusively determined contested factual issues instead of allowing a trier of fact to do so following trial. This course of action violates the fundamental concepts and principles underlying Rule 56 and requires the reversal of the district court's grant of summary judgment. *Miller*, 761 F.3d at 827-28.

Repeatedly, the district court would effectively apply a reverse summary judgment standard, refusing to draw inferences or consider circumstantial evidence in favor of the Plaintiff, but repeatedly drawing the opposite inference in favor of the moving party. The largest and most significant inference that the district court repeatedly failed to draw was that in an environment riddled with Defendant's widespread policies and practices, those policies could have caused the harm suffered by the Plaintiff. It is not a stretch to conclude that an environment riddled with widespread policies of poorly maintained medical records that cannot be readily accessed by medical provides would lead a dying cancer patient to be labeled a malingering weeks after his large and rapidly growing tumor had been discovered. Instead, the district court drew the exact opposite inference – that there was no proof that the policies of deficient record keeping caused the harm to Mr. Dixon. R. 173, p. 19.

Specifically, the district court discounted all of the widespread policies and practices that were set out in the DOJ report. Instead of making the reasonable inference that those policies could have caused harm to Mr. Dixon by delaying the transmission of accurate and vital medical information; the district court took an extremely parochial view and made the exact opposite inference – that there was no proof those policies could have caused harm to the Plaintiff-Decedent. The existence of the Defendant's widespread policies and practices as detailed in the DOJ report should have been considered as circumstantial evidence on the issue of causation as to all of Plaintiff's claims, including that he did not receive essential palliative care in a timely manner. *See Shepherd v. Dallas County*, 591 F.3d 445, 457 (5th Cir. 2009) (DOJ report of Dallas County jail investigation is relevant and probative in 1983 action by inmate).

By artificially cleaving the issue of causation from the existence of the policy and practices, the district court did not give any weight to the sound circumstantial proof provided by the very existence of those widespread policies. Such strong circumstantial evidence would undoubtedly create a material issue of fact as to whether those policies caused harm to Mr. Dixon. The district court's error in this respect is particularly important as the issue of causation is rarely susceptible to direct evidence, particularly in a *Monell* situation. The use of circumstantial evidence on the issue of causation is supported by the willingness of courts to use the evidence of repeated constitutional violations against a single person as circumstantial evidence to establish a policy for purposes of establishing liability

under *Monell. See Powe v. City of Chicago,* 664 F.2d 639, 651 (7th Cir. 1981); *Wolf-Lillie v. Sonquist,* 699 F.2d 864, 870 (7th Cir.1983).

This failure to recognize evidence favorable to the Plaintiff extended beyond the DOJ report as the district court took the same tact with respect to the testimony of Dr. Hart, which affirmatively established that no changes to the record keeping policy and practice had been made between the issuance of DOJ report and the time of Mr. Dixon's treatment. Instead of acknowledging the wealth of strong circumstantial evidence of causation provided by the testimony of Defendant's Chief Medical Officer, the district court ignored this evidence and once again maintained its commitment to the completely opposite inference – these policies could not have caused harm to the Plaintiff-Decedent.

In a similar vein, the district court dismissed relevant testimony from Dr. Pedro Cruz, which detailed specific instances of the very problems set forth in the DOJ report. Instead of accepting, faithfully analyzing and making reasonable inferences from that testimony, the district court refused to give this testimony any weight on the issue of causation. Rather, the district court erroneously viewed testimony favorable to the Plaintiff from Dr. Cruz - that an urgent consult should not take almost 2 weeks as in Mr. Dixon's case, but rather be done in two days - into a fact that supported Defendant. R. 173 p. 18. Instead of inferring a connection between the policies and the unreasonable delay, the district court gave Defendant kudos for having a box on the form that could be marked "urgent," showing that there was a policy in place to expedite the consultation. The court, however, never considered that

this "urgent" request was completely ignored and ultimately ineffective. Instead of reasonably inferring that such a delay could have been caused by the Defendant's own policies that indicated an inability to coordinate records and convey vital information, the district court instead inferred that this was just a single instance of an individual not following a proper policy. Again - the negative inference is incorrectly applied to the non-moving party; the positive inference is wrongfully given to the moving party.

Even setting aside the DOJ report and the admission by Dr. Hart that such policies were still in place, the district court failed to consider other clear circumstantial evidence that supported Plaintiff's claim that the deficiencies in the policy and practices of the Defendant's maintenance of medical records resulted in harm to Mr. Dixon. On multiple occasions after he was diagnosed as having a large rapidly growing tumor in his chest in the middle of December, Mr. Dixon was denied medical treatment by certain personnel and treated as if he was malingering by his own doctor. Mr. Dixon was also the subject of completely unnecessary orders: 1) Dr. Bonaparte's order for an urgent pulmonary consult – when Mr. Dixon just had one the previous week; and 2) a psych consult to rule out malingering when he had lung cancer and a mass that was known for weeks. Dr. Bonaparte admitted that she did not see any of the scans of the Plaintiff's mass – even though some were taken weeks earlier and the one taken and available on January 2nd showed that the tumor was impinging on Mr. Dixon's spine. Yet on that same January 2nd, Plaintiff-Decedent was discharged without even being examined and shipped from the Acute Care Wing into the general jail population. This action was taken even

though every single objective and subjective medical criteria showed that he was in severe pain, in rapidly deteriorating health, was incontinent and unable to walk while in the Acute Care Unit. Again, the district court refused to infer that Defendant's substandard record keeping and inaccessible medical records could have caused harm to Mr. Dixon. This was so despite the fact that none of these medical decisions make any sense if Dr. Bonaparte was fully aware of the advanced state of Mr. Dixon's cancer. Once again, the district court refused to see the forest for the trees and maintained its myopic view that there was no indication that the widespread policies of the Defendant caused harm to Mr. Dixon.

At its core, the district court failed to appreciate that when an inmate is denied medical treatment following a diagnosis of malingering, summary judgment is inappropriate even when the inmate has received some medical treatment. *Arnett*, 658 F.3d at 750. This is particularly true in cases involving a misdiagnosis of malingering. *Gayton*, 593 F.3d at 620-22; s*ee also Rice*, 675 F.3d at 665 (7th Cir. 2012) (reversing summary judgment on issue of deliberate indifference even though there was evidence of malingering; triable issue of fact existed whether staff consciously disregarded inmate's condition). The Seventh Circuit has consistently held that the question of whether a physician's treatment was based "on a good-faith belief that he was malingering ... is an issue for the jury." *Walker v. Benjamin*, 293 F.3d 1030, 1040 (7th Cir. 2002); see also *Greeno v. Daley*, 414 F.3d 645, 655 (7th Cir. 2005) ("The possibility that [the defendants] did not do more for [the plaintiff] because they thought he was malingering and did not really have a severe medical

need is an issue for the jury."). By extension, the issue of whether the policy and practices of the Defendant caused Dr. Bonaparte to misdiagnosis Mr. Dixon as a malingerer likewise is an issue of fact that should be put before the trier of fact.

In addition to this considerable circumstantial evidence on the issue of causation, the district court incorrectly disregarded the opinion of the Plaintiff's expert, Dr. Robert Greifinger. In rendering summary judgment, the district court concluded that it had previously determined that Dr. Greifinger's opinion was not reliable because he failed to articulate the appropriate standard of care. That is simply incorrect. R. 101 p. 10. Certain wording and conclusionary sentences were stricken from Dr. Greifinger's report – they were unnecessary in a civil rights case - but there was never any ruling that the opinion was to be excluded. R. 10 The conclusion of that initial order expressly found the remainder of the report permissible. R. 101 p. 10. In fact, Defendant's subsequent motion to strike Dr. Greifinger was submitted to the district court along with the summary judgment, but was never ruled upon. R. 161.

Even though the district court sidestepped directly ruling on this issue, its failure to consider the expert opinion of Dr. Greifinger was error and must be addressed. Dr. Greifinger had 25 years in prison and health care experience and was the primary investigator for the 17-month investigation of the Department of Justice on the very institution at issue in this case. As such, Dr. Greifinger meets the rather liberal criteria (*Krist v. Eli Lilly & Co.*, 897 F.2d 293 (7th Cir. 1990)), established under the Federal Rules of Evidence 702, as someone who possesses

specialized knowledge due to his skill, experience, training, or education that will assist the trier of fact to understand the evidence or to determine a fact in issue. *Bannister v. Burton*, 636 F.3d 828 (7th Cir. 2011); *Meyers v. Illinois Central Railroad Co.*, 629 F.3d 639 (7th Cir. 2010). Rule 702 itself clearly contemplates the admission of testimony by experts whose knowledge is based upon their experience. *United States v. Parra*, 402 F.3d 752, 758 (7th Cir. 2005).

Dr. Greifinger's opinions as set forth in his report and flushed out in his deposition establish that he did not fail to articulate the standard of care and merely give bottom line conclusions, but rather explained each of his opinions and the basis for them. Dr. Greifinger enumerated 13 separate and identifiable ways in which the correctional health care was failing at the CCDOC. Dr. Greifinger then went further by setting out and explaining how these failings manifested themselves, providing concrete examples as to how the flawed CCDOC system compared with a properly run correctional health care institution. This allowed Dr. Greifinger to establish his familiarity with the inmate correctional health care system and explain how a properly functioning institution would work – a practical description of the standard of care. *Metavant Corp v. Emigrant Savings Bank,* 19 F.3d 748, 761-62 (7th Cir. 2010).

Discarding Dr. Greifinger's opinions as unreliable fails to give proper weight to: 1) Dr. Greifinger's extensive experience in the field of correctional healthcare, including supervising one of the largest jail systems in the nation and being a court monitor in a variety of jurisdictions; 2) his extensive investigation of both the Cook

County Correctional health care system in general and as it pertained to Kevin Dixon; 3) his familiarity with multiple national standards of inmate health care; 4) a detailed listing of the specific failings of the Cook County Correctional health care system; 5) specific examples of those failings of the Cook County Correctional health care system, including describing how a properly run correctional institution would have handled the issue; 6) specific discussions regarding how the aforementioned failings were not corrected after notice had been given; and 7) specific discussion as to how each of those failings was present or caused injury to Kevin Dixon. Although a *Monell* claim against one of the nation's largest correctional institutions involving massive failures relating to the healthcare of its inmates is bound to be somewhat expansive, Dr. Greifinger was the perfect person to make such an assessment considering his experience and prior contact with the CCDOC Healthcare system.

After commenting on the unreliability of Greifinger's opinion, the district court proceeded to discount the opinion altogether on the grounds that there was no opinion regarding causation as to timing contained within that opinion. R. 173, p. 19. Once again, this is yet another instance where the district court put on blinders and refused to appreciate the totality of the evidence that had been placed before it. In his report and in his deposition, Dr. Greifinger explained that he found the same systematic failures that resulted in inadequate continuity and coordination of acute care during his investigation of the CCDOC present in the case of Mr. Dixon. R. 129, ¶30, 32. Dr. Greifinger further explained that the deficient policies and procedures created barriers to coordination of care and treatment for Kevin Dixon resulting in

unnecessary pain, suffering and lack of palliative care. R. 31,¶31. This is direct evidence of causation – that the Defendant's policies and practices caused harm to Mr. Dixon.

In fact, Dr. Greifinger enumerated the policies and practices that created the barriers to timely and appropriate medical care for Mr. Dixon to include: (1) a lack of timeliness of care for a known serious medical condition; (2) a lack of communication between the various health care providers resulting in a lack of continuity and coordination of care; and (3) an inadequate and deficient dual medical record keeping system, all of which resulted in unnecessary pain and suffering for Kevin Dixon. R. 129, ¶32. This opinion presents a step by step manual as to why Kevin Dixon was treated in the deplorable manner in which he was and further establishes that the widespread policies of the Defendant caused harm to Mr. Dixon. *Wellman*, 715 F.2d at 272.

The district court, however, was not troubled by the widespread problems in the Defendant's medical record system, the inaccessibility of those records to medical providers, or Dr. Bonaparte's decision not to view those records in rendering its opinion. In fact, the district court concluded that Plaintiff could only establish causation if it proved that a medical provider was prevented from looking at the records. The district court concluded that otherwise, there is no reason to infer that Mr. Dixon remained in jail for any other reason than medical judgment. This is yet another hurdle erected by the court following its refusal to make a reasonable inference in favor of the Plaintiff. Considering the medical condition of Mr. Dixon

during his stay in the Acute Care Wing and then during his subsequent discharge into the general jail population, such an inference is completely unwarranted.

The district court culls certain facts from the testimony of Dr. Bonaparte to support its conclusion that the Defendant's policies and practices were not the moving force behind the harm to Mr. Dixon. R. 137, p. 20. Specifically, the district court notes that Defendant Bonaparte testified that she was aware of the mass in Dixon's chest and that she did not need any information beyond her own initial examination days earlier and the information provided by her nurses in order to discharge Mr. Dixon back into the jail population. Considering the outcome to Mr. Dixon, maybe Dr. Bonaparte should be less cavalier with her willingness to make snap judgments without reviewing critical medical information that leads to her patients enduring prolonged and unnecessary suffering. In fact, such an attitude is the epitome of deliberate indifference – the same deliberate indifference claim that the district court dismissed by effectively portraying Defendant Bonaparte as a pawn operating in a much larger system. Ironically, and unfortunately for Mr. Dixon, Dr. Bonaparte was the perfect complement to the Defendant's substandard and inaccessible record keeping system of critical detainee medical records.

## CONCLUSION

This Court should reverse the order of the district court granting Defendants'
Motion to Dismiss Counts 1, 2, and 5 of the Plaintiff's First Amended Complaint
and remand this matter for further discovery on those counts. This Court should
also reverse the order of the district court granting Summary Judgment to
Defendant Cook County on Count III (*Monell* Count) and remand this portion of the
case for trial.


Respectfully Submitted,

/s/ Robert Robertson

Robert Robertson


Law Offices of Robert Robertson
Attorney for Plaintiff-Appellant
20 North Wacker Drive
Suite 3710
Chicago, Illinois 60606
(312) 223-8600

Dated March 26, 2015

No. 13-3436

---

## IN THE
## UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

---

KEVIN P. DIXON, deceased, by and through
LULA M. DIXON, his mother, next best
Friend and Independent Administrator of the
Estate of Kevin P. Dixon,

                        Plaintiff-Appellant,

     v.

COOK COUNTY d/b/a CERMAK HEALTH
SERVICES; KATRINA M. BONAPARTE M.D.;
and NEWORLD ABOIGBE (f/k/a OMEKE,
R.N.),

                        Defendants-Appellees.

---

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division
No. 09 CV 6976
The Honorable THOMAS M. DURKIN and The Honorable HARRY D.
LEINENWEBER, Judges Presiding

––––––––––––

## APPENDIX PURSUANT TO RULE 30
––––––––––––

### ROBERT ROBERTSON

Law Offices of Robert Robertson
Attorney for Plaintiffs-Appellants
20 North Wacker Drive
Suite 3710
Chicago, Illinois 60606
(312) 223-8600

COMBINED RULE 30(a) AND RULE 30(b) APPENDIX

Order Dismissing First Amended Complaint (R. 70)……………..……………….A1

Transcript from April 26, 2011…………………………………………….………A2

Order From September 25, 2012 (R. 101)……………………………………….A11

Memorandum Opinion from October 30, 2013 (R. 137)…….…………….……..A21

Judgment in a Civil Case (R. 174)……………………………………………….A44

CIRCUIT RULE 30(d) STATEMENT

Pursuant to Circuit Rule 30(d), the materials required by parts (a) and (b) of Circuit Rule 30 are included in this appendix.

/s/ Robert Robertson
Robert Robertson
Attorney for Plaintiff-Appellant

CIRCUIT RULE 31(e) CERTIFICATION

The undersigned hereby certifies that I have filed electronically, pursuant to Circuit Rule 31(e), versions of the brief in non-scanned PDF format.

/s/ Robert Robertson
Robert Robertson
Attorney for Plaintiff-Appellant

CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for the Plaintiff-Appellants, Kevin P. Dixon, by and through his next best Friend Lula M. Dixon, furnishes the following in compliance with F.R.A.P. Rule 32(a)(7):

I hereby certify that this brief conforms to the rules contained in F.R.A.P. Rule 32(a)(7) for a brief produced with a proportionally spaced font. This brief contains 13,787 words as recorded by the word count of the Microsoft Word 2007 word-processing system used to prepare this brief, counting from the words "Jurisdictional Statement" through "Respectfully Submitted."


/s/ Robert Robertson
Robert Robertson
Attorney for Plaintiff-Appellant

CERTIFICATE OF SERVICE

I certify that I served the attached Brief of Plaintiff-Appellant by placing a copy in an envelope with appropriate postage affixed and directed to the person named below at the address indicated, and by depositing that envelope in a United States mail box before 5:00 P.M. on March 26, 2015.


/s/ Robert Robertson
Robert Robertson
Attorney for Plaintiff-Appellant

Person Served:

Assistant State's Attorney Thomas Cargie
Deputy Supervisor
Conflicts Division
Cook County State's Attorney's Office
69 W. Washington St.
Suite 2030
Chicago, IL 60602

Case: 1:09-cv-06976 Document #: 70 Filed: 04/26/11 Page 1 of 1 PageID #:471

### UNITED STATES DISTRICT COURT
### FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 4.2
### Eastern Division

Kevin P Dixon, et al.

           Plaintiff,

v.                              Case No.: 1:09–cv–06976
                                      Honorable Harry D. Leinenweber

Cook County, et al.

           Defendant.

### NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Tuesday, April 26, 2011:

      MINUTE entry before Honorable Harry D. Leinenweber:For the reasons stated in open court, all claims against Defendants Omeke and Bonaparte are dismissed with prejudice. Discovery extended to 6/7/2011. Status hearing set for 6/7/2011 at 09:00 AM.Mailed notice(wp, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at *www.ilnd.uscourts.gov*.

1           IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF ILLINOIS
2                    EASTERN DIVISION

3   KEVIN P. DIXON, Deceased,      )    Docket No. 09 C 06976
    by the through Lula M. Dixon,  )
4   his mother, Next Best Friend and )
    Independent Administrator of the )
5   Estate of Kevin P. Dixon,      )
                                    )
6                   Plaintiff,      )    Chicago, Illinois
                                    )    April 26, 2011
7            v.                     )    11:32 a.m.
                                    )
8   COOK COUNTY d/b/a CERMAK HEALTH )
    SERVICES, et al.,,              )
9                                   )
                    Defendants.     )
10
                   TRANSCRIPT OF PROCEEDINGS
11        BEFORE THE HONORABLE HARRY D. LEINENWEBER

12
    APPEARANCES:
13
    For the Plaintiff:        MICHAEL D. ROBBINS & ASSOCIATES by
14                            MR. MICHAEL D. ROBBINS
                              20 North Wacker Drive, Suite 3710
15                            Chicago, Illinois  60606

16  For Sheriff Defendants:   COOK COUNTY STATE'S ATTORNEY'S OFFICE
                              MS MAUREEN O'DONOGHUE HANNON
17                            69 West Washington Street, Suite 2030
                              Chicago, Illinois 60602
18
    For Cermak Defendants:    COOK COUNTY STATE'S ATTORNEY'S OFFICE
19                            MR. THOMAS F. CARGIE
                              500 Richard J. Daley Center
20                            Chicago, Illinois  60602

21

22  Court Reporter:           GAYLE A. McGUIGAN, CSR, RMR, CRR
                              Federal Official Court Reporter
23                            219 South Dearborn, Room 2318-A
                              Chicago, Illinois 60604
24                            (312) 435-6047
                              Gayle_McGuigan@ilnd.uscourts.gov
25

                              A-2

1      (In open court.)

2            THE CLERK:  09 C 6976, Dixon versus Cook County.

3            MS. HANNON:  Good morning, your Honor.  Maureen Hannon,

4      Assistant State's Attorney, on behalf of the Sheriff Defendants.

5            MR. CARGIE:  Good morning, your Honor.  Assistant

6      State's Attorney Thomas Cargie, C-A-R-G-I-E, on behalf of the

7      Cermak Defendants.

8            MR. ROBBINS:  Good morning, your Honor.  Michael

9      Robbins for Plaintiff.

10           THE COURT:  All right.  Before the Court is the

11     Rule 12(b)(6) motion to dismiss from defendants Dr. Katina

12     Bonaparte and Nathan Omeke.

13           Plaintiff Kevin Dixon was incarcerated in the Cook

14     County Department of Corrections as a pretrial detainee

15     beginning in September 2008.

16           Upon entering, he appeared healthy and displayed no

17     indication of any disease, disability, or condition.

18           Beginning in October 2008, plaintiff allegedly began

19     complaining of increasingly severe and persistent abdominal and

20     back pain and requested urgent care.

21           The pain became so bad that plaintiff could no longer

22     stand or walk.

23           After being seen by Nurse Omeke and Dr. Bonaparte in

24     December 2008, defendant was taken to Stroger Hospital in

25     January 2009, where he was found to have cancer.

1    Plaintiff died in March 2009.

2    The Court previously granted a motion to dismiss

3    without prejudice as to defendants Bonaparte and Omeke.

4    Plaintiff, through his estate, filed an amended

5    complaint alleging that defendants Bonaparte and Omeke, among

6    others, were deliberately indifferent to his serious and obvious

7    medical needs in violation of 1983, and are also liable for the

8    state law tort of intentional infliction of emotional distress.

9    Bonaparte and Omeke have filed motions to dismiss all

10    counts against them.

11    Under Rule 12(b)(6), a court must dismiss a plaintiff's

12    complaint if it does not include sufficient facts to state a

13    claim for relief that is plausible on its face.

14    In considering a motion to dismiss, the Court must

15    accept plaintiff's allegations as true and view them, along with

16    any reasonable inferences drawn from them, in the light most

17    faborable to the plaintiff.  See *Justice*, 577 F.3d at 771.

18    Legal conclusions can provide a complaint's framework,

19    but unless well-pled factual allegations move the claims from

20    conceivable to plausible, they are insufficient to state a

21    claim.  See *Iqbal*, 129 Supreme Court at 1950-51.

22    To survive a motion to dismiss, a plaintiff must give

23    enough details about the subject matter of the case to present a

24    story that holds together.  See *Swanson*, 614 F.3d at 404.

25    The analysis from the Court's June 24th, 2010 oral

1    ruling dismissing plaintiff's complaint as to Bonaparte and

2    Omeke is relevant to the analysis of the current motion before

3    the Court.

4         Defendants argue that plaintiff's 1983 claim must fail

5    because they did not display deliberate indifference to

6    plaintiff's serious medical needs, in violation of his Eighth

7    and Fourteenth Amendment rights.

8         The Seventh Circuit has held that a prison official

9    violates a pretrial detainee's due process rights when he

10   displays deliberate indifference to a detainee's serious medical

11   needs.  See *Hayes*, 546 F.3d at 522.

12        A deliberate indifference claim contains an objective

13   and a subjective component.  See *Farmer*, 511 U.S. at 834.

14        The parties agree that plaintiff's symptoms were

15   objectively sufficiently serious.

16        The subject matter component requires -- the subjective

17   component requires a subjective knowledge of a risk to the

18   inmate's health, and that the risk be disregarded.  See *Collins*,

19   462 F.3d 761.

20        Furthermore, proof of deliberate indifference requires

21   a showing of more than just negligence or gross negligence; it

22   requires the equivalent of criminal recklessness.  *Grievson*, 538

23   F.3d 777.

24        Nurse Omeke learned of plaintiff's pain and inability

25   to use the bathroom on December 30th, 2008.

1          Plaintiff alleges that Omeke displayed deliberate

2     indifference to his medical needs, which caused his condition to

3     worsen and caused him pain and suffering, when he learned of

4     this condition and subsequently -- and apparently did not object

5     to or try to discharge the decision of defendant Lanieka Davis

6     to place plaintiff on sick call three days later.

7          The only new allegations against Omeke in the amended

8     complaint are the general allegations made against all

9     defendants, which allege that plaintiff did not receive adequate

10     medication or medical treatment from December 31, 2008 until he

11     was transferred to Stroger Hospital on January 5, 2009, which

12     occurred because of the defendants' lack of effort to provide

13     him medical care.

14          These general allegations against all defendants do not

15     satisfy the *Iqbal* pleading requirements.

16          In particular, the amended complaint does not allege

17     that Omeke played any role in making the sick call decision, or

18     that he ever evaluated or saw plaintiff.

19          It also fails to allege that Omeke was a gatekeeper for

20     other medical personnel, or in any way responsible for the sick

21     call delay.  See *Turman*, 40 Fed. Appx. at 2087.

22          While the allegations may present a claim for

23     negligence, they do not come close to the level of deliberate

24     indifference.

25          Therefore, the 1983 claim against Omeke is dismissed,

1   this time with prejudice.

2          Moving to Dr. Bonaparte, she saw plaintiff for the

3   first time on December 31, 2008.  It's alleged that plaintiff

4   was in severe pain, incontinent, and had lost functionality in

5   his lower extremities at the time of this examination, and that

6   Bonaparte was aware of earlier CT scans that showed a mass in

7   plaintiff's chest.

8          After her examination, Bonaparte filled out a request

9   form to have plaintiff transferred to Stroger Hospital for

10  consultation, and marked the form "Rush."

11         Plaintiff was not transferred for five days.

12         Plaintiff alleges that this delay in his transfer

13  demonstrates deliberate indifference by Bonaparte.

14         In addition, he alleges that Bonaparte failed to

15  provide medication stronger than Tylenol to treat his pain,

16  offer any medical treatment to him prior to his transfer, or

17  ensure that he was seen on January 2, 2009, for his scheduled

18  consultation at Fantus Clinic.

19         The amended complaint, however, does not allege that

20  Bonaparte caused the delay in transfer, had the authority to

21  make the transfer happen more quickly, or played any role in the

22  missed consultation at Fantus Clinic.  See *Walker*, 293 F.3d at

23  1038.

24         These allegations, while perhaps alleging negligence

25  for providing treatment below the standard of care, do not make

1    out a claim of deliberate indifference.

2            Therefore, the 1983 claim against Bonaparte is

3    dismissed, also with prejudice.

4            In regard to the intentional infliction of emotional

5    distress, to prove this tort under Illinois law, plaintiff must

6    show facts that establish the defendant's conduct was extreme

7    and outrageous; two, the emotional distress caused [sic.] by

8    plaintiff was severe; and, three, defendant knew that severe

9    emotional distress was certain or substantially certain to

10   result from such conduct.  See *Johnson*, 723 N.E. 2d 1197.

11           The defendant's conduct must be so extreme as to go

12   beyond all possible bounds of decency and be regarded as

13   intolerable in a civilized community.  See *Dunn*, 347 F.3d at

14   651.

15           As already explained, the amended complaint does not

16   allege that Omeke or Bonaparte engaged in any behavior that rose

17   to the level of deliberate indifference to plaintiff's medical

18   needs.

19           It likely -- likewise fails to allege extreme or

20   outrageous conduct by Omeke and Bonaparte, which is required for

21   his emotional distress claim.

22           Accordingly, all claims against defendants Omeke and

23   Bonaparte are dismissed, at this time with prejudice.

24           MR. CARGIE:  Thank you, your Honor.

25           MR. ROBBINS:  Your Honor, discovery closes today.  We

1  think.

2          What is pending is the *Monell* claim.

3          THE COURT:  Is there a motion?

4          MR. ROBBINS:  There's no dispositive motions regarding

5  the *Monell* claim.

6          THE COURT:  All right.

7          MR. ROBBINS:  What we --

8          THE COURT:  Are you ready for trial or what?

9          MR. ROBBINS:  Well, no.  Actually, discovery needs to

10  be done on the *Monell* claim.

11          MS. HANNON:  And the plaintiff has continued the

12  depositions of all the decedent's family members, so we need to

13  still take those.

14          MR. ROBBINS:  And we have some 30(b)(6) depositions yet

15  to take, so could we have six weeks of additional discovery

16  time?

17          MS. HANNON:  That's fine, your Honor.

18          MR. CARGIE:  No objection, your Honor.

19          THE COURT:  Six weeks.

20          THE CLERK:  June 7th.

21          THE COURT:  Have a status.

22          THE CLERK:  June 7th at 9:00.

23          MR. ROBBINS:  Thank you, your Honor.

24          MS. HANNON:  Thank you, your Honor.

25          MR. CARGIE:  Thank you.  Have a good day.

```
 1              THE COURT:  Thank you.

 2          (Proceedings concluded.)

 3                  C E R T I F I C A T E

 4      I certify that the foregoing is a correct transcript of the

 5   record of proceedings in the above-entitled matter.

 6

 7

 8   /s/ GAYLE A. McGUIGAN                     December 12, 2013
     Gayle A. McGuigan, CSR, RMR, CRR                Date
     Official Court Reporter
 9
                                               December 12, 2013
10   Gayle A. McGuigan, CSR, RMR, CRR                Date
     Official Court Reporter
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

KEVIN P. DIXON, Deceased, by
and through LULA M. DIXON, his
Mother, Next Best Friend, and
Independent Administrator of
the Estate of Kevin P. Dixon,

               Plaintiff,

     v.

COOK COUNTY, d/b/a CERMAK
HEALTH SERVICES, *et al.*,

               Defendants.

Case No. 09 C 6976

Hon. Harry D. Leinenweber

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant Cook County, d/b/a Cermak Health Services' Motion to Strike the Rule 26(a)(2) report of Plaintiff's retained expert witness, Robert Greifinger, M.D. (hereinafter, "Dr. Greifinger"). For the reasons stated herein, Defendant's Motion is granted in part and denied in part.

### I.  BACKGROUND

On September 5, 2008, Kevin Dixon (the "Decedent") entered the Cook County Department of Corrections as a pre-trial detainee. At this time, Decedent's estate (the "Plaintiff") alleges that Decedent was in good health. In October 2008, Decedent began to experience pain in his stomach, back, and chest. Plaintiff alleges that after Decedent began to experience

A-11

pain, Decedent repeatedly requested help from various Defendant Correctional Officers, but Defendants refused to provide Decedent appropriate medical assistance.

On November 12, 2008, Decedent visited a physician and was diagnosed with possible gastroesophageal reflux disease. On November 19, 2008, Decedent appeared in court and a judge ordered Decedent to be seen by physicians at Cermak Hospital. On November 28, 2008, a physicians' assistant (the "PA") evaluated Decedent and diagnosed him with psychosomatic pain. Plaintiff alleges that Decedent's tier-mate filled out many requests for care on behalf of Decedent in November 2008, and further alleges that despite these requests, Defendants failed to respond.

On December 10, 2008, Decedent had a chest x-ray which revealed a paratracehal mass density in his chest. On December 11, 2008, a CT scan was performed and confirmed the presence of a mass in Decedent's chest. On December 23, 2008, Decedent visited the pulmonary clinic at Stroger Hospital of Cook County. During this visit, physicians again confirmed the mass in Decedent's chest. As a result, Decedent was scheduled for a follow-up CT scan on January 2, 2009, and a visit on January 6, 2009.

On or about December 29, 2008, Decedent again experienced pain in his abdomen and leg and complained to various correctional officers that he was constipated and could not get

- 2 -

up.   On this date, Decedent was sent to Cermak Hospital's
Emergency Room for lack of breathing and pain.   On December 30,
2008, Decedent reported two weeks of constipation and reported he
was unable to walk.   Plaintiff alleges that at this time Decedent
was referred to a mental health physician.

On December 31, 2008, Decedent was admitted to Cermak
Hospital Infirmary.   A physician saw Decedent and completed a
Cermak Hospital Consultation Request Form, requesting that
Decedent have a pulmonary consultation at Stroger Hospital.
Plaintiff alleges on this visit the physician marked it was
"RUSH" request.

On January 2, 2009, Decedent had another CT scan which
reported similar findings to his prior exams, the presence of a
mass in Decedent's chest.   On January 5, 2009, Decedent was
transported to Stroger Hospital and saw a physician who reported
that Decedent had metastasized lung cancer.   On March 4, 2009,
Decedent died.

On November 5, 2009, Decedent's estate filed suit against
Defendant Cook County d/b/a Cermak Health Services as well as
other agents of the Cook County Department of Corrections.
Plaintiff alleges Defendants violated Decedent's civil rights
under 42 U.S.C. § 1983 by failing to provide adequate medical
care and alleges intentional infliction of emotional distress.

Defendant Cook County now seeks to strike Plaintiff's Rule 26(a)(2) report of Plaintiff's expert Dr. Robert Greifinger.

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 26(a)(2) governs the disclosure of expert testimony. The rule states that parties must disclose the identity of any expert who may be used at trial to present evidence under Federal Rules of Evidence 702, 703, or 705. FED. R. CIV. P. 26(a)(2)(A). Rule 26(a)(2) also requires litigants to provide opposing counsel an accompanying report prepared and signed by the disclosed expert which contains "a complete statement of all opinions the witness will express and the basis and reasons for them; the data or other information considered by the witness in forming the opinions; any exhibits to be used as a summary or support for the opinions; [and] the qualifications of the witness . . ." FED. R. CIV. P. 26(a)(2)(B).

## III.   DISCUSSION

Defendant seeks to strike the Rule 26(a)(2) report of Plaintiff's expert Robert Greifinger, M.D. Defendant alleges that Dr. Greifinger's report should be struck because his opinions are unreliable and conclusory. Defendant specifically takes issue with Dr. Greifinger's use of the phrase "deliberate indifference," in his report, arguing that such a phrase is a legal term to be defined by the Court. Def.'s Mot. to Strike the Rule 26(a)(2) report of Robert Greifinger, M.D. at 6. Plaintiff

responds that Dr. Greifinger is qualified to render opinions regarding the policies and procedures concerning the custodial medical care at the Cook County Department of Corrections because of Dr. Greifinger's extensive experience, and argues that his use of the term "deliberate indifference" does not amount to a legal conclusion.

At the outset, the Court finds Defendant's motion confusing. In its motion, Defendant seeks to strike Dr. Greifinger's Rule 26(a)(2) report, yet in support of such motion Defendant directs this Court to case law handling motions *in limine* and motions to strike and exclude testimony. The Court is unsure if Defendant actually seeks to strike Dr. Greifinger as an expert witness or strike his proposed testimony. However, it is not a function of the Court to organize or form a party's motions or arguments. *See United States v. McClellan*, 165 F.3d 535, 550 (7th Cir. 1999). Because of this, the Court only will rule on the exclusion of Dr. Greifinger's Rule 26(a)(2) report.

Trial courts have broad discretion under Federal Rule of Evidence 702 to admit or exclude expert testimony. *United States v. Smith*, 869 F.2d 348, 351 (7th Cir. 1989). Rule 702 and the Supreme Court's opinion in *Daubert v. Merrell Dow Pharmaceuticals, Inc.* govern the admissibility of expert testimony. FED. R. EVID. 702; *Daubert v. Merrell Dow*

*Pharmaceuticals*, 509 U.S. 579 (1993). *Daubert* provides a three-step analysis for district courts to consider in determining whether the proffered expert testimony is both relevant and reliable. *Ervin v. Johnson & Johnson*, 492 F.3d 901, 904 (7th Cir. 2007). *Daubert* instructs district courts to determine (1) whether the witness is qualified as an expert "by knowledge, skill, experience, training or education"; (2) whether the theory [the expert is relying on] "has been subjected to peer review and publication"; and (3) whether the theory is "generally accepted in the scientific community." *Daubert*, 509 U.S. at 593-94.

The Seventh Circuit has noted that while *Daubert* provides a list of factors to be considered "when evaluating the admissibility of expert testimony – including testing, peer review, error rates, and acceptability within the relevant professional community - these factors do not establish a definitive checklist." *United States v. Cruz-Velasco*, 224 F.3d 654, 660 (7th Cir. 2000). Moreover, the Seventh Circuit has recognized that the *Daubert* opinion was limited to scientific testimony and that "while extensive academic and practical expertise in an area is certainly sufficient to qualify a potential witness as an expert, Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience." *United States v. Parra*, 402

- 6 -

A-16

F.3d 752, 758 (7th Cir. 2005).  As such, the Seventh Circuit
"consider[s] a proposed expert's full range of practical
experience as well as academic or technical training when
determining whether that expert is qualified to render an opinion
in a given area." *Trustees of Chi. Painters and Decorators
Pension v. Royal Intern. Drywall and Decorating*, Inc., 493 F.3d
782, 787-88 (7th Cir. 2007).

### A.  Dr. Greifinger's Qualifications

       After reviewing Dr. Greifinger's report and deposition, the
Court finds that both Dr. Greifinger's education and experience
in the field of correctional medicine qualifies him as an expert
in this case.  *See* Def.'s Mot. to Strike Rule 26 (a)(2) Report of
Greifinger, Ex. 3 at 1.  The Court specifically refers to Dr.
Greifinger's 20 years of experience as a physician practicing
correctional medicine, and his experience as the Chief Medical
Officer for the New York State Department of Correctional
Services.

### B.  The Reliability of Dr. Greifinger's 26(a)(2) Report

       The Court next turns to Defendant's contention that Dr.
Greifinger's opinions should be struck because his opinions
amount to legal conclusions, and therefore are unreliable.
Defendant alleges that Dr. Greifinger's report lacks a basis for
his opinions and conclusions.  Defendant further argues that Dr.

- 7 -

A-17

Greifinger's use of the phrase "deliberate indifference" amounts to an impermissible legal conclusion. Plaintiff contends Dr. Greifinger's extensive experience in the field of correctional medical care provides a sufficient basis for his opinions.

"If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why the experience is a sufficient basis for the opinion and how that experience is reliably applied to the fact." FED. R. EVID. 702 advisory committee's notes (2000 amendment). The more subjective and controversial the expert's inquiry, the more likely the testimony should be excluded as unreliable. *See O'Connor v. Commonwealth Edison Co.*, 13 F.3d 1090 (7th Cir. 1994).

In his report, Dr. Greifinger fails to connect his experience, whether it was how he operated a correctional facility or what he observed in other correctional facilities, to his conclusions in his report. As an example, in paragraph 33 of Dr. Greifinger's report he states: "Mr. Dixon's pain was increasing, including 10 out of 10 on December 23, 2008, yet he never received anything stronger than acetaminophen for his pain. Mr. Dixon [Decedent] suffered substantially. This falls far below the standard of correctional health care and was deliberately indifferent to his serious medical needs." Def.'s

- 8 -

Mot. to Strike Rule 26(a)(2) Report of Robert Greifinger, M.D. Ex. 2 at 5. The Court finds this statement, much like the rest of the report, to merely state a fact and then provide a conclusion, without providing any analysis as to how Dr. Greifinger reached such a conclusion.

In the "Opinions and Conclusions" section of his report, Dr. Greifinger repeatedly states that Defendants' actions "fell below the standard of correctional health care." Yet, Dr. Greifinger fails to articulate what the appropriate standard of care is. As such, the Court not only finds this assertion to lack reliability, but also finds it to lack relevancy in a civil rights case like this one and not a medical malpractice case where the standard of care is directly at issue.

"[E]xperts' work is admissible only to the extent it is reasoned, uses the methods of the discipline and is founded on data. Talking off the cuff – deploying neither data nor analysis – is not an acceptable methodology." *Lang v. Kohl's Food Stores*, 217 F.3d 919, 924 (7th Cir. 2004). As such, the Court strikes any and all of Dr. Greifinger's unsupported conclusions in his Rule 26(a)(2) report. Specifically, the Court holds that any reference to Defendants' "falling below the standard of correctional health and care," and Defendants' actions constituting a "deliberate indifference" to Decedent's needs to be struck from Dr. Greifinger's report. (This includes the last

- 9 -

A-19

sentence of paragraphs 30, 31, 32, 33, 35, 36, 38, 39, and 40; as well as the last two sentences in paragraphs 34 and 37.)  The Court finds the remainder of the report permissible, and reminds Defendant that its holding is narrowly construed to Defendant's motion to strike the Rule 26(a)(2) report.  Defendant may find it necessary to file additional motions *in limine* regarding Plaintiff's experts' proposed testimony as trial approaches.

### IV.  CONCLUSION

For the reasons stated herein, Defendant's Motion to Strike Dr. Greifinger's Rule 26(a)(2) Report is granted in part and denied in part.

**IT IS SO ORDERED.**

Harry D. Leinenweber, Judge
United States District Court

**DATE:** 9/25/2012

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

KEVIN P. DIXON, deceased, by and
through LULA M. DIXON, his mother,
next best Friend and Independent
Administrator of the Estate of Kevin P.
Dixon,

               Plaintiffs,

       v.

COOK COUNTY d/b/a CERMAK HEALTH
SERVICES, COOK COUNTY DEPARTMENT
OF CORRECTIONS, OFFICER LANIEKA
DAVIS, SERGEANT LEROY KELLY, OFFICER
BRENDAN KELLY, SERGEANT LEON
MARMOL, PARAMEDIC LOGGIN, CERTAIN
UNKNOWN PARAMEDICS, CERTAIN
UNKNOWN EMPLOYEES/AGENTS OF COOK
COUNTY DEPARTMENT OF CORRECTIONS
and CERTAIN UNKNOWN
EMPLOYEES/AGENTS OF COOK COUNTY
d/b/a CERMAK HEALTH SERVICES,

               Defendants.

No. 09 C 6976

Judge Thomas M. Durkin

## MEMORANDUM OPINION AND ORDER

Lula Dixon ("Plaintiff") filed a complaint on behalf of her son Kevin Dixon, deceased ("Dixon"), alleging that Cook County, doing business through its prison medical services provider Cermak Health Services (the "County"), and corrections officers Officer Lanieka Davis, Sergeant Leroy Kelly, Officer Brendan Kelly, Sergeant Leon Marmol (the "Officers"), violated the Eighth Amendment and state law by being deliberately indifferent to Dixon's medical needs while he was

incarcerated in the Cook County Jail pending trial. R. 49-1. The County, R. 106, and the Officers, R. 119, have separately moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the following reasons, both motions are granted and Dixon's complaint is dismissed.

## Background

At the time Dixon entered the Cook County Department of Corrections as a pre-trial detainee on September 5, 2008, he was in apparent good health. R. 120 ¶ 5; R. 126 ¶ 5. But in October 2008, Dixon began to experience increasingly severe pain in his back and abdomen. R. 120 ¶ 6; R. 126 ¶ 6. On November 8, 2008, Dixon submitted a medical request form complaining of pain in his stomach, back, and heart. He was treated by a physician on November 12, 2008, and diagnosed with gastroesophageal reflux disease. R. 120 ¶ 10; R. 126 ¶ 10. Dixon saw another "medical professional" on November 28, 2008, who concluded that Dixon was experiencing psychosomatic pain. R. 120 ¶ 11; R. 126 ¶ 11.

Dixon had a chest x-ray on December 10, and based on the results, a CT scan was ordered for Dixon. R. 108 ¶ 9; R. 130 ¶ 9. The CT scans that Dixon underwent on December 11 revealed that he had a large mass in the left paratracheal region of his chest, a little larger than five by five centimeters. R. 167 ¶ 5; R. 129-15. Based on the CT scan results, Dixon was scheduled for an "urgent" pulmonary consultation, which he received on December 23. R. 129-16. He was then scheduled to have a follow-up visit with the pulmonologist and to undergo another CT scan on January 2, 2009. R. 108 ¶ 10; R. 130 ¶ 10.

Edward Floyd was Dixon's cellmate during the relevant time period. Floyd testified that Dixon collapsed to the floor the night of December 29-30 and urinated on himself. R. 120-11 (Floyd's Deposition Transcript) at 34-36.

Officer Davis began her shift at 7 a.m. on December 30. R. 167 ¶ 15. Officer Davis checks on each cell at the start of her shift to make sure the inmates "are alive." *Id.* ¶ 15. Floyd says that when Officer Davis checked on their cell at the beginning of her shift, he told her that Dixon had collapsed and could not move, and he asked her to bring them a mop. R. 120-11 at 38-40. Floyd says that Officer Davis did not believe him and did not provide a mop. *Id.*

Officer Davis completed an "Inmate Medical Service Request" form stating that she notified Sergeant Kelly (her supervisor) at 9:40 a.m., Paramedic Loggin at 9:44 a.m., and Nurse Omeke at 11:09 a.m. that Dixon had pain in his stomach and legs, was not able to use the bathroom, and could not get up. R. 128-9. The form also noted that Dixon would be put on "sick call for Friday," which was three days later, and that Dixon was not "treated on site," "transported to the dispensary," nor "transported to Cermak." *Id.* Floyd testified, however, that no medical personnel came to the cell to attend to Dixon that morning and that Dixon remained lying on the floor in his urine. R. 120-11 at 39-40.

Officer Kelly and Sergeant Marmol came on duty at 3:00 p.m. that afternoon. R. 167 ¶ 23. When Officer Kelly started his shift, he found Dixon lying on the floor of his cell. R. 120 ¶ 23; R. 126 ¶ 23. Either Dixon or Floyd told Kelly that Dixon was in pain and could not stand. R. 120 ¶ 22; R. 126 ¶ 22. By 5:00 p.m., Officer Kelly had

reported Dixon's condition to Sergeant Marmol (Officer Kelly's supervisor), and medical staff from Cermak arrived at approximately 5:15 p.m. R. 120 ¶ 24; R. 126 ¶ 24.

According to Floyd, when the paramedics from Cermak arrived, they stated that nothing was wrong with Dixon's legs and he should be able to walk. R. 120-11 at 41-42. The paramedics told Dixon he had to get down the stairs by himself, so he started dragging himself across the floor with his arms. *Id.* at 43. When Dixon could not drag himself any further, Officer Kelly and another person dragged Dixon down the stairs. *Id.* at 44-46.

Rufus Balentine, an inmate in a nearby cell, testified that he heard the guards curse at and kick Dixon. R. 120-6 at 89. Balentine said Dixon complained that he was in pain, but the guards were laughing and joking. R. 120-5 at 43.

Dixon arrived at Cermak's emergency room at 6:00 p.m., and had a CT scan of his back at 6:29 p.m. R. 120 ¶ 28; R. 126 ¶ 28. Physician's Assistant Glen Trammel examined Dixon and noted that despite Dixon's claims of paralysis, Dixon was able to lift his legs to remove his socks and hold his legs in the air during a range of motion exam. R. 108 ¶ 14; R. 130 ¶ 14. Based on the inconsistency between Dixon's claimed paralysis and Trammell's observation that Dixon used his legs, Trammell ordered a psychiatric consultation to rule out the possibility that Plaintiff was malingering or faking his paralysis. R. 108 ¶ 15; R. 130 ¶ 15. He also ordered a CT scan of the thoracic, lumbar, and sacral regions of Dixon's spine and an obstructive series of Dixon's abdomen to ensure that there was no obstruction

causing constipation. This series showed no such obstruction. R. 108 ¶ 15; R. 130 ¶ 15.

The next day, Dixon was transferred to the infirmary at Cermak. R. 120 ¶ 29; R. 126 ¶ 29. Dr. Katina Bonaparte examined Dixon around 10:00 a.m. R. 108 ¶ 19; R. 130 ¶ 19. At her deposition, Dr. Bonaparte testified that the only report in Dixon's electronic records was a normal chest x-ray from September 2008. R. 146 ¶ 2. She also testified that she was aware that Dixon had a mass in his chest, and that he had a consult with a pulmonologist on December 23. R. 129-2 (Bonaparte Deposition Transcript) at 145-48; 177-78. A "Consultation Request Form" that Dr. Bonaparte completed on December 31 notes that Dixon's December 11 CT scan showed a "paratracheal mass." R. 108-8 at 3. Dr. Bonaparte has since submitted a declaration re-asserting that she was aware that radiology had discovered a mass located in Dixon's left paratracheal region and that he had already consulted with a pulmonologist in December. R. 108-8.[1] The parties agree that Dr. Bonaparte requested another pulmonologist consult for Dixon on a "rush" basis. R. 108 ¶ 22; R. 130 ¶ 22.

---

[1] In her declaration, Dr. Bonaparte states, "While I was aware that radiology had discovered a mass located in Mr. Dixon's left paratracheal region, I also saw on the Cerner System, which is the electronic medical records system . . ., that Mr. Dixon had already consulted with a pulmonologist." R. 108-8 ¶ 4. Plaintiff objects that this statement "directly contradicts her prior deposition testimony that the only report in the CERNER system was [Dixon's] normal chest x-ray from September 2008." R. 130 ¶ 22. This inconsistency may be enough to show a dispute as to what information was contained in the electronic records system, but Dr. Bonaparte has consistently asserted, both at her deposition and in her declaration, that she was aware at the time she examined Dixon that he suffered from a mass in his chest and had a pulmonologist consultation on December 23.

On January 2, 2009 at 10:33 a.m., radiologist Calvin Flowers read the CT scan Dixon had on December 30 and observed a "significant amount of fecal matter throughout the entire colon and a large left paraspinal and paramediastinal mass in the left chest." R. 146 ¶ 5.[2] Dr. Bonaparte testified that she does not remember if she made any effort to learn the results of the CT scan. *Id.* ¶ 7. Dr. Bonaparte prescribed a powerful laxative and over-the-counter pain relievers and discharged Dixon back to the Cook County Jail at 12:30 p.m. on January 2, 2009. R. 108 ¶¶ 23, 26; R. 130 ¶¶ 23, 26.

Before being discharged, Dixon had another CT scan on January 2, 2009. R. 146 ¶ 13. The scan report was verified by radiologist Michael Apushkin at 3:48 p.m. on January 2, after Dixon had been discharged. *Id.* The report described the mass in Dixon's body as a "6 x 4 centimeters . . . [and] indicative of a malignant neoplasm." *Id.*

On January 5, 2009, Dixon was again brought to the Cermak emergency room. He was examined by Dr. Pedro Cruz. R. 146 ¶ 19. Dr. Cruz diagnosed Dixon with paraplegia and bowel and bladder incontinence, a large left paramediastinal mass, and a Stage II sacral pressure sore on his right buttock. *Id.* ¶ 22. Dr. Cruz made the decision to transfer Dixon to Stroger Hospital because the lower part of Dixon's body was paralyzed. *Id.*

---

[2] The results of the CT scan performed on December 31 were not available until January 8. R. 129-8.

6

Doctors at Stroger Hospital determined that Dixon was paralyzed because of metastasized lung cancer. Dixon died from lung cancer on March 4, 2009. R. 120 ¶ 30; R. 126 ¶ 30.

Dr. Cruz testified that when he was a physician at Cermak in 2008 and 2009, there were circumstances when he examined a patient and did not have access to the patient's prior medical records because they had not yet been scanned into the computer system utilized by the jail's healthcare providers. R. 146 ¶ 23. In Dr. Cruz's experience, there were occasions when there was a lack of communication between the attending physicians at Cermak and the outside doctors who did consultations. *Id.* ¶ 24. Dr. Cruz also testified that an "urgent" consultation request should be fulfilled within 24 to 48 hours. R. 108-12 at 61:15-21.

Plaintiff relies on the expert report of Dr. Robert Greifinger to argue that "the policies and practices within the Cook County Jail create barriers to coordination of care and treatment which resulted in deficient medical care for Mr. Dixon resulting in unnecessary pain and suffering and lack of palliative care." R. 129 ¶ 31. Dr. Greifinger found that the "dual paper and electronic medical record system used by Cermak at [Cook County Jail] contributed to poor continuity and coordination of care. . . . Although there were more than enough x-rays and CT scans performed [on Dixon], staff who ordered them did not seek the reports and did not respond to the deteriorating results on this diagnostic testing, even when the reports were available to physician staff in the [electronic] system." R. 129-3 ¶ 38.

Plaintiff also argues that the Court should consider a July 11, 2008 report from the Civil Rights Division of the Department of Justice that "put Defendant Cook County on notice that a 17 month investigation revealed severe deficiencies in the policies and procedures of the Cook County Jail regarding acute care, continuity of care, coordination of care, and the medical record keeping system that created barriers to [providing] timely and appropriate medical care to its detainees." R. 134 at 6.

The County submits the expert report and testimony of Dr. Marc F. Stern stating that the treatment Dixon received was appropriate. R. 108-14. Dr. Stern is a board certified internist specializing in correctional health care. In Dr. Stern's opinion, the Cermak staff "moved with appropriate—if not supranormal—speed in getting [Dixon] in the office of a pulmonologist following the report of an abnormal chest x-ray." *Id.* at 3. Dr. Stern is of the opinion that the pain management Dixon was prescribed was appropriate considering the observations by medical staff regarding Dixon's pain levels. *Id.* at 4-5. In Dr. Stern's opinion, the Cermak medical staff took Dixon's complaints and condition seriously, because despite "collecting clinical information . . . that was painting a picture for them of a patient who might not be as sick and weak as he said he was[,] [r]ather than simply discounting Mr. Dixon's symptoms and jumping to that conclusion, they sought the input of a mental health specialist to see if he concurred with their clinical skepticism." *Id.* at 9. According to Dr. Stern, Dr. Bonaparte's request for a "rush" pulmonologist consult did not require that the consult occur within fewer than seven days. *Id.* at 5-

6. Dr. Stern explained that "days or even short weeks are unlikely to affect the prognosis in a patient with [Dixon's] type of lung cancer." *Id.* at 3.

## Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court considers the entire evidentiary record and must view all of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Ball v. Kotter*, 723 F.3d 813, 821 (7th Cir. 2013). To defeat summary judgment, a nonmovant must produce more than "a mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Harris N.A. v. Hershey*, 711 F.3d 794, 798 (7th Cir. 2013). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## Analysis

"Prison officials violate the Eighth Amendment's proscription against cruel and unusual punishment when they display deliberate indifference to serious medical needs of prisoners." *Hayes v. Snyder*, 546 F.3d 516, 522 (7th Cir. 2008) (internal quotation marks omitted). To establish a deliberate indifference claim premised upon inadequate medical treatment a plaintiff must show (1) that the plaintiff suffered an objectively serious risk of harm and (2) that the defendant

9

acted with a subjectively culpable state of mind. *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011). For a medical condition to satisfy the objective element, the condition must be "diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). The "condition need not be life-threatening to be serious," however; "it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated." *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). To satisfy the subjective element, the plaintiff must demonstrate that the defendant knew of a substantial risk of harm to the plaintiff and either acted or failed to act in disregard of that risk. *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011).

In circumstances where a plaintiff eventually receives the necessary medical treatment, a "delay in the provision of medical treatment for painful conditions— even non-life-threatening conditions—can support a deliberate-indifference claim," as long as the plaintiff can "place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment." *Grieveson v. Anderson*, 538 F.3d 763, 779 (7th Cir. 2008) (internal quotation marks omitted). "That is, a plaintiff must offer medical evidence that tends to confirm or corroborate a claim . . . . that the delay (rather than the inmate's underlying condition) caused some degree of harm." *Williams v. Liefer*, 491 F.3d 710, 715 (7th Cir. 2007).

## A.    The Officers

### 1.    Deliberate Indifference

Plaintiff contends that Officer Davis and Sergeant Kelly were deliberately indifferent to Dixon's medical condition on December 30 because they did not ensure that he received medical attention during their shifts, which lasted from 7 a.m. to 3 p.m. The undisputed facts show that Officer Davis notified Sergeant Kelly at 9:40 a.m., and Paramedic Loggins at 9:45 a.m., that Dixon required medical attention. The undisputed facts also show that Officer Davis notified Nurse Omeke at 11:09 a.m. that Dixon required medical attention.[3] The Seventh Circuit has held that corrections officers are "entitled to rely on the professional judgment of medical prison officials," *Hayes*, 546 F.3d at 527, and a corrections officer's "failure to take further action once he had referred the matter to the medical providers can[not] be viewed as deliberate indifference." *Greeno*, 414 F.3d at 655-56. Like the defendants in *Hayes*, Officer Davis and Sergeant Kelly "at worst . . . may have been negligent in failing to investigate further after" notifying Paramedic Loggins and Nurse Omeke, "but negligence is not deliberate indifference." 546 F.3d at 527.

---

[3] Plaintiff relies on the Inmate Medical Service Request form that Officer Davis completed to assert that Dixon was not "treated on site," or "transported to the dispensary," or "transported to Cermak," during Officer Davis's shift. R. 127 at 7. But this form also shows that Officer Davis informed Sergeant Kelly, Paramedic Loggins and Nurse Omeke of Dixon's condition. Plaintiff cannot cherry-pick information from this form. Plaintiff's assertion that neither Paramedic Loggins nor Nurse Omeke ever actually examined Dixon, based on Floyd's testimony that no medical professional visited their cell before 5:15 p.m., does not contradict Officer Davis's testimony that she reported Dixon's condition to Sergeant Kelly, Paramedic Loggins and Nurse Omeke, as she recorded in the service request form.

11

Plaintiff's claim against Officer Davis and Sergeant Kelly also fails because their actions did not "unnecessarily prolong[] and exacerbate[] [Dixon's] pain," as Plaintiff contends. R. 127 at 12 (quoting *Williams v. Liefer*, 491 F.3d 710, 716 (7th Cir. 2007)). The only delay for which Officer Davis or Sergeant Kelly could possibly be responsible is the three to four hour delay from the time Officer Davis notified Nurse Omeke that Dixon required medical attention until 3:00 p.m. when Officer Davis's and Sergeant Kelly's shifts ended. The cases Plaintiff cites that involved delays in treatment which courts found could support a deliberate indifference claim all involved delays of much greater length, or pain that was much more emergent than Dixon's. In *Grieveson v. Anderson*, 538 F.3d 763, 779 (7th Cir. 2008), the plaintiff waited a day and half for treatment of a broken nose. In *Edwards v. Snyder*, 478 F.3d 827, 831 (7th Cir. 2007), the plaintiff waited two days for treatment of a dislocated finger. And in *Berry v. Peterman*, 604 F.3d 435, 442 (7th Cir. 2010), the plaintiff waited two months for treatment of a severe toothache. Dixon's case is much more like *Murphy v. Walker*, 51 F.3d 714, 717 (7th Cir. 1995), and *Knight v. Wiseman*, 590 F.3d 458, 466 (7th Cir. 2009), where the *Murphy* plaintiff's two-hour wait for treatment of a broken hand, and the *Knight* plaintiff's two and half-hour wait for treatment of a torn rotator cuff, did not "unnecessarily prolong" either plaintiff's pain.

Although Plaintiff relies heavily on the seven hour delay in treatment of a plaintiff's heart attack symptoms in *Williams v. Liefer*, that case is distinguishable because the court held that the plaintiff had proffered "verifying medical evidence"

that the delay exacerbated his condition. 491 F.3d at 716-17. The plaintiff was able to show that the medication he was eventually given quickly alleviated his pain and significantly decreased his blood pressure. *Id.* The court held that a jury could find that "six extra hours of pain and dangerously elevated blood pressure for no good reason" could constitute deliberate indifference. *Id.*

By contrast, Plaintiff has proffered no such evidence here. A cancerous mass is obviously a very serious condition, and the Court accepts that Dixon was experiencing pain and that the mass was making it difficult for Dixon to use his legs, if not causing him out-right paralysis for at least certain periods of time. But there is no evidence in the record that the delay at issue caused or exacerbated these conditions. Plaintiff has not even alleged that once Dixon was taken to the hospital that his pain was significantly alleviated. If the medical attention Dixon eventually received did not materially ameliorate his condition, then absent evidence to the contrary, the Court cannot hold that a reasonable juror could find that a delay of several hours in receiving that medical attention exacerbated Dixon's condition.

With regard to Officer Kelly and Sergeant Marmol, it is undisputed that their shifts began at 3:00 p.m. and that Officer Kelly reported Dixon's condition to Sergeant Marmol by approximately 5:00 p.m., and paramedics arrived at Dixon's cell around 5:15 p.m. For the same reasons the Court discussed above, this two-hour

delay in medical treatment cannot support a claim of deliberate indifference against Office Kelly or Sergeant Marmol.[4]

### 2.    Qualified Immunity

Moreover, even if the Officers' conduct violated Dixon's Eighth Amendment rights, they are entitled to qualified immunity. "Qualified immunity protects public servants from liability for reasonable mistakes made while performing their public duties." *Findlay v. Lendermon*, 722 F.3d 895, 899 (7th Cir. 2013); *see also Saucier v. Katz*, 533 U.S. 194, 205 (2001) ("The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct."). A "plaintiff seeking to defeat a defense of qualified immunity must establish two things: first, that she has alleged a deprivation of a constitutional right; and second, that the right in question was 'clearly established.'" *Miller v. Harbaugh*, 698 F.3d 956, 962 (7th Cir. 2012) (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). "In undertaking this analysis . . . . [i]t is not enough . . . to say that it is clearly established that those operating detention facilities must not engage in cruel or unusual punishment." *Miller*, 698 F.3d at 962. "The way that the right is translated into the particular setting makes a difference." *Id.* "The plaintiff must show that the contours of the right are

---

[4] Balentine, an inmate in a cell near Dixon's, testified that he "heard" the guards or paramedics kick Dixon. Absent additional evidence that Dixon was actually kicked and of who kicked him, Balentine's testimony that he heard rather than saw Dixon be kicked is insufficient to support a claim of deliberate indifference against any of the Officers. Moreover, Plaintiff alleges that Officers acted with deliberate indifference, not excessive force.

14

'sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

Even if the Eighth Amendment required the Officers to have ensured that Dixon received medical attention more quickly than they did, it was not unreasonable for the Officers to believe that they were acting in compliance with Dixon's rights. Officer Davis contacted Paramedic Loggins just over two hours after she learned that Dixon required medical attention. Her supervisor, Sergeant Kelly, instructed Officer Davis to contact medical professionals, and she did so. While it may have been preferable for Officer Davis and Sergeant Kelly to check whether Dixon had received the medical attention he required before they completed their shifts at 3:00 p.m., it was not unreasonable for them to assume that Paramedic Loggins or Nurse Omeke had appropriately handled the situation. This analysis holds true as well for the even shorter delay in treatment Plaintiff has alleged Officer Kelly and Sergeant Marmol caused.

### 3.    Intentional Infliction of Emotional Distress

Plaintiff also alleges that the Officers' intentionally inflicted emotional distress on Dixon in violation of Illinois law. Under the Illinois Local Governmental and Governmental Employees Tort Immunity Act, 745 ILCS 10/4-105, public employees like the Officers are not "liable for injury proximately caused by the failure of the employee to furnish or obtain medical care for a prisoner in his custody," unless the employee "knows . . . that the prisoner is need of immediate medical care and, through willful and wanton conduct, fails to [act]." The parties

15

agree that the "'willful and wanton standard is remarkably similar to the deliberate indifference standard.'" R. 121 at 12 (quoting *Williams v. Rodriguez*, 509 F.3d 392, 404 (7th Cir. 2007)); R. 127 at 18-19. Consequently, a holding that public employees did not act with deliberate indifference "is dispositive of" whether their conduct was willful and wanton. *Williams*, 509 F.3d at 405. Therefore, Plaintiff's intentional infliction of emotional distress claim is dismissed because the Court has held that the Officers did not act with deliberate indifference.

## B.    The County

Plaintiff also alleges that the County is liable for providing deficient medical care to Dixon because the County failed to correct "severe lapses in the practices and procedures . . . that created barriers to the continuity and coordination of necessary medical care for Mr. Dixon's serious medical condition." R. 134 at 8-9.

Although "a municipality cannot be held liable under § 1983 on a respondeat superior theory," "municipalities and other local government units [are] included among those persons to whom § 1983 applies." *Monell v. Dep't of Soc. Servs. of the City of N.Y.*, 436 U.S. 658, 690-91 (1978); *accord Calhoun v. Ramsey*, 408 F.3d 375, 379 (7th Cir. 2005). "A local governing body may be liable for monetary damages under § 1983 if the unconstitutional act complained of is caused by: (1) an official policy adopted and promulgated by its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority." *Thomas v. Cook County Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010). "To demonstrate that the County is liable

16

for a harmful custom or practice, the plaintiff must show that County policymakers were 'deliberately indifferent as to [the] known or obvious consequences.'" *Id.* (quoting *Gable v. City of Chicago*, 296 F.3d 531, 537 (7th Cir. 2002)). "In other words, they must have been aware of the risk created by the custom or practice and must have failed to take appropriate steps to protect the plaintiff." *Thomas*, 604 F.3d at 303. Moreover, for a municipality to be liable, the causal relationship between the policy or practice and the harm must be such that the policy was the "moving force behind the constitutional violation." *City of Canton v. Harris*, 489 U.S. 378, 379 (1989); *accord Teesdale v. City of Chicago*, 690 F.3d 829, 833 (7th Cir. 2012).

The County argues that summary judgment is appropriate here because "Plaintiff cannot establish that [Dixon] suffered a constitutional injury," or "that a widespread practice existed causing his alleged injury." R. 107 at 3-4. Plaintiff argues that Dixon was harmed by the County's "lack of timely care for a serious medical need," "lack of communication and coordination of care between providers," and "dysfunctional medical record keeping procedures." R. 134 at 17-18.

As the Court discussed previously, a constitutional injury requires both an objectively serious risk of harm and that the defendant acted with a subjectively culpable state of mind. *Roe*, 631 F.3d at 857. Regarding the "risk of harm," it is undisputed that Dixon was examined or treated by medical professionals on November 12 and 28, December 10-12 and 23, and December 30-Jaunary 2. Dixon had a CT scan on December 11 and based on the results of that scan, Dixon was

17

examined by a pulmonologist on December 23. Dixon then had CT scans on December 30 and 31, and January 2.

Plaintiff contends that this course of treatment from November until Dixon's discharge on January 2 was untimely and that the medical professionals involved did not follow through on treatment instructions—specifically, they waited 11 days to provide a pulmonologist consultation that was ordered as "urgent." But Plaintiff has not cited any fact or expert testimony tending to show that Dixon's 11 day wait for a pulmonologist consultation was the result of anything but a scheduling decision by the medical professionals involved. Plaintiff has offered no evidence to suggest that any deficiencies in County policies or practices prevented Dixon from receiving the consultation sooner. Dr. Cruz's testimony that Dixon should have received this consultation sooner because the referral was marked "urgent" is evidence that the medical professionals involved did not follow the policy or practice that was in place, not that the County's policy or practice was substandard. That there was a mechanism in place to allow for referrals to be marked "urgent" points to the fact that policies at least existed that allowed for an expedited referral process to take place.

Plaintiff also relies on the report of Dr. Greifinger to argue that "the policies and practices within the Cook County Jail create barriers to coordination of care and treatment which resulted in deficient medical care for Mr. Dixon resulting in unnecessary pain and suffering and lack of palliative care." R. 129 ¶ 31. The Court has already held, however, that Dr. Greifinger's opinion that the County's response

18

time was substandard is not reliable because Dr. Greifinger "fails to articulate what the appropriate standard of care is." R. 101 at 9. But, in any event, Dr. Greifinger's opinion that Dixon's care should have been expedited is not evidence that any deficiency in County policy *caused* Dixon's care to occur in the time frame which it did. Therefore, the Court holds that a reasonable juror could not find that Dixon's history of medical treatment leading up to his discharge on January 2 could constitute deliberate indifference to Dixon's medical condition.

Beyond the course of treatment that Dixon received until his discharge on January 2, Plaintiff also alleges that Dixon was harmed by the three day delay in providing Dixon with appropriate care for his cancer between January 2, when he was discharged from Cermak, and January 5 when he was transferred back to Cermak. Plaintiff asserts that Dr. Bonaparte did not have access to Dixon's complete medical records while he was at Cermak, and that the medical professionals at Cermak did not adequately communicate with each other. Plaintiff contends that if Bonaparte had access to Dixon's medical records, specifically Dixon's CT scan from December 11-12, she would not have discharged him on January 2. and that because Dixon was discharged on January 2 he "suffered needlessly, received no palliative care for his cancer and developed painful stage II pressure ulcers on his buttocks." R. 134 at 13.

Although the County concedes that Dixon's "lung mass [was] a serious medical condition," R. 107 at 6, the mere existence of the lung mass is not the harm at issue here. Rather it was the three day delay in receiving palliative care for

Dixon's quickly deteriorating condition that is the harm at issue here. The Court finds that this three day delay in receiving palliative care unnecessarily prolonged Dixon's suffering. See *Grieveson*, 538 F.3d at 779.

Plaintiff, however, cannot show that any policy failure on the part of the County was the moving force behind the harm Dixon suffered. Plaintiff has no evidence to contradict Dr. Bonaparte's assertion that she was aware that Dixon had a mass in his chest area. And despite this knowledge, Dr. Bonaparte was not convinced that this mass was causing Dixon's symptoms and determined that it was appropriate to discharge Dixon based on her examinations of Dixon and reports from nurses at Cermak. Moreover, the pulmonologist who examined Dixon on December 23 had reviewed the results of the CT scan from December 11 and determined that Dixon could return to the jail. Plaintiff has not provided any evidence to conclude that had Dr. Bonaparte reviewed the December 11 CT scan she would have reached a conclusion different from the pulmonologist. In fact, she requested another pulmonologist consultation for Dixon, indicating that she thought a pulmonologist's expertise was again necessary to access Dixon's condition.

Additionally, Plaintiff has not alleged that any deficiency in County policy prevented Dr. Bonaparte from accessing Dixon's December 11 or December 30 CT scans if she had determined she needed to review them. Thus, despite Plaintiff's allegation that Dr. Bonaparte's decision would have been different had she had Dixon's complete medical records, Dr. Bonaparte was not *deprived* of access to any pertinent information that was available at the time of Dixon's discharge. Rather,

had Dr. Bonaparte felt she needed to review any of Dixon's CT scans she could have retrieved that information. It was Dr. Bonaparte's determination, however, that she did not need this information. Accordingly, even assuming that the County did not maintain a policy or practice sufficient to ensure that doctors had their patients' complete medical records and communicated with each other during and prior to patient examinations, Plaintiff has not shown that this failure on the County's part caused Dixon's discharge.

The undisputed evidence also shows that the CT scan Dixon had on the morning of January 2 was available that afternoon (after Dixon had been discharged) and revealed that the mass in his chest had grown and was malignant. Although Plaintiff does not specifically make the argument, the Court construes Plaintiff's complaint and briefs to contend that County medical professionals should have compared the CT scans from December 11 and January 2 and realized that Dixon needed to be transferred back from the jail again and checked into the hospital to receive palliative care.

Plaintiff, however, does not provide any evidence that any deficient County policies or practices caused Dixon to be deprived of palliative care until January 5. Plaintiff has provided some evidence that the County's policies and practices for maintaining medical records and ensuring coordination among medical professionals were deficient. For instance, Dr. Cruz testified that he did not always have the medical records he required when examining patients, and Dr. Bonaparte testified that Dixon's December 11 CT scan was not in the files she had when she

21

examined him. But Plaintiff has presented no evidence to show that this type of policy break down caused Dixon's harm in this specific instance. For there to have been a policy break-down sufficient to support a claim that the County was deliberately indifferent, Plaintiff needed to allege and provide evidence that a medical professional with the authority to order that Dixon be readmitted to the hospital was *prevented* from reviewing Dixon's January 2 CT scan. Plaintiff has made no such allegation or presented any such evidence. Without such evidence, there is no basis to infer that the reason Dixon was allowed to remain in the jail was anything other than a decision by the medical professionals who reviewed his records.[5]

Therefore, Plaintiff's claim against the County must be dismissed because a reasonable juror could not find that the harm Dixon suffered was caused by any deficiencies that may have existed in the County's policies for making medical records available to treating medical professionals or ensuring that medical professional adequately communicated with each other.

---

[5] Plaintiff, of course, also relies on the report from the Department of Justice, while the County argues that this report is inadmissible hearsay. The Court need not decide whether the report is admissible since the Court had held that Plaintiff has failed to produce any evidence of a sufficient causal relationship between the County's policies (or lack thereof) and the failure to provide palliative care to Dixon between January 2 and January 5.

## Conclusion

For the foregoing reasons, both the County's motion for summary judgment, R. 106, and the Officers' motion for summary judgment, R. 119, are granted, and Plaintiff's complaint is dismissed.

ENTERED

_Thomas M Durkin_

Honorable Thomas M. Durkin
United States District Judge

Dated:  October 30, 2013

## IN THE UNITED STATES DISTRICT COURT
### FOR THE
### NORTHERN DISTRICT OF ILLINOIS

Kevin P. Dixon, et al )
                )
       Plaintiff(s) )    Case No. 09 C 6976
                )
v. )
Cook County, et al )
       Defendant(s)

## JUDGMENT IN A CIVIL CASE

Judgment is hereby entered (check appropriate box):

☐ in favor of plaintiff(s)
and against defendant(s)
in the amount of $             ,

     which ☐ includes      pre judgment interest.
            ☐ does not include pre judgment interest.

Post-judgment interest accrues on that amount at the rate provided by law from the date of this judgment.

Plaintiff(s) shall recover costs from defendant(s).

---

☑ in favor of defendant(s) Cook County, et al
and against plaintiff(s) Kevin Dixon, et al

Defendant(s) shall recover costs from plaintiff(s).

---

☐     other:

---

This action was (check one):

☐ tried by a jury with Judge Select a Judge       ○ presiding, and the jury has rendered a verdict.
☐ tried by Judge Select a Judge     ○    without a jury and the above decision was reached.
☑ decided by Judge Thomas M. Durkin    ○ on a motion for summary judgment.

Date: 10/30/13                       Thomas G. Bruton, Clerk of Court
                                       /s/ Sandy Newland         , Deputy Clerk