No. 13-3634

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT**

| | | |
|---|---|---|
| KEVIN P. DIXON, deceased, | ) | Appeal from the U.S. District |
| by and through LULA DIXON, | ) | Court for the Northern District |
| his mother, Next Best Friend | ) | of Illinois, Eastern Division |
| and Independent Administrator | ) | |
| of the Estate of Kevin P. Dixon | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 09 C 6876 |
| | ) | |
| The County of Cook, Katina Bonaparte, M.D., | ) | |
| and Newworld Aboigbe (f/k/a | ) | |
| Omeke), R.N. | ) | Hon. Thomas M. Durkin and |
| | ) | Hon. Harry D. Leinenweber |
| | ) | United States District Judges |
| Defendants-Appellees. | ) | |

---

**BRIEF OF DEFENDANTS-APPELLEES COUNTY OF COOK,
KATINA BONAPARTE, M.D., AND NEWWORLD ABOIGBE, R.N.**

---

ANITA ALVAREZ
State's Attorney of Cook County
69 West Washington Street
Suite 2030
Chicago, Illinois 60602
Tel: (312) 603-1426
Fax: (312) 603-9616
e-mail: Thomas.Cargie@cookcountyil.gov

MAUREEN O. HANNON
Supervisor, Conflicts Counsel Unit

THOMAS CARGIE
Assistant State's Attorneys
*Of Counsel*

# TABLE OF CONTENTS

TABLE OF CONTENTS.........................................................................i

TABLE OF AUTHORITIES ..............................................................iii

JURISDICTIONAL STATEMENT .....................................................1

ISSUES PRESENTED FOR REVIEW ................................................1

STATEMENT OF THE CASE............................................................1

SUMMARY OF THE ARGUMENT .................................................11

STANDARD OF REVIEW...............................................................14

ARGUMENT...................................................................................15

I.   The Amended Complaint Does Not State A Plausible Claim
     Of Deliberate Indifference Or Intentional Infliction
     Of Emotional Distress Against Either Dr. Bonaparte
     Or Nurse Aboigbe .......................................................................15

     A.  Under *Twombly* and *Iqbal*, Mr. Dixon Should Not Be Able to
         Rely in This Appeal on Facts That Were Not in the Amended
         Complaint To Demonstrate That the Amended Complaint
         Asserted A Plausible Claim of Deliberate Indifference
         Against Dr. Bonaparte.............................................................15

     B.  The Facts Alleged In the Amended Complaint Do Not State
         a Plausible Claim of Deliberate Indifference Against
         Dr. Bonaparte .........................................................................22

     C.  Mr. Dixon Knows Or Should Know that Many of the Additional
         Facts Upon Which He Relies In This Appeal Are Not True .................30

     D.  Dr. Bonaparte Made A Medical Determination Based On The
         Evidence That Mr. Dixon Was Not In Need Of Emergency Care
         And That His Pain Could Be Adequately Alleviated With
         Non-Prescription Strength Pain Reliever; Thus She Was
         Not Deliberately Indifferent To Mr. Dixon............................32

     E.  The Amended Complaint Does Not State A Plausible Claim
         Against Nurse Aboigbe .............................................................36

F.  The Amended Complaint Does Not Assert a Plausible Claim
of Intentional Infliction of Emotional Distress against
Either Dr. Bonaparte or Nurse Aboigbe ................................................ 38

II. The District Court Properly Granted The County Summary Judgment
On Mr. Dixon's *Monell* Claim Because There Is No Evidence That Any
County Practice Or Policy Actually Caused Any Constitutional Harm .......... 40

A.  The Existence of Alleged Unconstitutional Practices, Standing Alone,
Is Not Sufficient Proof that Those Practice Were the Moving
Force in Causing a Constitutional Harm .............................................. 40

B.  The District Court Did Not Err in Excluding Dr. Greifinger's
Conclusory Opinion Testimony, But Even If It Had, Greifinger
Offered No Reasoned Opinion on Causation To Show That
a Policy or Practice of Cook County Was the Moving Force
Behind Mr. Dixon's Alleged Harm ...................................................... 42

1.  Dr. Greifinger provided no explanation for the conclusions
he reached; thus the opinions he gave are both
unreliable and irrelevant .............................................................. 42

2.  Greifinger did not explain how any County practice was
the cause of any constitutional injury to Mr. Dixon .................... 46

CONCLUSION ..................................................................................... 48

## <u>TABLE OF AUTHORITIES</u>

### CASES

*Agnew v. NCAA*, 683 F.3d 328 (7th Cir. 2012) ......................................................... 21

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................................... *passim*

*Bank of Am., N.A. v. Knight*, 725 F.3d 815 (7th Cir. 2013) .................................... 37

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) .................................... *passim*

*Bd. of County Comm'rs of Bryan County v. Brown*,
    520 U.S. 397 (1997) ................................................................................. 41, 47

*Car Carriers v. Ford Motor Co.*, 745 F.2d 1101 (7th Cir. 1984) .......... 12, 15, 16, 17

*Chavez v. Ill. State Police*, 251 F.3d 612 (7th Cir. 2001) ................................. 17, 18

*City of Canton v. Harris*, 489 U.S. 378 (1989) ....................................................... 40

*City of Oklahoma City v. Tuttle*, 471 U.S. 808 (1985) ........................................... 41

*Conley v. Gibson,* 355 U.S. 41 (1957) ........................................................... *passim*

*Dawson v. General Motors Corp.*, 977 F.2d 369 (7th Cir. 1992) .................... *passim*

*Denius v. Dunlap*, 330 F.3d 919 (7th Cir. 2003) .................................................... 31

*Doe v. Calumet City*, 161 Ill. 2d 374, 641 N.E.2d 498 (1994) ............................... 38

*Estate of Cole by Pardue v. Fromm*, 94 F.3d 254 (7th Cir. 1996) .................... 32, 33

*Estate of Novack v. County of Wood*, 226 F.3d 525 (7th Cir. 2000) ...................... 47

*Estelle v. Gamble*, 429 U.S. 97 (1976) .................................................................. 32

*Feltmeier v. Feltmeier*, 207 Ill. 2d 263, 798 N.E.2d 75 (2003) .............................. 38

*Hayes v. Snyder*, 546 F.3d 516 (7th Cir. 2008) ................................................ 28, 29

*Hiland Dairy, Inc. v. Kroger Co.*, 402 F.2d 968 (8th Cir. 1968) ............................ 25

*Hishon v. King & Spalding*, 467 U.S. 69 (1984) ....................................... 12, 17, 18

*Holloway v. Del. County Sheriff*, 700 F.3d 1063 (7th Cir. 2012) ...................... 25, 26

*In re Text Messaging Antitrust Litig.*, 630 F.3d 622 (7th Cir. 2010) ...................... 18

*Jones v. SABIS Educ. Sys.*, 1999 U.S. Dist. LEXIS 19449
    (N.D. Ill. Dec. 9, 1999) ................................................................ 21

*Lewis v. Citgo Petroleum Corp.*, 561 F.3d 698 (7th Cir. 2009) .............................. 43

*Marcilis v. Twp. of Redford*, 693 F.3d 589 (6th Cir. 2012) .................................... 37

*McZeal v. Sprint Nextel Corp.*, 501 F.3d 1354 (Fed. Cir. 2007) ............................ 19

*Metavante Corp. v. Emigrant Sav. Bank*,
    619 F.3d 748 (7th Cir. 2010) ........................................................ 43, 44, 45

*Mid-America Reg'l Bargaining Ass'n. v. Will County Carpenters
Dist. Counsel*, 675 F.2d 881 (7th Cir. 1982) .................................................. 25

*Milton v. Illinois Bell Tel. Co.*,
    101 Ill. App. 3d 75, 427 N.E.2d 829 (1st Dist. 1981) .................................. 39

*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978) .......................................... 13, 40

*Ortiz v. Webster*, 655 F.3d. 731 (7th Cir. 2011) ...................................................... 34

*Pyles v. Fahim*, 771 F.3d 403 (7th Cir. 2014) ........................................................ 33

*Reynolds v. CB Sports Bar, Inc.*, 623 F.3d 1143 (7th Cir. 2010) ............... 12, 19, 20

*Runnemede Owners, Inc. v. Crest Mortgage Corp.*,
    861 F.2d 1053 (7th Cir, 1988) .................................................................. 16, 17

*Salgado v. General Motors Corp.*, 150 F.3d 735 (7th Cir. 1998) ........................... 44

*Smego v. Mitchell*, 723 F.3d 752 (7th Cir. 2013) ....................................... 27, 28, 29

*Snipes v. DeTella*, 95 F.3d 586 (7th Cir. 1996) ...................................................... 33

*Steele v. Choi*, 82 F.3d 175 (7th Cir. 1996) .................................................. 33, 34, 35

*Tamayo v. Blagojevich,* 526 F.3d 1074 (7th Cir. 2008) ..................................... 26, 39

*Thomason v. Nachtrieb*, 888 F.2d 1202 (7th Cir. 1989)...........................................20

*Travel All Over the World v. Kingdom of Saudi Arabia,*
     73 F.3d 1423 (7th Cir. 1996) .......................................................14

*Walker v. Benjamin*, 293 F.3d 1030 (7th Cir. 2002) ........................................ 23, 24

*United States v. Moore*, 521 F.3d 681 (7th Cir. 2008) ...........................................43

*United States v. Noel*, 581 F.3d 490 (7th Cir. 2009) .......................................45, 46

## STATUTES AND RULES

Fed. R. Civ. P. 8(a)(2) ...............................................................37

Fed. R. Civ. P. 12(b)(6) .................................................... *passim*

Fed. R. Civ. P. 56...................................................................48

N.D. Ill. L.R. 56.1..................................................................3, 31

N.D. Ill. L.R. 56.1(b)(3)(B) .........................................................5, 15

## JURISDICTIONAL STATEMENT

Mr. Dixon's jurisdictional summary is both complete and correct.

## ISSUES PRESENTED FOR REVIEW

1. Whether, in light of *Twombly* and *Iqbal*, Mr. Dixon can challenge a district court order dismissing a complaint pursuant to FRCP 12(b)(6) using facts not alleged in, nor reasonably inferable from, that complaint, and if so, whether the additional facts upon which Mr. Dixon relies are nevertheless an impermissible attempt to amend the complaint to add a new distinct claim of deliberate indifference?

2. Whether the district court correctly found that Mr. Dixon's Amended Complaint did not assert a plausible claim of deliberate indifference or intentional infliction of emotional distress against either Dr. Bonaparte or Nurse Aboigbe[1]?

3. Whether the district court properly granted the County's motion for summary judgment on a *Monell* claim against it when Mr. Dixon offered no evidence to show that any practice or policy of the County was the "moving force" for this alleged constitutional injury?

## STATEMENT OF THE CASE

Overall, Mr. Dixon provides a fair summary of the facts in this case. However, he persistently intermingles facts that were alleged in the Amended Complaint with facts that were asserted in connection with the motion for summary judgment. Because of the procedural posture of this appeal -- an appeal from an order granting certain defendants' motion to dismiss as well as an appeal from an order granting summary judgment on a *Monell* claim against the county -- it is important to cabin the facts that were alleged in the Amended Complaint to understand the basis for

---

[1] In his brief, Mr. Dixon refers to him as Nurse Omeke, but he changed his name to "Aboigbe" prior to the institution of this lawsuit.

1

Judge Leinenweber's granting of Dr. Bonaparte and Nurse Aboigbe's motion to dismiss from those facts that Judge Durkin considered in ruling on the motion for summary judgment.

Moreover, Mr. Dixon misrepresented or omitted some of the facts that were a part of the summary judgment motion and, despite fully summarizing the opinion of his expert Dr. Robert Greifinger – an opinion that the district court found be both unreliable and irrelevant— Mr. Dixon omitted from his statement of the case any mention of the opinion provided by Defendants' expert Dr. Marc Stern. Accordingly, Defendants will briefly summarize the allegation against Dr. Bonaparte and Nurse Aboigbe in the Amended Complaint, clarify some of the misstatements in Mr. Dixon's Statement of the Case and then summarize the opinion testimony of Dr. Stern.

## Facts Alleged in Amended Complaint With Regard to Dr. Bonaparte and Nurse Aboigbe

On December 30, 2008, Nurse Aboigbe was notified by the correctional officer overseeing the tier in which Mr. Dixon resided that Mr. Dixon was suffering from abdominal and leg pain, that he was constipated, and that he could not get up. R. 49-1 ¶50. Later that day, Mr. Dixon was transported from his cell to the Cermak Emergency Room via stretcher. R. 49-1 ¶18. He arrived in the emergency room at 6 p.m. and was given a CT scan of his abdomen at 6:29 p.m. R. 49-1 ¶19. These scans again showed that he had a mass in this chest, which was consistent with the findings of the earlier CT scans. R. 49-1 ¶19.

On December 31, 2008, Mr. Dixon was transferred to the infirmary at Cermak, which at the time was overseen by Defendant Dr. Katina Bonaparte. R. 49-1 ¶34. In

that capacity, Dr. Bonaparte would have had access to Mr. Dixon's medical records for the treatment that he received at Cermak and any other hospital within the Cook County Bureau of Health Service Network, including any X-rays or CT scans. R. 49-1 ¶¶35-36. Despite her alleged knowledge of the mass in Mr. Dixon's chest, Mr. Dixon complains that Dr. Bonaparte did nothing to treat the mass, not even to ensure that he was transported to the Fantus clinic for his January 2, 2009 follow-up. R. 49-1 ¶43.

Dr. Bonaparte ordered that Mr. Dixon be given Tylenol for his pain. R. 49-1 ¶43. Dr. Bonaparte also completed a Cermak Hospital Consultation Request form so that Mr. Dixon would have a pulmonary consultation at Stroger Hospital on the "Lt. Para-tracheal Mass on CT." R. 49-1 ¶29. She marked on the form that the scheduling was urgent and she also noted that it was "RUSH." R. 49-1 ¶29. Mr. Dixon was discharged from the infirmary on January 2, 2009, and was transferred to the medical tier in Division 10 of CCDOC. R. 49-1 ¶43.

**Misstatements or Omissions of Facts in Mr. Dixon's Statement of the Case**

As noted above, Mr. Dixon's Statement of the Case largely provides an accurate narrative of most of the facts that the district court considered when ruling on the Defendants' respective motions. However, aside from the glaring omission of the opinion of the County's expert, Dr. Stern, which is summarized below, Mr. Dixon also misstates or misrepresents other "facts" that were in the parties' respective Local Rule 56.1 statements of facts. R. 108 & R. 129. For instance, Mr. Dixon claims that when he went to the ER at Cermak, the Physician's Assistant who treated him sent him for a psychiatric evaluation to rule out malingering (Pl. Br. at 5 citing R.

3

108 ¶15) but he does not also note that the PA sent him for the evaluation because Mr. Dixon's subjective complaints of paralysis did not comport with the objective assessment that the PA performed. R. 108-7 ¶4. While Mr. Dixon's claimed he had full lower extremity paralysis, the PA observed him bring his knees to his chest to remove his socks, hold his legs in the air during a range of motion test and lift his legs off the exam table and off the floor when being moved in a wheelchair. R. 108-7 ¶5.

As for the information that Dr. Bonaparte had when she first examined Mr. Dixon, he now claims that she did not have the radiology reports from the MRI's that had been taken of Mr. Dixon because of a backlog in scanning medical records at Cermak. Pl. Br. at 5 citing R. 129 ¶2. In making this argument, however, Mr. Dixon misstates Bonaparte's deposition as well as the evidence in the case. Bonaparte did not recall if she saw the radiology reports but Dr. Avery Hart, who was at the time the Chief Medical Officer of Cermak testified that the reports would have automatically loaded into the CERNER system and every doctor at Cermak had complete access to CERNER. R. 146, Response to ¶2. Thus, Bonaparte would have had access to those records when she first examined Mr. Dixon. R. 146, Response to ¶2. Moreover, Mr. Dixon alleged in the Amended Complaint that Dr. Bonaparte had access to Mr. Dixon's medical records for the treatment that he received at Cermak and any other hospital within the Cook County Bureau of Health Service Network, including any X-rays or CT scans. R. 49-1 ¶¶35-36.

Mr. Dixon's summary of the events leading to his discharge from Cermak is similarly often untrue. For example, he claims that there was no medical record made

by any caregiver prior to his discharge (Pl. Br. at 8) but that statement ignores the Medical Dormitory Admission form that Dr. Bonaparte completed prior to discharging Mr. Dixon to Division X, which is a medical dormitory at the Cook County Jail. R. 146, Response to ¶16. In an affidavit, Bonaparte admitted that she did not specifically remember the conversation that she had with Mr. Dixon when she examined him prior to completing that form, but it was her practice to record a patient's complaints along with other relevant information. *Id.*

Similarly, Mr. Dixon claims that Bonaparte took his wheelchair away despite knowing that he was paralyzed, but there is no evidence that he was paralyzed at the time of discharge. Bonaparte noted on the admission form that Mr. Dixon complained about not being able to walk, but she also noted that nurses and other detainees reported that Mr. Dixon could in fact walk and that a mental health professional thought that he was malingering. *Id.* Moreover, in the prescription order attached as Exhibit H to Mr. Dixon's own Statement of Additional Facts (R. 129-9), Bonaparte did not just "take away" Mr. Dixon's wheelchair but replaced it with a walker, thus suggesting that at the time of discharge, Mr. Dixon was not fully paralyzed as he now claims, but could walk with assistance. R. 129-9

Mr. Dixon also states that if the results of the January 2, 2010 CT scan were known by healthcare providers, he would not have been discharged from Cermak and his wheelchair would not have been taken away. Pl. Br. at 8. Once again, however, Mr. Dixon relies only on his own unsupported assertion in his LR. 56.1(b)(3)(B) statement of additional facts in making that claim. R. 129 ¶17. In re-

sponse to that, Defendants demonstrated why that statement was not true, namely because it mischaracterized the testimony of Nurse Amaya, the support upon which the statement was supposedly based. R. 146, Response to ¶17. Amaya was asked if she would have informed Dr. Bonaparte about the results of the scan if she knew, not whether she would have prevented Mr. Dixon from being discharged. *Id*. Moreover, Defendants pointed out that Nurse Amaya was not competent to testify as to what other healthcare providers might have done with that information. *Id*.

Finally, Mr. Dixon claims that he had no pain medication for the 3 days that he was in the medical dorm (Pl. Br. at 8 & 9) but that ignores the fact that he was given a blister pack of pain reliever that he could take as needed. R. 146, Response to ¶21. Mr. Dixon also claims that in those 3 days, he was paralyzed and was bladder and bowel incontinent (Pl. Br. at 9) but there is no evidence to support that allegation. The only evidence that Mr. Dixon cites is that he suffered from those conditions on January 5, 2010, when he was examined by Dr. Cruz. R. 146, Response to ¶21.

**Opinion of Dr. Marc Stern**

In support of its defense, Cook County offered the opinion of Marc F. Stern, M.D. Dr. Stern is a board certified internist specializing in correctional health care. R. 108-14 at 1. He managed correctional health care operations and has practiced or currently practices correctional health care in the following settings: jail; prison; post-release. *Id*. Over the course of his career, Dr. Stern has worked with primary care physicians and facility medical directors and has directly and indirectly super-

vised them clinically and administratively. *Id.* Dr. Stern has also taught correctional health care principles, including standards related to the practice of physicians, to national audiences of physicians and other health care professions. *Id.* In his practice as a physician, Dr. Stern has encountered patients with symptoms similar to those of Mr. Dixon and has considered the same set of possible diseases and conditions as those presented in Mr. Dixon's case. *Id.*

In his report, Dr. Stern opined as to the discrete care that was provided to Mr. Dixon after the discovery of the mass in December 2008. *Id.* at 2. Dr. Stern first addressed Mr. Dixon's claim that the County medical providers responded too slowly after discovering the mass in Mr. Dixon's Paratracheal region. *Id.* at 3. Dr. Stern opined that the Cermak staff "moved with "appropriate--if not supranormal-- speed in getting [Mr. Dixon] in the office of a pulmonologist following the report of an abnormal chest x-ray." *Id.* Dr. Stern went on to explain that the discovery of the mass did not in and of itself

> translate into the need for immediate action, neither in correctional health care nor in community health care. Unlike certain cancers, such as breast cancer, days or even short weeks are unlikely to affect the prognosis in a patient with [Mr. Dixon's] type of lung cancer. In the absence of other evidence of an emergency, such as shortness of breath (which [Mr. Dixon] did not have), it is reasonable and acceptable to refer a patient with [Mr. Dixon's] finding to a pulmonologist non-emergently.

*Id.* at 4.

Dr. Stern next addressed the appropriateness of the manner in which the Cermak and Stroger doctors treated the lung mass upon discovery. *Id.* Dr. Stern found it to be medically reasonable for a number of reasons. *Id.* First, the initial

consultation with the pulmonologist was carried out with appropriate dispatch as discussed above. *Id.* A pulmonologist is the medical professional who is best suited to decide a course of treatment with regard to a chest mass. *Id.* Thus, the decision to make referral to a pulmonologist instead of immediately ordering a biopsy was an appropriate course of treatment for Mr. Dixon. *Id.* Dr. Stern moreover noted that it was not unreasonable for the Cermak doctors to disregard the radiologist's recommendation that a biopsy be performed because that recommendation is, generally speaking, outside a radiologist's area of expertise and therefore not an immutable command. *Id.* And, as Dr. Stern noted, a biopsy was ultimately performed. *Id.* Dr. Stern also found no issues with regard to the manner in which Cermak clinicians communicated about the mass in Mr. Dixon's chest or the systems that the County uses to make detainees' medical records available. *Id.* at 7. Dr. Stern noted that every clinician who treated Mr. Dixon was aware that of the mass in his chest. *Id.* at 8.

Dr. Stern also opined that Mr. Dixon's pain was adequately managed throughout his treatment at Cermak. *Id.* at 4. Dr. Stern observed that while Mr. Dixon did not receive any pain reliever stronger than Tylenol, the medical records do not indicate that Tylenol was inadequate to treat Mr. Dixon's pain. *Id.*

For instance, during the initial exam by the pulmonologist at Fantus Clinic on December 23, 2008, he described his pain as being 10 out of 10. *Id.* at 5. Given that the pulmonologist, who in addition to being a pulmonary specialist is also fully certified in internal medicine, did not recommend that Mr. Dixon receive stronger pain

medication despite that complaint, Dr. Stern surmised that there was other clinical data that his pain was not that severe and was bearable under the regimen prescribed by the Cermak doctors. *Id*. Dr. Stern also noted that there was other evidence to suggest that Mr. Dixon's pain was properly managed despite his periodic claim that his pain was 10 out of 10. *Id*. As Dr. Stern noted, the first prescription for Tylenol for the period November 12, 2008, to December 10, 2009, authorized Mr. Dixon to take the medication three times a day as needed. Mr. Dixon took the three doses only once, on November 12, 2008. *Id*.

Moreover, on December 31, 2008, doctors supplemented Mr. Dixon's prescription by ordering that Mr. Dixon receive ibuprofen as needed for pain. *Id*. Once again, Mr. Dixon never requested the additional pain reliever. *Id*. Accordingly, Dr. Stern concluded that "[i]t is hard to square [Mr. Dixon's] behavior with the assertion that he was in severe pain. [Mr. Dixon] had pain medication at his disposal but did not find it necessary to make use of it." *Id*.

Dr. Stern also opined that the medical professionals at Cermak did not ignore Mr. Dixon's incontinence and leg weakness in the period December 31, 2008, through January 5, 2009. *Id*. at 8. Instead, they formulated a belief that Mr. Dixon did not have an emergency medical condition and they acted in accordance with that belief. *Id*. Dr. Stern notes that their belief with regard to Mr. Dixon's condition was not pulled out of thin air but was based on tangible clinical evidence. *Id*. at 9.

Dr. Stern pointed to the following clinical evidence as supporting the belief of the Cermak clinicians that Mr. Dixon was feigning his claimed lower extremity paraly-

9

sis:  (1) the EMT who first responded to Mr. Dixon in the tier noted on his report that "pt [(patient)] has full movement of all extremities," thus contradicting Mr. Dixon; (2) the PA who first examined him in the Cermak ER noted that Mr. Dixon exhibited considerable movement in his legs despite his repeated complaint of paralysis; (3) a test of Mr. Dixon's lower extremity reflexes were normal, which is not the case when someone is paralyzed from the waist down. *Id*. at 9-10.

Dr. Stern also opined that the care that was provided to Mr. Dixon during the period of December 30, 2008 through January 2, 2009, was demonstrative of clinicians who were willing to provide care to Mr. Dixon and who were searching for the truth with regard to his medical condition. *Id*. at 9. In support of that opinion, Dr. Stern noted that the clinical information that the Cermak clinicians collected when Mr. Dixon first came to the ER on December 30, 2008, painted a picture of a patient who was not as sick or weak as he was claiming. *Id*. But instead of just ignoring Mr. Dixon, the Cermak doctors sought the input of a mental health specialist to see if he or she concurred. *Id*. The mental health specialist's conclusion supported their initial conclusion that Mr. Dixon was likely faking his paralysis. *Id*. Dr. Stern specifically observed that the referral for a mental health evaluation was "simply not the behavior of clinicians who [were] behaving with a blatant disregard for their patient's welfare." *Id*. Dr. Stern also pointed out that the clinicians at Cermak treated Mr. Dixon for his constipation after conducting a thorough exam, ordering imaging to determine if there was any intestinal blockage causing the constipation, and ad-

mitting him to the infirmary for close observation. *Id*. There, Mr. Dixon was given additional treatment for his constipation. *Id*..

In sum, Dr. Stern found that during the period December 30, 2008 through January 5, 2009, the Cermak staff took Mr. Dixon's symptoms seriously, but in any event there was nothing in the record of this case to link the decisions made by those clinicians to Cermak's organizational policies, practices, procedures, or customs. *Id*. at 11. Moreover, Dr. Stern opined that given size of the tumor as of December 2008, and the type of cancer that Mr. Dixon had, it is unlikely that there was anything that any physician could have done to significantly change Mr. Dixon's prognosis. *Id*.

## SUMMARY OF THE ARGUMENT

In *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), the Court held that '[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.''" *Id*. at 678 quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Based on that standard, the district court properly found that Mr. Dixon's Amended Complaint did not state a plausible claim of deliberate indifference against Dr. Katina Bonaparte and Nurse Newworld Aboigbe for the healthcare that they provided to him from December 30, 2008, until January 5, 2009, while he was a detainee at the Cook County Jail.

Apparently recognizing that his amended complaint was inadequate to state a plausible claim under *Twombly* and *Iqbal*, Mr. Dixon largely relies on new unalleged "facts" to argue that the district court erred in granting the Rule 12(b)(6) mo-

tion. In this circuit, there are two lines of cases that address the permissibility of considering facts not alleged in an appeal of an order dismissing a complaint. The first line, typified by *Car Carriers v. Ford Motor Co.*, 745 F.2d 1101 (7th Cir. 1984), limits its review to only those facts that were alleged in the complaint. The other line, explained in *Dawson v. General Motors Corp.*, 977 F.2d 369 (7th Cir. 1992), permits an appellant to elaborate on the facts alleged in the complaint to show that the complaint was dismissed in error. Admittedly, *Dawson* is the majority view in this circuit.

*Dawson*, however, was premised on the notion from *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957), that no complaint should be dismissed unless "no relief could be granted under any set of facts that could be proved consistent with the allegations" in the complaint. *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984). *Iqbal* and *Twombly* changed that dynamic so that now, the complaint itself must contain sufficient facts to state a plausible claim.

In making the claim that *Dawson* is no longer viable in the aftermath of *Iqbal* and *Twombly*, Defendants respectfully request that this Court reconsider that part of its ruling in *Reynolds v. CB Sports Bar, Inc.*, 623 F.3d 1143, 1147 (7th Cir. 2010), that held that *Dawson* was not impacted by *Iqbal* and *Twombly*. Even under *Dawson*, however, Mr. Dixon should not be able to employ the new facts here because they do not relate to the instances of deliberate indifference alleged in the complaint, but instead assert a new claim of deliberate indifference and thus constitute an impermissible attempt to amend the complaint on appeal.

Moreover, the additional facts that Mr. Dixon relies upon in his brief do not establish a claim of deliberate indifference against Dr. Bonaparte. Instead, what they show is that she made a medical determination based on conflicting evidence that Mr. Dixon was not in need of emergency medical care and that his pain could be treated with non-prescription strength pain reliever. Dr. Bonaparte was not alone in her medical conclusion because other doctors who examined Mr. Dixon also did not think that his condition was an emergency.

Similarly, the district court properly dismissed the state law intentional infliction of emotional distress claim against the two individual defendants since there is no allegation showing that they acted outrageously. As noted above, the Amended Complaint does not even show that they were deliberately indifferent to Mr. Dixon. Mr. Dixon misapprehends Illinois law concerning IIED and positions of power and his argument that Defendants knew that he was susceptible to emotional distress given his physical condition is much too speculative to warrant consideration.

With regard to the *Monell* claim (*Monell v. Dep't of Soc. Servs.,* 436 U.S. 658 (1978)) against Cook County, Mr. Dixon fails to point to any facts that show that any County practice or policy was the moving force in causing his harm. It is clear from the record that the doctors treating Mr. Dixon at Cermak had all of the information that they needed to treat him. Mr. Dixon appears to believe the mere existence of some alleged unconstitutional practice is poof of causation as well but that simply is not the law.

Mr. Dixon also claims that the district court erred by not considering the expert opinion of Dr. Robert Greifinger, but that is not true. Greifinger's opinion was properly excluded because it consisted only of bottom line conclusions with no explanation as to how he reached those conclusions. Thus, his opinion was neither reliable nor relevant and was properly ignored.

But even if the court had considered his opinion, summary judgment would still be proper because Greifinger never actually opined as to what caused the alleged harm to Mr. Dixon. Instead, his opinion recounts alleged deficiencies in the delivery of health care at Cermak and just assumes that the deficiencies caused the harm. Accordingly, in the absence of any evidence that any practice or policy at Cermak was the moving force behind Mr. Dixon's alleged harm, the district court correctly granted the County's motion for summary judgment.

## STANDARD OF REVIEW

Defendants agree with Mr. Dixon's statement on the standards of review that are applicable to each of the orders on appeal, except with regard to the second to last sentence on the applicable standard for reviewing the granting of a Rule 12(b)(6) motion. Mr. Dixon incorrectly states that "[d]ismissal of a complaint pursuant to a motion to dismiss is warranted if the plaintiff can prove no set of facts in support of its claims that would entitle it to relief." Pl. Br. at 20 citing *All Over the World v. Kingdom of Saudi Arabia*, 73 F.3d 1423 (7th Cir,. 1996).

That statement is a summary of the standard of *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957), with which the U.S. Supreme Court dispatched in *Bell Atlantic Corp.*

14

*v. Twombly*, 550 U.S. 544, 563 (2007) (noting that "no-set-of-facts" standard of *Conley* had "earned its retirement"). Instead, the current standard is: "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) quoting *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (2009) quoting *Twombly*, 550 U.S. at 568.

## ARGUMENT

### I. The Amended Complaint Does Not State A Plausible Claim Of Deliberate Indifference Or Intentional Infliction Of Emotional Distress Against Either Dr. Bonaparte Or Nurse Aboigbe.

A. Under *Twombly* and *Iqbal*, Mr. Dixon Should Not Be Able to Rely in This Appeal on Facts That Were Not in the Amended Complaint To Demonstrate That the Amended Complaint Asserted A Plausible Claim of Deliberate Indifference Against Dr. Bonaparte.

Much of Mr. Dixon's argument against Dr. Bonaparte in this appeal relies on facts that were not in his Amended Complaint (R. 49-1) but rather were asserted in his Local Rule 56.1(b)(3)(B) statement of additional facts (R. 129). Thus, the first question in this appeal is whether Mr. Dixon can rely on facts that were not in the Amended Complaint to have this Court reverse the district court's ruling that the Amended Complaint did not assert a plausible claim of deliberate indifference against Dr. Bonaparte.

One case that would seem to foreclose Mr. Dixon's belated effort to add facts to the Amended Complaint via his brief on appeal is *Car Carriers v. Ford Motor Co.*,

745 F.2d 1101, 1106 (7th Cir. 1984). In *Car Carriers*, this Court admonished the district court for relying on "expanded statements [of fact] in the plaintiff's memorandum" in response to a motion to dismiss to "flesh out the complaint" while ruling on a Rule 12(b)(b) motion to dismiss.

The *Car Carriers* court expressly noted that "it is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss." *Id.* (citations omitted). The court went on to state that "consideration of a motion to dismiss is limited to the pleadings." *Id.* (citations omitted). Finally, after first observing that it was "questionable for the district court to have relied on the plaintiffs' briefs to embellish the conclusory allegations of the complaint," the court stated "*nonetheless, in this appeal we limit our review, as we must, to the well-pleaded allegations of the complaint.*" *Car Carriers*, 745 F.2d at 1106 (emphasis added).

That language, especially the statement that the court would limit its review on appeal to the "well-pleaded allegations of the complaint," seems to suggest that an appellant cannot use her brief to even elaborate on (or embellish) the facts alleged in the complaint, even if those facts are consistent with the allegations in the complaint. Thus, it is difficult to see how, under the rule of the *Car Carrier* case, Mr. Dixon can be permitted to rely on facts not contained in his Amended Complaint to gain a reversal of the district court order dismissing that complaint pursuant to FRCP 12(b)(6). *Accord Runnemede Owners, Inc. v. Crest Mortgage Corp.,* 861 F.2d 1053, 1057 (7th Cir. 1988) ("We agree that Runnemede's omission to specifically al-

lege Crest's noncompliance with the notice provision in its pleadings prevents our consideration of this issue on appeal.").

There is, of course, another line of cases in this circuit that seems fully opposed to *Car Carriers*. Those cases, as explained by *Dawson v. General Motors Corp.*, 977 F.2d 369, 372 (7th Cir. 1992), do permit an appellant seeking review of the granting of a Rule 12(b)(6) motion to "elaborate" on the facts alleged in the complaint in the appellate brief and allow this Court to consider facts beyond the well-pleaded allegations in the complaint.

The *Dawson* court recounted that "on more than one occasion [the Seventh Circuit has made it clear] that a plaintiff is 'free on . . . appeal to give us an unsubstantiated version of the events,' provided it is consistent with the complaint, to show that the complaint should not have been dismissed."  *Id.* (citations omitted). The *Dawson* court noted that its "rule is necessary to give plaintiffs the benefit of the broad standard for surviving a Rule 12(b)(6) motion as articulated in *Hishon* [*v. King & Spalding*], 467 U.S.[ 69,] 73 [(1984)] and *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)." *Dawson*, 977 F.2d at 372.

Of the two lines of cases, it appears that *Dawson* is the majority view in this circuit. S*ee Chavez v. Ill. State Police*, 251 F.3d 612, 650 (7th Cir. 2001) (noting that "the well-established law of this circuit provides that, when reviewing a dismissal under Rule 12(b)(6), we will consider new factual allegations raised for the first time on appeal provided they are consistent with the complaint"). However, it is important to note that the rationale for that rule has been fully undermined by the

changes to Rule 8 that were ushered in by *Twombly* and *Iqbal*. To remind the Court, the purpose of the *Dawson* rule was to "give to the plaintiffs the benefit of the broad standard for surviving a Rule 12(b)(6) motion as articulated in *Hishon* [*v. King & Spalding*], 467 U.S.[ 69, ]73 [(1984)] and *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)." *Dawson*, 977 F.2d at 372. In other words, the point of the *Dawson* rule is to ensure that no complaint is dismissed pursuant to FRCP 12(b)(b) unless "no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon*, 467 U.S. at 73 citing *Conley*, 355 U.S. at 45-46.

In effect, the *Conley* standard required a Rule 12(b)(6) movant to prove a negative, that is that the plaintiff could not recover for the claim asserted in the complaint. If, on appeal, facts added to the brief of a plaintiff showed that in fact the plaintiff could have prevailed on the asserted claim, the circuit court was obliged by *Conley* to take those new facts into account when reviewing the order of dismissal.

*Iqbal* and *Twombly* changed that dynamic. The *Twombly* Court explicitly overruled the earlier standard articulated in *Conley*. *Twombly*, 550 U.S. at 561. Instead of requiring a Rule 12(b)(6) movant to establish that there is no claim possible, *Iqbal* and *Twombly* oblige the plaintiff to demonstrate in the complaint not just the possibility that he or she can prevail on the claim asserted (which was, in  essence, the *Conley* approach) but rather, that the complaint alleges enough facts to show that the claim is not just possible, but is, in fact, plausible. *Twombly*, 550 U.S at 563. In other words, "the *complaint* must establish a non-negligible probability that the claim is valid." *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 629 (7th Cir.

2010) (emphasis added). That seems inconsistent with the permissiveness of *Dawson* and other cases that allow a plaintiff to offer additional facts at any time to show that his or her complaint should not have been dismissed.

Defendants recognize that adopting the rule that they propose would require this Court to reverse that part of the decision in *Reynolds v. CB Sports Bar, Inc.*, 623 F.3d 1143, 1147 (7th Cir. 2010), where the court noted that the rule of *Dawson* was still viable even in light of *Iqbal* and *Twombly*. The *Reynolds* court held:

> We conclude that the Supreme Court's recent decisions, while raising the bar for what must be included in the complaint in the first instance, did not eliminate the plaintiff's opportunity to suggest facts outside the pleading, including on appeal, showing that a complaint should not be dismissed. *See Twombly*, 550 U.S. at 563 ("[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint."); *McZeal v. Sprint Nextel Corp.*, 501 F.3d 1354, 1356 n.4 (Fed. Cir. 2007). Therefore, although the plaintiff is required to plead more than bare legal conclusions to survive a motion to dismiss, once the plaintiff pleads sufficient factual material to state a plausible claim--that is, sufficient to put the defendant on notice of a plausible claim against it--nothing in *Iqbal* or *Twombly* precludes the plaintiff from later suggesting to the court a set of facts, consistent with the well-pleaded complaint, that shows that the complaint should not be dismissed.

*Id*.

There are two problems with the *Reynolds* court's conclusion. First, it does not account for, nor even address, the fact that *Twombly* "retired the *Conley* no-set-of-facts test." *Ashcroft*, 556 U.S. at 670. Thus, as noted above, *Twombly* did away with the rationale for the rule of *Dawson* and, presumably therefore, the need for the rule as well.

Moreover, the *Reynolds* court appears to employ circular logic to reach its conclusion about *Dawson*. The court noted that once a plaintiff has pled enough factual

information to state a plausible claim, he or she should be able to supplement those facts on appeal to show that the complaint should not have been dismissed. In that scenario, however, the complaint was presumably dismissed because it lacked sufficient facts to state a claim that the district court considered to be, in fact, plausible. It is only with the supplemental facts offered on appeal that the complaint becomes plausible, thereby warranting reversal of the order dismissing the claim pursuant to Rule 12(b)(6). Accordingly, Defendants respectfully ask this court to reconsider its holding in *Reynolds*.

But even if the court declines to revisit its decision in *Reynolds,* Mr. Dixon should still be prevented from introducing new facts in his brief on appeal to challenge the district court's dismissal of his complaint against Dr. Bonaparte and Nurse Aboigbe because these new facts do not elaborate upon the claim brought in the Amended Complaint, but actually allege a new claim of deliberate indifference. Thus, they serve to amend the complaint impermissibly. *See Thomason v. Nachtrieb*, 888 F.2d 1202, 1205 (7th Cir. 1989) (holding that "it is a basic principle that the complaint may not be amended by the briefs in opposition to a motion to dismiss, nor can it be amended by the briefs on appeal.").

As will be discussed more fully below, Mr. Dixon's amended complaint against Dr. Bonaparte alleges that she was deliberately indifferent because she did not provide Mr. Dixon with narcotic strength pain reliever and she did nothing to treat the mass in his chest. The new facts allege a new, distinct claim of deliberate indifference, namely that she discharged him from the infirmary and sent him back to the

jail housing, thus denying him palliative care. This does not elaborate on the claims of deliberate indifference that were actually alleged in the Amended Complaint. Accordingly, the new facts should be considered an impermissible attempt to amend the complaint to add a count of deliberate indifference for her failure to provide him with palliative care.

What Mr. Dixon is attempting to do with his brief on appeal is similar to what the plaintiff tried to do in *Jones v. SABIS Educ. Sys.*, 1999 U.S. Dist. LEXIS 19449, *8-*12 (N.D. Ill. Dec. 9,  1999), in response to a motion to dismiss in the district court. The plaintiff there attached an affidavit to his response to the motion that he claimed clarified the allegations in the complaint at issue. The district court, however, found that the affidavit did not supplement or clarify the original defamation claims but rather sought to add distinctly new defamation claims. The court concluded that the affidavit to be an impermissible amendment of the complaint. Mr. Dixon is attempting to do the same thing here by adding a separate and distinct act of deliberate indifference regarding palliative care. Accordingly, this court should not permit Mr. Dixon to amend his complaint via his brief on appeal. *Agnew v. NCAA*, 683 F.3d 328, 348 (7th Cir. 2012) ("[I]t is a basic principle that the complaint may not be amended by the briefs in opposition to a motion to dismiss, nor can it be amended by the briefs on appeal.") (Citation omitted).

### B. The Facts Alleged In the Amended Complaint Do Not State a Plausible Claim of Deliberate Indifference Against Dr. Bonaparte.

Turning to the facts actually asserted against Dr. Bonaparte in the Amended Complaint, she first saw Mr. Dixon on December 31, 2008. R. 49-1¶39. The Amended Complaint assumes that Dr. Bonaparte was aware of the CT scans that were taken of Mr. Dixon's chest that showed a "large mass left paratracheal region above the aortic arch." R. 49-1¶¶40-41. The Amended Complaint also assumed that Dr. Bonaparte was aware that other Cermak medical providers had ordered a CT scan of Mr. Dixon's abdomen earlier that day and that the results of that scan were pending. R. 49-1¶¶40-41. After examining him, Dr. Bonaparte noted that Mr. Dixon should be referred for a psychiatric consultation to rule out malingering and she allegedly noted that she would see Mr. Dixon on Friday, which was two days later. R. 49-1¶47. Presumably, Dr. Bonaparte requested that referral because her objective assessment of Mr. Dixon was inconsistent with his subjective complaints. In any event, the fact that she made the psychiatric referral to rule out malingering is strong evidence that she did not subjectively believe that Mr. Dixon's condition was a medical emergency.

Despite the notation about seeing him again in two days, however, Dr. Bonaparte completed a form directing that Mr. Dixon receive a pulmonary consultation at Stroger Hospital. R. 49-1¶48. Dr. Bonaparte noted on the form that that her request was urgent and she marked it "RUSH." R. 49-1¶48. Moreover, Dr. Bonaparte provided Mr. Dixon with Tylenol to manage his pain. R. 49-1¶43.

It is clear from the facts alleged in the Amended Complaint that Dr. Bonaparte did not willfully disregard Mr. Dixon's medical needs. She acted reasonably with regard to the symptoms that Mr. Dixon presented to her. Mr. Dixon suggested in the Amended Complaint that Dr. Bonaparte should have done something in the infirmary to treat the mass in his chest that was noted in his medical records. This intimation is absurd. First, treating a mass was not something within the ability of anyone at Cermak Health Services. It is not a hospital but rather a limited medical facility with no capacity for specialized care. That is why Dr. Bonaparte directed that Mr. Dixon be transferred to Stroger Hospital for a consultation. She also marked the transfer form "RUSH" and noted that it was urgent.

Moreover, Mr. Dixon's medical records, which the Amended Complaint acknowledges that Dr. Bonaparte had access to, made it plain that he was already under the care of pulmonologists at Stroger Hospital's Fantus Clinic. In fact, as Mr. Dixon admits in the Amended Complaint, his medical records show that he was to return to Fantus for additional treatment two days after Dr. Bonaparte first saw him.

In *Walker v. Benjamin*, 293 F.3d 1030 (7th Cir. 2002), the court considered a claim similar to Mr. Dixon's. There, the plaintiff, who was an inmate in an Illinois correctional facility, complained that various members of the facility's medical staff were deliberately indifferent to an injury to his hand that caused him extreme pain and a bone infection. Among his complaints was that one of the doctors who treated him delayed referring him to a specialist to treat the infection for a number of days after determining that the inmate was in need of a specialist. The *Walker* court

found that such conduct did not fall to the level of deliberate indifference because there was no evidence that the delay was caused by the defendants. In addition, the court noted that there was no evidence that the delay contributed to any of the plaintiff's injuries. *Id.* at 1038.

That is also the case here. Although Mr. Dixon seeks to hold Dr. Bonaparte accountable for the delay, Mr. Dixon does not allege, nor could he, that Dr. Bonaparte caused the delay in transporting Mr. Dixon to Stroger Hospital.

Mr. Dixon also argues that Dr. Bonaparte was deliberately indifferent to what is termed Mr. Dixon's "excruciating" pain despite the fact that she prescribed Tylenol. Once again, however, that argument is not borne out by the allegations in the Amended Complaint. In that complaint, there is no allegation that Mr. Dixon ever told Dr. Bonaparte that he was in excruciating pain. Instead, Mr. Dixon bootstraps the fact that he informed the intake nurse at Stroger Hospital on January 5, 2009, that he rated his pain "10 out of 10," three days after Dr. Bonaparte last treated him. R. 49-1 ¶19. Moreover, Mr. Dixon now claims that Dr. Bonaparte "knew" that he had told a nurse earlier in the day that he could not walk and that he had a pain in his chest since October that was made worse with movement. Pl. Br. at  29 citing R. 49-1 ¶42. However, there is no allegation that this information was ever relayed to Dr. Bonaparte before she treated Mr. Dixon and there is also no allegation that Mr. Dixon told her that himself, nor is either of those things reasonably inferable from the facts alleged.

The essence of Mr. Dixon's argument is to ask this Court to infer that Dr. Bonaparte knew that Mr. Dixon was in excruciating pain and yet she chose to prescribe a pain reliever that she knew to be inadequate. While this Court must give the plaintiff the benefit of the doubt on an appeal of an order dismissing a case pursuant to Rule 12(b)(6), it is not required to accept unreasonable or unsound inferences nor is it required to give credence to all the plaintiff's assertions. *Mid-America Reg'l Bargaining Ass'n. v. Will County Carpenters Dist. Counsel,* 675 F.2d 881, 883 (7th Cir. 1982) quoting *Hiland Dairy, Inc. v. Kroger Co.*, 402 F.2d 968, 973 (8th Cir. 1968) ("In testing the legal sufficiency of the complaint . . . conclusions of law and unreasonable inferences or unwarranted deductions of fact are not admitted.").

The inference that Mr. Dixon would have this Court draw in order to sustain the claim that Dr. Bonaparte actually knew that the Tylenol that she prescribed to treat Mr. Dixon's pain was inadequate is not only unreasonable, it is flatly illogical. If Dr. Bonaparte were truly indifferent to Mr. Dixon's discomfort, she would not have bothered to give him any pain reliever at all. In an infirmary setting, it was just as easy for her to order a prescription strength pain reliever as it was for her to prescribe an over-the-counter medicine like Tylenol.

This case is nearly identical to *Holloway v. Del. County Sheriff*, 700 F.3d 1063 (7th Cir. 2012). There, the plaintiff claimed that a prison doctor was deliberately indifferent to his pain because the doctor prescribed Ibuprofen and Extra Strength Tylenol to manage the plaintiff's pain instead of the OxyContin that the plaintiff's regular doctor had prescribed. This Court found that the plaintiff had not estab-

lished that the doctor was deliberately indifferent to the plaintiff's pain because there was no evidence that the defendant doctor intended to cause the plaintiff's pain or that he knew that Ibuprofen and Extra Strength Tylenol would be insufficient to alleviate the pain. *Id.* at 1075.

That is also true here. As discussed above, there is no allegation that Dr. Bonaparte intended to cause pain or knew that Tylenol was inadequate. And in any event, such an allegation would be much too speculative to be plausible under *Twombly* and *Iqbal. Tamayo v. Blagojevich,* 526 F.3d 1074, 1083 (7th Cir. 2008) (interpreting *Twombly* to require a plausible factual allegation to be based on something more than mere speculation). Thus, there are not sufficient facts to state a plausible claim that Dr. Bonaparte was deliberately indifferent to Mr. Dixon's pain.

Based on the allegations in the Complaint, Dr. Bonaparte reacted in a medically reasonable fashion to Mr. Dixon's apparent medical condition. Rather than being deliberately indifferent to Mr. Dixon's needs, she addressed those symptoms that he presented that she was able to treat given the limited medical capabilities of her infirmary. There is no allegation that she perceived Mr. Dixon to be in an emergent medical condition that would warrant his immediate transfer to Stroger Hospital for immediate care.

Instead, consistent with Cermak's protocols, she scheduled Mr. Dixon for a consultation with a pulmonologist at Stroger Hospital. She noted on the proper form that the transfer was urgent and that it should be rushed. That he was not transferred to Stroger for five more days cannot be considered to be her fault since there

is no allegation in the Complaint that she had the authority to command earlier transportation in those circumstances. Moreover, there is no allegation that Dr. Bonaparte knew that the pain reliever that she prescribed for Mr. Dixon was inadequate to manage his pain and that any inference that she knew of the inadequacy would be too speculative to be plausible under *Twombly* and *Iqbal*.

None of the cases relied on by Mr. Dixon are factually similar to this one. For example, Mr. Dixon cites *Smego v. Mitchell*, 723 F.3d 752 (7th Cir. 2013) in support of his claim that Dr. Bonaparte was deliberately indifferent because she knew or should have known that her decision to prescribe only Tylenol was ineffective and that deliberate indifference can be inferred from the fact that she provided Mr. Dixon with "paltry" medical treatment. In *Smego*, the plaintiff was examined by the defendant dentist during his intake process after his civil commitment. The dentist informed the plaintiff that he had 12 cavities and promised to treat them early the next year. The dentist did not follow through, however, and the plaintiff's teeth worsened and became painful.

Eighteen months after diagnosing him with 12 cavities, the defendant dentist finally treated him. However, her treatment consisted of putting a temporary filling in only one of the 12 cavities and, in so doing, she ignored the tooth that the plaintiff told her was causing the most pain. She did not address that tooth for another month. Even after five years, the defendant dentist still had not treated all of the cavities that she identified on intake.

Moreover, the defendant dentist was also clearly deliberately indifferent to the plaintiff's pain. This was not, however, because she merely prescribed Motrin, an over-the-counter pain reliever, as Mr. Dixon implies. Instead, she manifested her deliberate indifference to the plaintiff's pain by repeatedly prescribing Motrin, and nothing else, despite the fact that the plaintiff was allergic to Motrin, something that she unquestionably knew because it was in his dental chart and because he repeatedly reminded her that he was allergic to Motrin.

Mr. Dixon also cites *Hayes v. Snyder*, 546 F.3d 516 (7th Cir. 2008) to support his claim that Dr. Bonaparte's prescribing only Tylenol for Mr. Dixon's pain constituted deliberate indifference. In *Hayes*, the plaintiff experienced muscle cramps in his scrotum that compressed his testicles and caused excruciating pain. The spasms and the corresponding pain occurred at least once a day and some days many times a day. The plaintiff had this condition for the 11 months that he was incarcerated. The defendant, who was the medical director of the prison, refused to prescribe prescription pain relievers or permit the plaintiff to see a urologist despite the plaintiff repeated claims throughout the 11 month period that the course of treatment chosen by the defendant doctor was not working. In fact, in further evidence that the defendant doctor was acting with a culpable mental state, the plaintiff alleged that the defendant medical director terminated even the minimal treatment for the plaintiff's pain when he learned that the plaintiff had filed grievances with regard to the inadequate medical care.

Here in contrast, Mr. Dixon was under Dr. Bonaparte's care for only 5 days. Although she knew that he had a mass in his chest, she made the medical determination that his condition was not an emergency. So unlike the dentist in *Smego* who knew about the plaintiff's cavities but did nothing for 18 months, Dr. Bonaparte was not consciously disregarding Mr. Dixon's medical needs, she just made the medical determination that his condition did not necessitate immediate transport to Stroger.

In addition, the dentist in *Smego* kept prescribing the same pain medication that she knew to be ineffective – ineffective in the sense that the plaintiff's allergies prevented him from taking them. Thus, she effectively let the plaintiff's pain go unmedicated for years. Similarly, the medical director in *Hayes* was repeatedly told by the plaintiff that the non-prescription strength pain reliever was not alleviating his excruciating pain plus the medical director actually took away the ineffective pain relief in retaliation when he learned that the plaintiff was complaining about his care. Here, there is no allegation, nor is it reasonably inferable that Dr. Bonaparte knew that Mr. Dixon's pain was not relieved by the Tylenol that she prescribed and again, her treatment of Mr. Dixon spanned only 5 days, not 5 years or even 11 months. The allegations of the amended complaint simply do not assert a plausible claim that Dr. Bonaparte was deliberately indifferent to Mr. Dixon's pain or his condition. Thus, the district court's order granting her motion to dismiss should be affirmed.

C. Mr. Dixon Knows Or Should Know that Many of the Additional Facts Upon Which He Relies In This Appeal Are Not True.

As noted above, Mr. Dixon relies on many facts that were never alleged in the Amended Complaint in his attempt to persuade this Court that the motion to dismiss Dr. Bonaparte was granted in error. For the reasons discussed above, these allegations should not be considered in resolving this appeal. If, however, the Court decides that the facts are proper, then they still do not warrant a reversal of the district court's order because they do not establish a plausible claim of deliberate indifference against Dr. Bonaparte. These additional facts include claims that Dr. Bonaparte knew that Mr. Dixon told a nurse that he could not walk and that Dr. Bonaparte discharged Mr. Dixon from the infirmary without examining him (Pl. Br. at 29) and sent him back to the jail's general population when he was in excruciating pain, was incontinent and was unable to walk. Pl. Br. at 31.

Besides not being in the amended complaint or even elaborating on the claims that were actually asserted there, Mr. Dixon knows or at least should know that these "facts" are not even true. Thus, he should not be permitted to rely on those untruths when seeking to reverse the district court's order. Surely, the *Dawson* court did not intend its rule to enable appellants seeking to reverse an order of dismissal to elaborate on a complaint using "facts" that they know or should know to be false.

First of all, Mr. Dixon was not discharged to the jail's general population.[2] Instead, he was transferred to Division X, which was, in part, designed to accommodate detainees with medical issues. Defendants ask the Court to take judicial notice[3] of the following facts from the Cook County Sheriff's website[4] describing Division X:

> Opened in December of 1992, Division X is a four-story maximum-security structure designed to hold 768 male detainees. In 2008, Division X was converted to medical and acute psych dose-by-dose building which accommodates inmates of all security level classifications.

With regard to the claim that Dr. Bonaparte discharged Mr. Dixon from the infirmary without examining him, Mr. Dixon states that there "is no medical record of any physical examination of Mr. Dixon by any caregiver at Cermak prior to his discharge at 12:30 p.m. on January 2, 2009[.]" Pl. Br. at 8. However, Mr. Dixon's medical records, which were produced in discovery, included the January 2, 2009 "Residential Unit Dormitory Admission Form" that Dr. Bonaparte completed prior to Mr. Dixon's transfer to Division X. R. 109-11. That form was also Exhibit K to the County's L.R. 56.1 statement of facts. *Id.*

On that form, Dr. Bonaparte recorded Mr. Dixon's complaint about not being able to walk but also noted that nurses and other detainees reported that Mr. Dixon

---

[2]It should be noted that despite his claim on appeal that Dr. Bonaparte transferred him to the "prison population" (Pl. Br. at 26) or the "normal prison incarceration setting" (Pl. Br. at 34), Mr. Dixon acknowledged in his Amended Complaint that he was transferred to the medical tier in Division 10 of CCDOC. R. 49-1 ¶43.

[3] *Denius v. Dunlap*, 330 F.3d 919, 928 (7th Cir. 2003) ("Judicial notice may be taken at any time, including on appeal.").

[4] http://www.cookcountysheriff.com/doc/doc_DivisionsOfJail.html

could, in fact, walk and that a mental health professional thought that he was malingering. *Id.* Moreover, Dr. Bonaparte's completion of that form belies Mr. Dixon's claim that Bonaparte released Mr. Dixon from the infirmary without examining him first. Also based on her habit of recording her patient's complaints, it does not appear that Mr. Dixon complained to her that he was either bowel or bladder incontinent or that he was in "excruciating pain."

Finally, regarding Mr. Dixon's claim that Dr. Bonaparte took away his wheelchair despite his inability to walk, Bonaparte did not just "take away" Mr. Dixon's wheelchair. Instead, she prescribed a walker for him, thus suggesting that at the time of discharge, Mr. Dixon was not fully paralyzed as he claims, but could ambulate with the assistance of a walker. R. 129-9.

> D. Dr. Bonaparte Made A Medical Determination Based On The Evidence That Mr. Dixon Was Not In Need Of Emergency Care And That His Pain Could Be Adequately Alleviated With Non-Prescription Strength Pain Reliever; Thus She Was Not Deliberately Indifferent To Mr. Dixon.

Dr. Bonaparte's decision to discharge Mr. Dixon from Cermak was a medical one. Rather than being indifferent to Mr. Dixon, she made the medical determination that he did not need the acute care provided at Cermak and could instead be housed in the medical section of Division X. A disagreement with a doctor's medical judgment or even evidence of malpractice generally will not establish deliberate indifference. *Estelle v. Gamble*, 429 U.S. 97, 105 (1976). To infer deliberate indifference on the basis of a physician's treatment decision, the decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment. *Estate of Cole by Pardue v. Fromm*, 94 F.3d

254, 261-62 (7th Cir. 1996); *see also Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996) (citation omitted) (noting that deliberate indifference can be inferred only when the treatment given is "so blatantly inappropriate as to evidence intentional mistreatment"). As this Court reaffirmed in *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) (citations omitted): "Making that showing is not easy: 'A medical professional is entitled to deference in treatment decisions unless 'no minimally competent professional would have so responded under those circumstances a medical condition.'"

In *Steele v. Choi,* 82 F.3d 175, 178 (7th Cir. 1996), the court illustrated the sorts of medical decisions that would be so far afield of medical standards as to constitute deliberate difference:

> If the symptoms plainly called for a particular medical treatment-the leg is broken, so it must be set; the person is not breathing, so CPR must be administered-a doctor's deliberate decision not to furnish the treatment might be actionable under §1983.

In this case, Mr. Dixon's medical needs were not so cut and dried. Dr. Bonaparte had conflicting evidence regarding Mr. Dixon's claimed paralysis. While Mr. Dixon allegedly said that he could not walk, she had heard from the nurses and other detainees that he could. R. 109-11. In addition, her own objective assessment of Mr. Dixon that made her question his subjective complaints was buttressed by the mental health professional who did the psychiatric evaluation of Mr. Dixon and concluded that he may have been malingering with regard to his claimed lower extremity weakness. R. 109-11. Moreover, Dr. Bonaparte was not the only medical professional who did not view Mr. Dixon to be in need of emergent care or conclude that non-

33

prescription strength pain relievers were adequate to treat his pain. Both the PA who initially treated Dixon in Cermak's ER on December 31, 2008, and the pulmonologist who treated him at Stroger on December 22, 2008, did not think that he needed an immediate transfer to Stroger nor did they prescribe a narcotic-strength pain reliever to remedy his pain. *See Steele*, 82 F.3d at 179 (noting that if other doctors "could draw the same (erroneous) conclusion, it is difficult at best to claim that another diagnosis was 'obvious[]'").

Citing *Ortiz v. Webster*, 655 F.3d. 731 (7th Cir. 2011), Mr. Dixon also claims that Dr. Bonaparte's decision to send Mr. Dixon to Division X contradicts her earlier decision to send him to Stroger for a "Rush" pulmonary consultation and thus stands as proof that she was deliberately indifferent to Mr. Dixon. In *Ortiz*, however, before asserting in his defense of a deliberate indifference claim that eye surgery was not medically necessary, the defendant doctor had first determined that the plaintiff would need eye surgery for his pterygia (a thin film that covers the eye) in a couple of years depending on future evaluations. But the defendant doctor never had any evaluation done over the next two years. In so doing, the defendant doctor ran afoul of the rule that prevents physicians from avoiding deliberate indifference liability by "'refusing to verify underlying fact' regarding the potential need for treatment." *Id*. at 735 (citations omitted).

That is not the case here. Dr. Bonaparte's sending Mr. Dixon to Division X would not prevent him from seeing a pulmonologist at Stroger Hospital as she ordered. He

could be transported from Division X to Stroger in much the same manner as he could be transported from Cermak.

In the conclusion to its ruling in *Steele v. Choi*, 82 F.3d 175, 178 (7th Cir. 1996), this court wrote:

> Like the district court, we are not without sympathy for Steele's plight. With the benefit of hindsight, it is clear that Dr. Choi did not take the right steps, and Steele has suffered and will continue to suffer the consequences. Nonetheless, we agree with the district court that there is no evidence in this record that shows that Dr. Choi--as a subjective matter--was deliberately indifferent to Steele's medical needs, applying the *Farmer* standard to an Eighth Amendment claim based upon a failure to give needed medical treatment.

That sentiment applies here as well. With the benefit of hindsight, we now know that Mr. Dixon was not malingering and that the mass in his parathrachial/paraspinal region was infiltrating his spine. However, Mr. Dixon did not sufficiently allege that Dr. Bonaparte was subjectively aware of that fact, especially in light of the conflicting evidence – *i.e.*, the reports of other nurses and detainees that Mr. Dixon could walk and the fact that "psyche [thought] malingering."

That was also the conclusion that Dr. Stern reached. He opined that the care that was provided to Mr. Dixon during the period of December 30, 2008, through January 2, 2009, was demonstrative of clinicians who were willing to provide care to Mr. Dixon and who were searching for the truth with regard to his medical condition. R. 108-14 at 9. In support of that opinion, Dr. Stern noted that the clinical information that the Cermak clinicians collected when Mr. Dixon first came to the ER on December 30, 2008, painted a picture of a patient who was not as sick or weak as he was claiming. *Id*. But instead of just ignoring Mr. Dixon, the Cermak doctors

sought the input of a mental health specialist to see if he or she concurred. *Id*. The mental health specialist's conclusion supported their initial conclusion that Mr. Dixon was likely faking his paralysis. *Id*. Dr. Stern specifically observed that the referral for a mental health evaluation was "simply not the behavior of clinicians who [were] behaving with a blatant disregard for their patient's welfare." *Id*.

At bottom, Dr. Bonaparte did not disregard Mr. Dixon's medical needs. She made the medical determination that he was not in need of emergency care and she also made the medical determination that his pain could be adequately alleviated with non-prescription strength pain reliever. Much like Dr. Choi, the most that can be said is that she was negligent. That, however, does not violate that constitution. Accordingly, the district court's order dismissing the complaint against Dr. Bonaparte should be affirmed.

### E.  The Amended Complaint Does Not State A Plausible Claim Against Nurse Aboigbe

The claim against Nurse Aboigbe is even less plausible than the one against Dr. Bonaparte. The only specific allegation is that on December 30, 2009, Aboigbe learned that Mr. Dixon was suffering from abdominal and leg pain, that he was constipated, and that he could not get up. The Amended Complaint further alleges that he was seen that day by another Cermak doctor in the ER. Therefore, there is no factual basis to a claim for the sort of willful disregard of Mr. Dixon's medical needs that is necessary to state a claim for deliberate indifference.

On appeal, Mr. Dixon claims that Nurse Aboigbe was aware of the mass in his chest (Pl. Br. at 4 citing R. 49-1 ¶¶50, 72) but neither of the allegations cited refer to

the mass in his chest and it is not reasonably inferable that Nurse Aboigbe knew about the mass. Mr. Dixon also claims that Aboigbe "left [him] on the floor of his cell suffering from bowel and urinary incontinence and paralysis" (Pl. Br. at 4 citing R. 49-1 ¶¶50, 72), but once again, neither allegation in the Amended Complaint supports that claim. All that those paragraphs allege was that "Mr. Dixon was complaining of pain in his stomach, that Mr. Dixon could not use the bathroom; that Mr. Dixon had leg pain and could not get up." R. 49-1 ¶¶50, 72. In other words, Mr. Dixon was not complaining of being bowel and bladder incontinent but rather of being constipated. *Id.*

For the most part, Mr. Dixon's argument on appeal against Nurse Aboigbe relies on the general allegations against "Defendants" which would include Sheriff's Correctional Officers as well as other nurses and doctors to claim that the Amended Complaint shows that Aboigbe was deliberately indifferent. General assertions as to "all defendants" are insufficient, especially in light of *Iqbal*. Mr. Dixon's "lumping together" of factual allegations against all Defendants does not comport with the requirements of Federal Rule of Civil Procedure 8(a)(2). *Bank of Am., N.A. v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013) (noting that a complaint that relies on allegations against "all defendants" does not satisfy Rule 8 and concluding that "[a] complaint based on a theory of collective responsibility must be dismissed."); *see also Marcilis v. Twp. of Redford*, 693 F.3d 589, 596 (6th Cir. 2012) (holding that a complaint that refers to all defendants generally does not state a claim against any one defendant). Thus, the district court properly dismissed the §1983 claim against Nurse Aboigbe.

F. The Amended Complaint Does Not Assert a Plausible Claim of Intentional Infliction of Emotional Distress against Either Dr. Bonaparte or Nurse Aboigbe.

Mr. Dixon also claims that the district court erred when it granted Defendants' motion to dismiss with regard to his state law intentional infliction of emotional distress ("IIED") claim. In order to state a claim for intentional infliction of emotional distress, the plaintiff must show that: "(1) the defendant's conduct was extreme and outrageous; (2) the defendant either intended that his conduct should inflict severe emotional distress, or knew that there was a high probability that his conduct would cause severe emotional distress; (3) the defendant's conduct in fact caused severe emotional distress." *Doe v. Calumet City*, 161 Ill. 2d 374 392, 641 N.E.2d 498, 506 (1994). The nature of the defendant's conduct "must be so extreme as to go beyond all possible bounds of decency and be regarded as intolerable in a civilized community." *Feltmeier v. Feltmeier*, 207 Ill. 2d 263, 270, 798 N.E.2d 75, 83 (2003).

In this case, Mr. Dixon does not allege facts that can be reasonably said to establish either the first or the second element of the tort. As Judge Leinenweber concluded, the Amended Complaint does not even allege that Bonaparte and Aboigbe were deliberately indifferent to Mr. Dixon, much less that their conduct was extreme or outrageous. R. 70 at 7, A-8. Moreover, there simply are no allegations from which it can be inferred that they had a subjective awareness that the care that they were providing to Mr. Dixon was inadequate. Thus, they cannot be deemed to have intended to cause him emotional distress or know about the possibility that they would.

Mr. Dixon also argues that the district court erred because its ruling did not account for Dr. Bonaparte and Nurse Aboigbe's positions of power over him or the fact that they knew that he was "susceptible to emotional distress." Mr. Dixon misapprehends state law regarding IIED and positions of power. Being in a position of power is only relevant to an IIED claim when the conduct at issue is the use of that power to coerce the plaintiff into doing something. *Milton v. Illinois Bell Tel. Co.*, 101 Ill. App. 3d 75, 79, 427 N.E.2d 829, 832 (1st Dist. 1981) ("As Dean Prosser pointed out, 'The extreme and outrageous nature of the conduct may arise not so much from what is done as from abuse by the defendant of some relation or position which gives him actual or apparent power to damage the plaintiff's interests. The result is something very like extortion.'").

As for the argument that Dr. Bonaparte and Nurse Aboigbe knew that Mr. Dixon was susceptible to emotional distress given his physical condition, that is mere speculation that does not warrant consideration. *Tamayo v. Blagojevich,* 526 F.3d 1074, 1083 (7th Cir. 2008). Under *Ashcroft*, Mr. Dixon's allegations against Bonaparte and Aboigbe do not satisfy the requirements of Federal Rule of Civil Procedure 8(a)(2). Thus the district court's order dismissing them pursuant to FRCP 12(b)(6) should be affirmed.

**II. The District Court Properly Granted The County Summary Judgment On Mr. Dixon's *Monell* Claim Because There Is No Evidence That Any County Practice Or Policy Actually Caused Any Constitutional Harm.**

    A. The Existence of Alleged Unconstitutional Practices, Standing Alone, Is Not Sufficient Proof that Those Practice Were the Moving Force in Causing a Constitutional Harm.

In granting the County's motion for summary judgment, Judge Durkin concluded that there was no practice or policy at Cermak that caused Mr. Dixon any constitutional harm. In his brief, Mr. Dixon curiously suggests that Judge Durkin erred by "cleaving the issue of causation from the existence of the policy and practice." Pl. Br. at 46. While the meaning of that is not entirely clear, it seems to suggest that Mr. Dixon believes that the mere existence of some allegedly unconstitutional practice or policy tends to prove that that policy or practice necessarily caused a constitutional harm and thus creates a genuine issue of fact for trial. That, of course, is contrary to the law.

In fact, *Monell* itself defeats this argument. The *Monell* Court noted that to prevail on a claim against a municipality, the plaintiff needs to show not just that the practice or policy could have been a cause of his constitutional deprivation -- which seems to be Mr. Dixon's argument -- but that the municipality's policy or practice at issue "was the 'moving force' behind the injury alleged." *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 694 (1978); *see also City of Canton v. Harris*, 489 U.S. 378, 387 (1989) (noting that "our first inquiry . . . is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation"). The Supreme Court has noted that where the basis of the *Monell*

claim is an express municipal policy, causation is a relatively straightforward issue. *Bd. of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 405, (1997). Claims involving non-express policies, such as the alleged customs and practices of Cermak at issue here, present "much more difficult problems of proof" (*id*. at 406) that require something beyond the "mere probability" that the widespread custom or practice might cause a constitutional violation. *Id*. at 412.

But the mere probability that practices and policies at Cermak "could have caused the harm suffered by Mr. Dixon" (Pl. Br. at 45) is the sum and substance of Mr. Dixon's causation argument in this appeal. As such, this argument is expressly foreclosed by the U.S. Supreme Court decision in *City of Oklahoma City v. Tuttle*, 471 U.S. 808 (1985). There, the Court held that it is not enough to show that a municipal custom or practice "might lead" to a constitutional violation. *Id*. at 823 n.8. Rather, the plaintiff must show an actual affirmative link between the policy and the particular constitutional violation alleged. *Id*.; accord *Bryan County,* 520 U.S. at 403) (noting that "a finding of [municipal] culpability [under *Monell*] simply cannot depend on the 'mere probability' of causation but rather that the constitutional deprivation was highly likely").

As the district court held, there is simply no evidence in the record that tends to show that any practice at Cermak actually caused Mr. Dixon's alleged injuries. For instance, while Mr. Dixon claims that one cause of his harm was the record keeping at Cermak, the district court noted there is no evidence to refute the fact that Dr. Bonaparte was aware of the mass in Mr. Dixon's chest. R. 173 at p. 20, A-40. At bot-

tom, the district court properly concluded that the moving force in this case was the clinical decisions that were made by the health care providers and not any practice or policy of Cermak. Thus, the district court did not err in granting the County's motion for summary judgment.

    A. **The District Court Did Not Err in Excluding Dr. Greifinger's Conclusory Opinion Testimony, But Even If It Had, Greifinger Offered No Reasoned Opinion on Causation To Show That a Policy or Practice of Cook County Was the Moving Force Behind Mr. Dixon's Alleged Harm.**

        1. **Dr. Greifinger provided no explanation for the conclusions he reached; thus the opinions he gave are both unreliable and irrelevant.**

Mr. Dixon also argues that Judge Durkin erred when he declined in his ruling on the summary judgment motion to consider the opinion testimony of Dr. Robert Greifinger, whose opinion had already been found to have been unreliable by Judge Leinenweber. R. 101, A-11. Oddly, Mr. Dixon now claims that Judge Durkin "sidestepped" the issue of the admissibility of the Greifinger opinion (Pl. Br. at 50), but in reality, the court reaffirmed Judge Leinenweber's determination that Greifinger's report was unreliable because he only provided a bottom line conclusion rather than explaining the basis for those conclusions. R. 173 at 18, A-38 citing R. 101 at 9, A-19.

In his September 25, 2012 ruling on the County's motion to strike Dr. Greifinger's report, Judge Leinenweber found three things: (1) Dr. Greifinger's knowledge, experience and training qualified him to offer an opinion in this case; (2) that despite being qualified to render an opinion in this case, the opinion that Greif-

inger provided was not reliable because his conclusions were not supported; and (3) that Greifinger's opinions were not relevant to the issues in this case. R. 101 at 9, A-19.

In his brief on appeal, Mr. Dixon focuses solely on the portion of Judge Leinenweber's ruling that found Dr. Greifinger to be qualified and conveniently ignores those portions of the order that found his opinion to be both unreliable and irrelevant. Defendants do not dispute that Dr. Greifinger is qualified to offer an opinion in this case. However, "[g]ood credentials may be a necessary condition for expert testimony but they are not a sufficient condition." *United States v. Moore*, 521 F.3d 681, 685 (7th Cir. 2008). "Qualifications alone do not suffice. A supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method and are reliable and relevant under the test set forth by the Supreme Court in *Daubert*." *Lewis v. Citgo Petroleum Corp.,* 561 F.3d 698, 705 (7th Cir. 2009).

With regard to Greifinger's failure to provide a rationale or explanation for his opinion, Mr. Dixon again claims that Greifinger based his opinions on his "vast experience" and thus did not need to provide any additional support for his opinions besides that experience. While it is true that an admissible opinion can be based on an expert's experience, the expert must still "explain the 'methodology and principles' that support his opinions; he cannot simply assert a 'bottom line.'" *Metavante Corp. v. Emigrant Sav. Bank,* 619 F.3d 748, 761 (7th Cir. 2010) (internal citations omitted).

*Metavante Corp.,* an opinion upon which Mr. Dixon also relies, illustrates the sort of opinions that is reliable even though the expert supports it with his experience alone. In that case, the expert was asked to opine on the commercial reasonableness of the plaintiff's performance of its contract to provide the defendant with certain financial services technology. The expert supported his opinion with his experience of having acquired similar technology for other financial service companies. In finding his opinion to be reliable, the Seventh Circuit noted that the expert did not "simply testify that [the plaintiff's] performance was commercially reasonable because he said so." *Id.* at 761. Instead, he explained that it was commercially reasonable because the plaintiff's performance of its contract enabled the defendant bank to achieve its business objective. *Id.* at 762.

As the *Metavante Corp.* decision emphasizes, the analysis showing how the expert reached his conclusions is the most important part of an expert's opinion. *Salgado v. General Motors Corp.*, 150 F.3d 735, 741 n. 6 (7th Cir. 1998) ("A complete [expert] report must include the substance of the testimony which an expert is expected to give on direct examination together with the reasons therefor...[It] must include 'how' and 'why' the expert reached a particular result, not merely the expert's conclusory opinions."). It is the explanation that enables the trier of fact to determine why the expert's conclusions should be given credit.

In contrast here, all of Greifinger's conclusions move from point A (the facts) to point C (his conclusion that the Cermak employees were deliberately indifferent to Mr. Dixon's medical needs) but fail to provide point B (his analysis or rationale for

44

reaching that conclusion). In the context of the *Metavante Corp.* case, it would be as if the financial expert omitted the section of his report where he explained that the fact that the defendant bank achieved its business objectives was his reason for finding the plaintiff to have acted in a commercially reasonable fashion, which was the part that this Court cited at being the basis for the opinion's admissibility. Greifinger does not explain the reason that he found the treatment provided to Mr. Dixon to be deliberately indifferent. He just states that it is so. In essence, Greifinger's support for his opinions amounts to "Trust me, I am an expert."

Instead of being similar to the expert's opinion in *Metavante Corp.*, Greifinger's opinion here is much like the opinion testimony of Detective Barnes in the case *United States v. Noel*, 581 F.3d 490 (7th Cir. 2009). The defendant in that case was charged with producing and possessing child pornography in violation of 18 U.S.C. §§ 2251(a) and 2252(a)(4)(B). Detective Barnes worked for the Indiana State Police and she conducted the examination of a computer that was seized from the defendant on which she found the pictures for which the defendant was being prosecuted. In the course of her testimony, Barnes opined that the pictures that she found met the federal definition of "pornographic."

On appeal, the defendant claimed that her testimony regarding whether the pictures were pornographic was not admissible either as lay opinion under Rule 701 or expert opinion under Rule 702. With regard to Rule 702, the Seventh Circuit agreed. It wrote:

> Barnes's "expert" testimony that the photos met the definition of child pornography was a bare conclusion that provided nothing but the bottom line,

> *i.e.*, that [the defendant] possessed illegal photos. Had Barnes provided some
> basis for this explanation, perhaps her testimony would have been of some
> use for the jury. But she did not do so. She, in essence, told the jury nothing
> more than, "I am familiar with the definition of child pornography, and this
> meets that definition because I said so."

*Id.* at 497. Thus, the district court did not err when it found Greifinger's unexplained opinion to be both unreliable and irrelevant.

> ### 2. Greifinger did not explain how any County practice was the cause of any constitutional injury to Mr. Dixon.

Moreover, even if Greifinger's opinion testimony was admissible, he never actually opined on the issue of causation. Much like Mr. Dixon, Greifinger apparently believed that the mere fact that there were deficiencies in various aspects of the delivery of medical care at Cermak necessarily meant that those deficiencies caused the harm that Mr. Dixon allegedly suffered. As Judge Durkin pointed out, Greifinger only stated that Mr. Dixon should have been transferred to Stroger Hospital earlier, but offers no opinion, admissible or otherwise, regarding how some of the allegedly deficient practices at Cermak caused the delay. R. 173 at 19, A-39.

Accordingly, the most that can be said about Greifinger's opinion is that he establishes that there were practices at Cermak that could have led to constitutionally inadequate medical care. However, he offers no explanation as to how those practices were the moving force behind the alleged constitutionally inadequate care that Mr. Dixon received at Cermak. Instead, Greifinger paints with a broad brush to claim that any medical mistake made by any Cermak employee directly related back to the customs and practices at Cermak. In essence, Greifinger's opinion with

regard to the County's liability is premised more on a *respondeat* theory than *Monell*, and that is not permitted. *See Bryan County*, 520 U.S. at 410 ("where a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into *respondeat* superior liability").

Greifinger's opinion here is akin to the opinion of the plaintiff's expert in *Estate of Novack v. County of Wood*, 226 F.3d 525 (7th Cir. 2000), which this Court found to be inadequate to establish *Monell* liability for the defendant county. There, the plaintiff offered the opinion testimony of a psychiatrist who pointed out "numerous flaws in the [defendant's] policies for treating mentally ill inmates and state[d] the opinion that these deficiencies contributed to [the plaintiff's] death." *Id*. at 532. The court held that the most that could be said of that opinion was that it demonstrated that some of defendant's employees could have done more to prevent the plaintiff's suicide; it did not show that there was any policy or practice that was the actual cause of the injury. *Id.*

So too here. Greifinger's opinion recites a number of alleged problems with the delivery of health care at Cermak but he offers no explanation as to how those problems actually caused Mr. Dixon harm. He just speculates that the practice he cited must have been the cause of Mr. Dixon's injury. But such speculation does not suffice to show causation in a *Monell* claim. *Bryan County*, 520 U.S. at 403 (noting that "a finding of [municipal] culpability [under *Monell*] simply cannot depend on the mere probability" of causation but rather that the constitutional deprivation was highly likely"). As the district court noted, there was nothing in Greifinger's opinion

that showed that "the deficiency in County policy *caused* Dixon's care to occur in the timeframe that it did." R. 173 at 19, A-39 (emphasis in original). Thus, Greifinger's opinion, even if it was reliable and/or relevant, would not have defeated the County's summary judgment motion. Accordingly, since the record in this case is devoid of any evidence that any practice or policy at Cermak was the moving force behind any injury that Mr. Dixon experienced, this Court should affirm the order granting the County summary judgment on Mr. Dixon's *Monell* claim.

## CONCLUSION

For all of the above-stated reasons, Defendants-Appellees Dr. Katina Bonaparte and Nurse Newworld Aboigbe respectfully requests that this Court affirm the decision of the district court granting their motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). Defendant-Appellee Cook County respectfully requests that this Court affirm the decision of the district court granting its motion for summary judgment pursuant to Federal Rule of Civil Procedure 56.

Respectfully submitted,

ANITA ALVAREZ
State's Attorney of Cook County
By:  /s/ *Thomas Cargie*
ARDC # 6210034

Maureen O. Hannon
Supervisor, Conflicts Counsel Unit

*Counsel for Defendants-Appellees Katina Bonaparte, M.D., Newworld Aboigbe, R.N. and the County of Cook.*

48

## CERTIFICATE OF COMPLIANCE WITH Fed. R. App. P. 32(a)(7)(C) AND CIRCUIT RULE 32

The undersigned, an attorney, certifies that the Appellees' Brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(C) and Circuit Rule 32. The Brief was prepared using Microsoft Word, version 2010, contains 13,535 words, 1100 lines, and is 48 pages long.

_/s/ Thomas Cargie_

Thomas Cargie
Assistant State's Attorney
69 West Washington Street
Suite 2030
Chicago, Illinois 60602
(312) 603-1426

_Counsel for Defendants-Appellees_

## CERTIFICATE OF SERVICE

I hereby certify that on June 26, 2015, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Thomas Cargie*
Thomas Cargie
Assistant State's Attorney
69 West Washington Street
Suite 2030
Chicago, Illinois 60602
(312) 603-1426

*Counsel for Defendants-Appellees*